## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| Nos. 18-2297 & 18-2323 | Nos. 19-1057 & 19-1058 |
|---|---|

**Pennsylvania Professional Liability Joint Underwriting Association**

*Appellee*

*v.*

**Governor of the Commonwealth of Pennsylvania and The General Assembly of the Commonwealth of Pennsylvania,**

*Appellants*.

**Pennsylvania Professional Liability Joint Underwriting Association**

*Appellee*

*v.*

**Governor of Pennsylvania, Insurance Commissioner of Pennsylvania, President Pro Tempore of Pennsylvania Senate, Speaker of Pennsylvania House of Representatives, Minority Leader of Pennsylvania House of Representatives,**

*Appellants*.

On appeal from the United States District Court, Middle District of Pennsylvania at Nos. 17-2041 & 18-1308 (The Honorable Christopher C. Conner)

## BRIEF OF APPELLEE PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION

Kevin J. McKeon, I.D. # 30428
Dennis A. Whitaker, I.D. #53975
Melissa A. Chapaska, I.D. # 319449
Hawke McKeon & Sniscak, LLP
100 North Tenth Street
Harrisburg, PA  17101
(717) 236-1300
(717) 236-4841 (facsimile)
*Counsel for Plaintiff-Appellee Pennsylvania Professional  Liability Joint Underwriting Association*

DATE: April 25, 2019

## CORPORATE DISCLOSURE

Appellant Pennsylvania Professional Liability Joint Underwriting Association ("JUA") is nonprofit joint underwriting association. JUA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Corporate Disclosure** ...........................................................................2

**Table of Authorities** ...........................................................................5

**Counterstatement of the Issue** ............................................................9

**Counterstatement of the Case** ...........................................................10

   I.   JUA's Pre-Act 44 and Act 41 Existence....................................10

   II.  Act 44 ..............................................................................13

   III.  Act 41 .............................................................................13

**Summary of Argument**........................................................................14

**Argument** .........................................................................................16

   I.   The District Court's Holistic Approach to Determining that JUA
is a Private Entity is Correct; the General Assembly's Alternative
has No Basis .......................................................................16

      A.  The Question Presented is Whether the Entity is Part of the
State, not Whether the Entity was Created by State Statute.................18

      B.  The District Court is Correct; JUA is not Part of the State, and
its Assets are Private Property Protected by the Fifth Amendment ......28

   II.  The District Court's Conclusion that JUA is a Private Entity is
Correct; the Governor's New Arguments to the Contrary
Are Meritless.......................................................................39

      A.  The District Court Correctly Concluded that JUA is a Distinct
Entity with Rights of its Own, notwithstanding the Governor's
Unpreserved Argument Concerning the Unincorporated Nonprofit
Association Law....................................................................41

      B.  The District Court Correctly Distinguished the Insurance
Commissioner's Regulatory Authority over JUA from
State Control of a Public Entity ...............................................51

      C.  The District Court Correctly Determined that JUA's Members
have an Interest in JUA's Property and Purpose .................................54

      D.  The District Court Correctly Applied Its Multi-Factor Test.................58

III.   The District Court's Decision is Consistent with
       Principles of Federalism..................................................................61

**Conclusion**....................................................................................................**63**

**Combined Certifications of Counsel** ........................................................**64**

**Excerpt of Governor Wolf's Answering Brief in JUA I
pursuant to LAR 30.3(a)** ...........................................................................**65**

**Addendum of Statutes pursuant to FRAP 28(f)** .....................................**73**

1.  Excerpts of Pennsylvania Health Care Services
    Malpractice Act of 1975 ................................................................74

2.  Excerpts of Pennsylvania Medical Care Availability
    and Reduction of Error Act ......................................................... 84

3.  Pennsylvania Uniform Unincorporated Nonprofit Association Law,
    15 Pa. C.S. §§ 9111 et seq. ........................................................103

# TABLE OF AUTHORITIES

## Cases

*Amato v Wilentz*,
  952 F2d 742 (3d Cir. 1991)...................................................18

*Arroyo-Melecio v. Puerto Rican American Ins. Co.*,
  398 F.3d 56 (1st Cir. 2005) ............................................ 17, 23, 36, 38

*Asociacion de Subscripción Conjunta del Seguro*
  *de Responsabilidad Obligatorio v. Flores Galarza*,
  484 F.3d 1 (1st Cir. 2007) ........................................... passim

*AstenJohnson, Inc. v. Columbia Cas. Co.*,
  562 F.3d 213 (3d Cir. 2009)...............................................55

*Barna v. Bd. of Sch. Dir. of Panther Valley Sch. Dist.*,
  877 F. 3d 136 (3d Cir. 2017)............................................ 41, 42, 43

*Bd. of Levee Comm'rs of the Orleans Levee Bd. v. Huls*,
  852 F.2d 140 (5th Cir. 1988).............................................19

*City of Hugo v. Nichols,*
  656 F.3d 1251, 1255 (10th Cir. 2011) ...................................18

*City of Trenton v. New Jersey*,
  262 U.S. 182 (1923) ................................................ 18, 19, 27, 30

*Coleman v. Miller*,
  307 U.S. 433 (1939)......................................................19

*Equitable Gas Co. v. City of Pittsburgh*,
  488 A.2d 270 (Pa. 1985) ................................................50

*Florida Residential Prop. & Cas. Joint Underwriting Ass'n v. United States*,
  207 F. Supp. 2d 1344 (N.D. Fla. 2002)..................................12

*General Refractories Co. v. First State Ins. Co.*,
  855 F. 3d 152 (3d Cir. 2017)............................................43

*Hous. Auth. of Kaw Taw Tribe of Indians of Oklahoma v. City of Ponca City*,
  952 F. 2d 1183 (10th Cir. 1991) ........................................19

*Hunter v. Pittsburgh*,
  207 U.S. 161 (1907) ....................................................30

*Illinois Clean Energy Foundation v. Filan*,
    392 F. 3d 934 (7th Cir. 2004)........................................................ 35, 59

*Kelley v. Metro. Cnty. Bd. of Educ.*,
    836 F.2d 986, 998 (6th Cir. 1987) ...........................................30

*Leatherman v. Wolf*,
    88 A. 17 (Pa. 1913) ...................................................................57

*Maliandi v. Montclair State Univ.*,
    845 F.3d 77 (3d Cir. 2016)........................................................24

*Med. Malpractice Ins. Ass'n v. Superintendent of Ins.*,
    533 N.E.2d 1030 (N.Y. 1988) .......................................... passim

*Mississippi Surplus Lines Ass'n. v. Mississippi*,
    261 Fed. App'x 781 (5th Cir. 2008) ............................... passim

*Nationwide Mut. Ins. Co. v. Com.*,
    324 A.2d 878 (Pa. Cmwlth. 1974) ...........................................53

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987) ...................................................................56

*Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*,
    870 F.3d 244 (3d Cir. 2017)......................................................16

*Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
    327 F.Supp.3d 767 (M.D. Pa. 2018) ........................................55

*Palomar Pomerado Health Sys. v. Belshe*,
    180 F.3d 1104 (9th Cir. 1999) ..................................................20

*Pennsylvania Blue Shield v. Dept. of Health*,
    500 A.2d 1244, 1249 (Pa. Cmwlth. 1993) ..............................53

*Pennsylvania State Univ. v. Derry Twp. Sch. Dist.*,
    731 A.2d 1272 (Pa. 1999) .........................................................27

*Philadelphia Nat. Bank v. United States*,
    666 F. 2d 834 (3d Cir. 1981).....................................................27

*Philadelphia v. Beretta U.S.A*,
    126 F. Supp. 2d 882 (E.D. Pa. 2000) ......................................19

*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*,
    442 Fed. Appx. 681 (3d Cir. 2011)................................ 18, 21, 22, 46

*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.,*
   908 F. Supp. 2d 597 (M.D. Pa. 2012) ........................................................ 18, 22

*S. Macomb Disposal Auth. v. Wash. Twp.,*
   790 F.2d 500 (6th Cir. 1986).................................................................... 19, 30

*School Dist. of Phila. v. Penn. Milk Mktg. Bd.,*
   877 F. Supp. 245 (E.D. Pa. 1995) .................................................................19

*Texas Catastrophe Prop. Ins. Ass'n v. Morales,*
   975 F. 2d 1178 (5th Cir. 1992) ............................................................ passim

*Tri-Arc Fin. Servs., Inc. v. Evanston Ins. Co.,*
   725 Fed. App'x 97 (3d Cir. 2018)...................................................................42

*Trustees of Dartmouth College v. Woodward,*
   17 U.S. (4 Wheat.) 518 (1819)........................................................... passim

*United States v. Alabama,*
   791 F. 2d 1450 (11th Cir. 1997) ...................................................................27

*United States v. Olano,*
   507 U.S. 725 (1993) .............................................................................. 41, 42

*Williams v. Mayor of Balt.,*
   289 U.S. 36 (1933) .......................................................................................19

**Statutes**

1 Pa. C.S. § 1921 ............................................................................................50

1 Pa. C.S. § 1991 ..................................................................................... 19, 44

40 P.S. § 59 .....................................................................................................52

40 P.S. § 911 ...................................................................................................52

40 Pa. C.S. §§ 6301-6335 ...............................................................................53

68 Pa. C.S. 5301 .............................................................................................27

Limited Liability Company Act,
   Act of Dec. 7, 1994 (P.L. 703, No. 106)........................................................45

Pennsylvania Act 41 of 2018, P.L. 273 (June 22, 2018),
   codified in pertinent part at 40 P.S. §323.1-A, et seq. ................................ passim

Pennsylvania Act 44 of 2017, P.L. 725 (Oct. 30, 2017),
    codified in pertinent part at 72 P.S. § 201-D, et seq. ............................ 10, 13, 28

Pennsylvania General Associations Act,
    Act of Oct. 1, 1988, P.L. 1444, No. 177 ...................................................... 49, 51

Pennsylvania Health Care Services Malpractice Act of 1975,
    P.L. 390, No. 111 (Oct. 15, 1975),
    formerly codified at 40 P.S. §§ 1301.101, *et seq.* ................................... 10, 12, 48

Pennsylvania Medical Care Availability and Reduction of Error Act,
    Act 13, P.L. 154 (Mar. 20, 2002),
    codified at 40 P.S. §§ 1303.101, *et seq.* ...................................................... passim

Pennsylvania Uniform Unincorporated Nonprofit Association Law,
    15 Pa. C.S. §§ 9111 et seq ............................................................................. passim

**Rules**

Fed. R. Civ. P. 56 .....................................................................................................16

## COUNTERSTATEMENT OF THE ISSUE

JUA was established in 1975 as an unincorporated nonprofit association of all Pennsylvania insurers to offer medical professional liability insurance to health care providers who "cannot conveniently obtain it" through other sources. (A.0093-0098). For over 40 years JUA has been operated and regulated as a private insurer, staffed by private-sector employees, governed by a private member-dominated board, funded exclusively through privately-paid premiums, entrusted with its private reserve and surplus, and burdened with its own liabilities. (A.0121). In 2017 and 2018 the General Assembly needed funds to balance the budget and passed statutes declaring JUA a state "instrumentality" and demanding surrender of JUA's surplus to the General Fund. The District Court twice found this legislation to be unconstitutional takings of JUA's private property in contravention of the Fifth Amendment.  The issue thus presented by the General Assembly's (including its leaders) and the Governor's (including the Insurance Commissioner) appeals is:

1.  Did the District Court correctly hold that JUA is a private entity with private funds warranting protection from a governmental taking under the Fifth Amendment, given the way JUA was established by statute, JUA's private function, historical autonomy from the state, statutory treatment and private non-state funding source?

## COUNTERSTATEMENT OF THE CASE[1]

### I.    JUA's Pre-Act 44 and Act 41 Existence

JUA has been a private nonprofit entity separate and apart from the Commonwealth since inception.  The Pennsylvania Health Care Services Malpractice Act of 1975, P.L. 390, No. 111 (Oct. 15, 1975), formerly codified at 40 P.S. §§ 1301.101, *et seq.* (the "CAT Fund statute") gave Pennsylvania's Insurance Commissioner an option:  Assure that "professional liability insurance" will be available to health care providers who cannot otherwise obtain it, either through a plan established as part of Pennsylvania's government, or through a non-government plan established and governed by private insurers subject to the commissioner's regulatory authority and supervision. (A.0094).  The commissioner chose the non-governmental option – a joint underwriting association – and approved JUA's operations plan. (A.0043); 40 P.S. § 1301.803 (superseded) (A.0733). That approved plan correctly described JUA as "a non-profit unincorporated association constituting a legal entity separate and distinct from its members." (A.0775 ¶ 2).

From 1975 through 2002, JUA was governed by a board controlled by its private insurer members (A.0606; A.0777-0778, Art. VI), funded by premiums

---

[1] JUA is satisfied with the General Assembly's "Relevant Procedural History," Br. at 2-4.

paid by health care providers in exchange for JUA's acceptance of risk (A.0042; A.0097-0098), staffed by private sector employees who enjoyed no state health or pension benefits (A.0037; A.0613-0614 ¶¶ 70-72), quartered in office space privately leased and paid for (A.0614 ¶ 73), subjected to taxation like any other non-governmental, nonprofit entity (A.0606 ¶¶ 20-21; A.0611-0612 ¶¶ 55-57; A.0992-0998), free of public disclosure requirements like other non-governmental entities (A.0614-0616 ¶¶ 77-82), and regulated in its sale of insurance like any other private insurer (A.0121; A.0612-0613 ¶¶ 58-64).

When the Pennsylvania Medical Care Availability and Reduction of Error Act, Act 13, P.L. 154 (Mar. 20, 2002), codified at 40 P.S. §§1303.101, *et seq.* ("MCARE statute") replaced the CAT Fund statute in 2002, the legislature hardwired into it the non-governmental model. It "established" the already-existing JUA as a separate legal entity – a nonprofit association. (A.0095-0096, *citing* 40 P.S. § 1303.731(a)). The MCARE statute made other changes from the CAT Fund statute that confirm JUA's non-governmental status. First, while the CAT Fund statute empowered the commissioner to "dissolve the plan" if deemed necessary (A.0608 ¶¶ 30, 32; A.0734-0735; A.0843-0884), dissolution is not mentioned in the MCARE statute. Second, while the CAT Fund statute authorized JUA to borrow from the government-run CAT Fund in the event of a deficit, that never-used opportunity was eliminated and replaced with private borrowing.

(A.0608-0609 ¶¶ 33-36); 40 P.S. § 1301.803 (superseded) (A.0733-0734); 40 P.S. § 1303.733 (A.0875). Third, while the CAT Fund statute was silent regarding the Commonwealth's responsibility for JUA's liabilities, the MCARE statute stated that the JUA's liabilities are not Commonwealth or General Fund liabilities. 40 P.S. § 1303.731(c) (A.0875); (A.0097).  Fourth, while the CAT Fund statute did not require JUA to be nonprofit, the MCARE statute did, 40 P.S. § 1303.731(a) (A.0874), a designation entirely superfluous if JUA was deemed part of the Commonwealth.[2]

The MCARE statute provided that, other than these changes, JUA was to continue as it had previously. 40 P.S. §§ 1303.5104-5107 (A.0883). Its treatment of JUA as an independent non-governmental legal entity dovetails with Pennsylvania law.  An unincorporated nonprofit association "is a legal entity distinct from its members and managers." 15 Pa. C.S. § 9114(a). Such an association has "the same powers as an individual to do all things necessary or convenient to carry on its purposes," *Id.* § 9114(c), and "all matters relating to the activities of the nonprofit association are decided by its managers" *i.e.*, JUA's private member-controlled board, *Id.* § 9128(5).  *See generally Id.* §§ 9111-9135

---

[2] *See Florida Residential Prop. & Cas. Joint Underwriting Ass'n v. United States*, 207 F. Supp. 2d 1344, 1349 (N.D. Fla. 2002) ("income earned by an integral part of a state or a political subdivision of a state is not taxable in the absence of a specific statutory authorization to tax that income.").

(inclusive provisions of the Pennsylvania Uniform Unincorporated Nonprofit Association Law (Unincorporated Nonprofit Association Law)).

## II.    Act 44

Forty-two years into JUA's existence as a private nonprofit association, Act 44 of 2017 made a "finding" that JUA "is an instrumentality of the Commonwealth" and that its money "belongs to the Commonwealth." § 201-D (A.0257).  Act 44 then mandated that by December 1, 2017, JUA "shall pay the sum of $200,000,000 to the State Treasurer for deposit in the General Fund" or the JUA would be abolished and all of its assets transferred to the Insurance Commissioner. § 203-D (A.0258-0259). The District Court preliminarily enjoined Act 44 in advance of the December 1 deadline, and permanently enjoined Act 44 on May 17, 2018 (*JUA I*), reasoning that Act 44 effected a taking of JUA's private property.

## III.    Act 41

Act 41 of 2018, enacted on the heels of *JUA I* on June 22, 2018, purported to make JUA and all of its assets part of the Insurance Department, effective July 22, 2018. (A.2180-2187). The District Court preliminarily enjoined Act 41 in advance of the July 22 deadline, and permanently enjoined Act 41 on December 18, 2018 (*JUA II*), reasoning that Act 41 likewise effected a taking of JUA's private property. (A.0121-0127).

13

## SUMMARY OF ARGUMENT

The District Court correctly decided that JUA, examined holistically in light of its private nonprofit function, historical autonomy from the state, responsibility for its own liabilities, statutory treatment, and private non-state funding, is not part of the state but rather is a private entity whose assets are protected by the Fifth Amendment's Takings Clause. (A.0048; A.0126). The General Assembly and the Governor seek reversal by attacking the District Court's decisions from opposite directions.  The General Assembly attacks the District Court's analytical approach, arguing that it exhibits "fundamental confusion" in selecting the proper test to apply to determine public versus private entity status,  whereas the correct approach asks only whether JUA was created by statute; because it was, JUA is a "creature of the state" precluded from invoking the Fifth Amendment's protection against the uncompensated government taking that occurred here.  These grounds for reversal are baseless. Neither the General Assembly's critique of the District Court's analytical approach nor its own "statutory creation" alternative finds any support in case law. The General Assembly's fallback attempt to distinguish the cases from other circuits in which federal courts have stepped in to protect similarly situated state-created insurance associations from similarly overreaching state statutes, Br. at 47-55, fares no better.

The Governor for his part accepts the District Court's holistic analytical approach  but attacks the court's conclusion that JUA is a private entity, pointing to alleged differences between JUA and the private entities to which the court analogized JUA. Br. at 33-39.  To fuel the attack, the Governor manufactures alleged differences between JUA and other entities found to be private. Br. at 21-33.  These arguments are meritless. Moreover, the primary argument, which alleges the inapplicability of the Unincorporated Nonprofit Association Law, Br. at 21-27, debuts on appeal and contradicts the position the Governor took below. It is waived.

Finally, both the General Assembly, Br. at 16-18, and Governor, Br. at 39-42, accuse the District Court of undermining federalism by interfering with the General Assembly's policy choices. But as the District Court correctly responded, where a state statute abridges constitutionally protected rights, core concepts of federalism also impose a duty of review from which the federal courts "dare not shrink." (A.0122, *quoting Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 625 (1819)).

The District Court's decisions should be affirmed.

# ARGUMENT

*Standard of review:*

This Court exercises "plenary review of a district court's resolution of cross-motions for summary judgment" and applies "the same standard as did the district court." *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 870 F.3d 244, 252-53 (3d Cir. 2017). This Court will "affirm a grant of summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## I.     The District Court's Holistic Approach to Determining that JUA is a Private Entity is Correct; the General Assembly's Alternative has No Basis

The General Assembly maintains, as it did below, that because JUA is a "statutory creation" it is "indisputably a 'creature of the state'" and cannot "'challenge its maker's decisions on Constitutional grounds,'" Br. at 19, unless it is asserting claims on behalf of private individuals or has statutory authorization to sue.  Br. at 29-30.  No court has ever adopted this facile theory. Instead, the approach favored since *Dartmouth College* when deciding whether an entity such as JUA, that is not a traditional political subdivision or other obvious state governmental entity, is prohibited from suing to protect its constitutional rights because it is "part of the state," has been more nuanced, based on the totality of the entity's attributes.  As the District Court explained:

16

Defendants insist that we need not look beyond the fact of state creation to define [JUA's] relationship with the state. But for all of the ink spilled on the issue, neither defendant identifies a single decision that turns *exclusively* on the fact that an association was created by statute. Our research reveals no support for this uncritical proposition.

(A.0031) (emphasis in original).

…. Instead, all courts facing our present inquiry have holistically examined the entity's relationship with the state. *See Asociacion [de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 20 (1st Cir. 2007) (adopting *Arroyo-Melecio v. Puerto Rican American Insurance Co.*, 398 F.3d 56, 60-63 (1st Cir. 2005)); *Texas Catastrophe Prop. Ins. Ass'n v. Morales*, 975 F. 2d 1178, 1181-83 (5th Cir. 1992); *Mississippi Surplus Lines Ass'n. v. Mississippi*, 261 Fed. App'x 781, 784-86 (5th Cir. 2008) (*MSLA*); *Med. Malpractice Ins. Ass'n v. Superintendent of Ins.*, 533 N.E.2d 1030, 1031, 1036-1037 (N.Y. 1988) (*MMIA*)]. These courts have considered a variety of factors, including the nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted to the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated. Viewed through this prism, we are compelled to find that [JUA] is a private entity as a matter of law.

(A.0037).

Challenging the District Court's conclusions on appeal, the General Assembly repackages its arguments but remains unable to cite any authority to support its "uncritical proposition" that JUA's state creation is determinative. The court was correct in its approach and in its conclusion that JUA is not the state, but rather a private entity possessed of private property.

17

## A. The Question Presented is Whether the Entity is Part of the State, not Whether the Entity was Created by State Statute

### 1. Traditional political subdivisions are "part of the state"

The "proposition that a municipal corporation cannot sue the state," *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.,* 442 Fed. Appx. 681, 687 (3d Cir. 2011) (*Pocono I*), *on remand*, 908 F. Supp. 2d 597 (M.D. Pa. 2012) (*Pocono II*), also known as the political subdivision standing doctrine, *City of Hugo v. Nichols*, 656 F.3d 1251, 1255 (10th Cir. 2011), is well established. *Amato v Wilentz*, 952 F2d 742, 754-55 (3d Cir. 1991) (recognizing the doctrine as the "law of the land" that dates from *Dartmouth College*). The rationale is that:

> [a] municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will.

*City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). The legal rule inherent in the political subdivision standing doctrine, therefore, is not that an entity "created by a state statute" may not sue the state, but rather that an entity that is a part of or a subset of the state government may not.

The question, then, is whether an entity that seeks to vindicate constitutional rights against the state is "part of the state." As the Fifth Circuit posed the question in a situation similar to JUA's: "The … question is whether CATPOOL [a Texas insurance association similar to JUA] is part of the state. For if … [it is], it cannot

make any constitutional claims against the state….").  *Morales*, <u>975 F. 2d at 1181-82</u> (finding CATPOOL to be a private entity).

The answer is straightforward if the entity is a traditional political subdivision; a city, township, county, or school district simply cannot sue to vindicate constitutional rights against the state.[3]  This is the situation in almost every case the General Assembly cites –  straightforward applications of the political subdivision standing doctrine with little or no need to inquire about the entity's status or attributes once the easily ascertainable objective fact is established that the entity asserting claims against the state is a traditional political subdivision.[4]

---

[3] In Pennsylvania, a political subdivision is defined as "any county, city, borough, incorporated town, township, school district, vocational school district or county institution district." 1 <u>Pa. C.S. § 1991</u>.

[4] The General Assembly cites: *Coleman v. Miller*, <u>307 U.S. 433</u> (1939) (Kansas state senators' suit against Kansas secretary of state); *Williams v. Mayor of Balt.*, <u>289 U.S. 36, 40</u> (1933) (city vs. state); *City of Trenton, supra.* (city vs. state); *Hous. Auth. of Kaw Taw Tribe of Indians of Oklahoma v. City of Ponca City*, <u>952 F. 2d 1183, 1188</u> (10th Cir. 1991) (housing authority designated by state statute as a state agency vs. city); *Bd. of Levee Comm'rs of the Orleans Levee Bd. v. Huls*, <u>852 F.2d 140</u> (5th Cir. 1988) (levee board that was undisputed state agency vs. state); *S. Macomb Disposal Auth. v.Wash. Twp.*, <u>790 F.2d 500</u> (6th Cir. 1986) (municipal corporation vs. township); *Philadelphia v. Beretta U.S.A,* <u>126 F. Supp. 2d 882</u> (E.D. Pa. 2000) (city vs. state); *School Dist. of Phila. v. Penn. Milk Mktg. Bd.*, <u>877 F. Supp. 245</u> (E.D. Pa. 1995) (school district vs. state agency).

2.  <u>Entities that are not traditional political subdivisions require analysis</u>

The answer to the "is the entity part of the state" question requires more effort, however, where under state law the entity's public/private status is not obvious.[5]  In such cases, the federal courts, as long ago as *Dartmouth College*, have undertaken a searching analysis of the entity's attributes to determine whether the entity is public, and thus beyond the Fifth Amendment's protections, or private, and thus within them.

In *Dartmouth College* the Court considered a multiplicity of factors that differentiate public entities from private entities. Similar to the criteria used by the District Court (which examined the "relationship to the state through the prism of, *inter alia*, its function, autonomy, and statutory treatment as well as the nature (including the source) of its funds," A.0120-0121),  *Dartmouth College* considered whether the state legislature had conferred "political power" on the college for the "administration of the government," whether its funds were "public property" supplied by the government, and whether the state alone had an interest "in its transactions":

An act of incorporation be a grant of political power, if it create

_____

[5] The General Assembly cites *Palomar Pomerado Health Sys. v. Belshe*, <u>180 F.3d</u> <u>1104</u> (9th Cir. 1999) for the proposition that the doctrine applies broadly to all state-created entities, but that case involved a health care district classified under California law as a "political subdivision" of the state. *Id.* at 1107-1108.

> a civil institution, to be employed in the administration of the government, or if the funds of the college be public property, or if the state of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

*Dartmouth College* at 629-30.

As part of this analysis, the Court also considered and rejected the notions: that by providing education, a public good the government also could provide, the college's trustees and employees had become part of the government, *id*. at 634-35; that the college's purpose was to benefit the citizens of the state rather than the students of the college, *id*. at 639-40; and that, because neither the college's donors nor its students could complain or establish an injury from the state takeover, but only the trustees, state interference and redirection of funds could be permissible, *id*. at 641-46.

The General Assembly mischaracterizes the holding in *Dartmouth College* as having divided the world into "entities [the state] creates" (that may not sue the state) and "those it merely charters" (that may sue the state).  Br. at 21.  But as this overview of the Court's analysis reveals, no fair reading of the text supports that simplistic formula.  The Court did the work needed to discern whether the college's attributes made it part of the state.

*Pocono I and II* are more recent examples of entity attribute examination in

this context.  In *Pocono I*, where a charter school sued its chartering school district, this court remanded to the district court to determine "to what extent the Charter School's association with and relationship to the school district" bars it from "suing the district." *Id.* at 686-87.  On remand, the court looked exhaustively at the charter school's attributes and its relationship to the school district, ultimately concluding that the charter school was part of the state.  The court considered the facts that a charter school had a budget funded entirely from its school district's public funds, was required to observe nonsectarian and nondiscriminatory policies, was required to participate in PSSA testing, and faced a yearly evaluation that could result in revocation of its charter. *Pocono II* at 611-612.  The court also noted that charter schools are subject to the Right to Know Act. *Id.* at 612.

Closer to JUA's circumstances, the District Court here, in addition to reviewing the process used by the courts in *Dartmouth College* (A.0113-0115), and *Pocono I and II* (A.0026-0027), examined the manner in which other federal and state courts analyzed whether state-created insurance associations similar to JUA are "part of the state" for purposes of standing to sue the states that created them to vindicate constitutional rights.  As the District Court summarized, in each of those cases the courts employed the type of multi-factor holistic test the court adopted and utilized here:

> [W]e looked to other cases involving constitutional claims brought by state-created insurance associations. … which

included the Fifth Circuit's decision in *Texas Catastrophe Property Insurance Ass'n v. Morales*, 975 F.2d 1178 (5th Cir. 1992); the First Circuit's decisions in *Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), and *Arroyo-Melecio v. Puerto Rican American Insurance Co.*, 398 F.3d 56 (1st Cir. 2005); and the New York Court of Appeals' decision in *Medical Malpractice Insurance Ass'n v. Superintendent of Insurance* ("MMIA"), 533 N.E.2d 1030 (N.Y. 1988). In each of those cases, we determined, the courts "holistically examined the entity's relationship to the state," by examining such considerations as the "nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted to the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated."

(A.0116 (citations omitted)).

The General Assembly's many criticisms of the District Court's holistic approach are convoluted; none is convincing. For example, oblivious to the fact that *Dartmouth College* used just such a holistic approach, the General Assembly berates the District Court for "sit[ting] in judgment of what constitutes 'the administration of government'" and "creat[ing] a federal taxonomy of 'public' and 'private' entities.'" Br. at 25. But the court was merely responding to the General Assembly's advocacy that *Dartmouth College* requires a finding that JUA is the state. The court allowed that the opposite may be true, and that at a minimum JUA "does not fit neatly into any of the categories of public entities described in *Dartmouth*." (A.0115). Making judgments of this type is precisely what the Court did in *Dartmouth College*, and what is required in order to discern whether an

23

entity that is not a traditional political subdivision but that has some state involvement and that seeks to sue the state, is public or private.

Similarly, the General Assembly argues that the District Court's holistic approach "exemplifies fundamental confusion" because in rejecting the "state creation is determinative" approach, Br. at 31, and adopting a multi-factor approach, the court blundered into using a test similar to Eleventh Amendment immunity analysis that ignores the dictates of federalism and disregards state law in deciding whether JUA is public or private. Br. at 34-37. But it is the General Assembly that exhibits confusion.  First, all of these arguments presuppose the validity of the General Assembly's "state creation is determinative" approach which, as discussed *infra*, is unsupported and meritless. Second, while the holistic approach adopted by the District Court shares some of the factors examined in Eleventh Amendment analysis, including whether the state is liable for the entity's obligations, the entity's status under state law, and the entity's degree of autonomy from the state, *see, e.g.*, *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016), the District Court's test is broader, more flexible, more detailed, and more deferential to the state:

> courts typically look to a number of nonexhaustive considerations in assessing the public-versus-private nature of state-affiliated insurance associations, including "the nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted the association), and the statutory treatment, if

any, of the entity, in addition to the nature of the funds
implicated."

(A.0106, *quoting* A.0037).

Third, the District Court's holistic test expressly includes, and is
dispositively influenced by, the way state law treats the entity in question. (A.0116
(object is to "'holistically examine[] the entity's relationship to the state'")).  In
applying this test, the court was faithful to Pennsylvania law, comprehensively
examining JUA's relationship to the state under the applicable Pennsylvania
statutes, (A.0036-0043), even to the point of correcting the General Assembly's
erroneous representations concerning the operation of the insurance statutes in
question. (*See* A.0039-0040 (rejecting as "simply incorrect" the General
Assembly's assertion that the Insurance Commissioner has revisionary power over
JUA's rates)).

For two hundred years, federal courts have been answering the "is the entity
part of the state?" question for purposes of deciding whether an entity that is not
obviously a political subdivision has standing to sue the state to vindicate
constitutional rights.  In doing so, they have used some version of the attribute test
employed by the District Court here. The notion that such a test is unnecessary or
overly intrusive on state sovereignty is baseless.[6]

---

[6] The General Assembly's complaints that the District Court "ignored" statements
by Pennsylvania's Commonwealth Court that describe JUA as a "statutory facility"

### 3.  "State creation is determinative" is a useless construct

The General Assembly's sole support for its claim that "state creation is

determinative" is a series of snippets from political subdivision standing doctrine

cases in which local governments and other political subdivisions are described as

"creatures of the state" that cannot challenge their makers' decisions on

constitutional grounds.  *See, e.g.* Br. at 19, 27-29, 32-35. As the District Court

observed, the General Assembly's claim is an "uncritical proposition,"

unsupported by any case law and never explicated by the General Assembly.

(A.0031). The General Assembly has not redressed that void on appeal.  It thus is

reasonable to surmise that the General Assembly simply assumes from these

"creature of the state" references that refer expressly to political subdivisions that

are indisputably part of government that any entity created by the state is part of

the state.  *See* Br. at 28 n. 9 ("no extensive 'analysis' is necessary [for the

proposition that state creation makes an entity part of the state for purposes of the

---

and a "statutory insurance pool," and "glossed over" the MCARE Act's statement
that JUA's purpose is to provide insurance to those who cannot obtain it through
"ordinary" methods, Br. at 36-37, only highlight the weakness of the argument that
JUA is the state.  No one disputes that JUA was created by statute to provide
insurance to those who cannot conveniently obtain it through "ordinary" methods,
but that does not make JUA the state.  And while the Commonwealth Court's
descriptions of JUA, which had no impact on the legal issues in those cases, are
factually accurate, the fact that it called JUA a "statutory facility" contributes
nothing to the debate whether JUA is the state.

prohibition on suit] when dealing with a state-created entity.")[7] But the proposition is hardly self-evident; indeed, it is a *non sequitur*.[8]

The justification for the political subdivision standing doctrine is the fact that "[a] municipality is merely a department of the state," *City of Trenton* at 187. The justification for the "state creation is determinative" approach cannot rest on this rationale, because JUA is not a municipality or any other traditional political subdivision. The very question to be answered is whether JUA, an entity that is not a traditional political subdivision, is part of the government because of its limited involvement with the state. Simply stating that it was created by a state statute does not answer the question. The upshot is that the crux of the General Assembly's case criticizing the District Court's approach – that "state creation is determinative" of whether an entity is public or private – is a tautology.

---

[7] *United States v. Alabama*, 791 F. 2d 1450, 1456 (11th Cir. 1997) (political subdivision standing doctrine "extends logically to other creatures of the state such as state universities."); *cf. Philadelphia Nat. Bank v. United States*, 666 F. 2d 834, 840 (3d Cir. 1981) (Temple University not a political subdivision whose interest payments to bank could be tax exempt where university had a limited authorization to exercise one small aspect of police power and with no eminent domain or taxing power), *Pennsylvania State Univ. v. Derry Twp. Sch. Dist.*, 731 A.2d 1272, 1273-1274 (Pa. 1999) (concluding that Penn State, an entity established by an act of the legislature, did not thereby become a Commonwealth instrumentality).

[8] *See, e.g.*, 68 Pa. C.S. § 5301 (statutorily created unit owners association may take form of a private unincorporated or incorporated association.)

### B. The District Court is Correct; JUA is not Part of the State, and its Assets are Private Property Protected by the Fifth Amendment

The District Court authored two thoughtful and detailed opinions in which it carefully reviewed the facts of JUA's founding, history, autonomous operation as a nonprofit association operating as a private insurer, and source of funding, and correctly concluded that the state's attempts through Act 44 of 2017 and Act 41 of 2018 to seize JUA's surplus generated exclusively from private premiums paid by private individuals in exchange for JUA's acceptance of insurance risk violates the Fifth Amendment's Takings Clause.  As the District Court summarized its reasoning:

> [JUA] is created by statute. But in the same legislation that created [JUA], the General Assembly relinquished control thereof, for all material intents and purposes, to [JUA's] board of directors. The legislature had the option to tightly circumscribe [JUA's] operations and composition of its board, *cf. MMIA*, <u>533 N.E.2d at 1036-37</u> (citing MCKINNEY"S INSURANCE LAW § 5501 *et seq.*); to establish [JUA] as a special fund within the state's treasury, *cf.* 40 PA. STAT. & CONS. STAT. ANN. § 1303.712(a); or to retain meaningful control in any number of other ways. That the General Assembly chose to achieve a public health objective through a private association has a perceptible benefit: it assures availability of medical professional liability coverage throughout the Commonwealth at no public cost. By the same token, it also has a consequence: the General Assembly cannot claim *carte blanch* access to [JUA's] assets. We hold that [JUA] is a private entity, and its surplus funds are private property. The Commonwealth cannot take those funds without just compensation.

(A.0043).

The General Assembly attacks some of the factors the District Court considered, dismissing them as "irrelevant," Br. at 37-47, and goes on to attempt to distinguish some of the cases to which the court compared JUA, arguing that the cases do not support the court's holistic approach.  Br. at 47-55. As a review of the law and the court's analysis reveals, however, these attacks are unfounded. The District Court got it right. JUA is a private entity with private assets that are beyond the General Assembly's reach.

1. The District Court's consideration of the factors of statutory control, function, and JUA's source of funds is relevant – and dispositive

The General Assembly argues that the District Court's use of statutory control, function, and source of funds as factors in deciding whether JUA is the state or a private entity is "irrelevant," "erroneous," and otherwise flawed.  Br. at 37-47. None of these attacks withstands scrutiny.

a. *Statutory control*

The General Assembly's primary critique on control is that the District Court's conclusion that the Commonwealth "relinquished control," (A.0043), of JUA is "utterly illusory" because the state retains inherent power over entities it creates. Br. at 41.  Like much of the General Assembly's reasoning, however, this argument presupposes that JUA is the state because it was created by the state – that is, it presupposes the answer to the question being asked – and thus is circular.

29

The cited portions of the cases on which it relies (both are political subdivision standing doctrine cases), Br. at 41, stand for the proposition that the state has inherent power over <u>municipal bodies</u>. *City of Trenton* at 186-187 (referring to "municipal corporations" and quoting *Hunter v. Pittsburgh*, <u>207 U.S. 161, 178</u> (1907)), *Kelley v. Metro. Cnty. Bd. Of Educ.*, <u>836 F.2d 986, 998</u> (6th Cir. 1987) (referring to "municipal bodies") and *S. Macomb Disposal Auth. supra*.  JUA is not a municipal body.  Whether it is the state is the issue here, and the degree of its autonomy fairly informs that debate.

The District Court's point concerning control is that the General Assembly had the option to place JUA's responsibilities in a state agency, and indeed did exactly that with the MCARE Fund, JUA's statutory partner in the MCARE Act. (A.0013 (describing the MCARE Fund)). It did not with JUA. "Instead, the General Assembly 'established' the Association as 'a nonprofit joint underwriting association.'" (A.0014, *citing* 40 <u>P.S. § 1303.731(a))</u> As a nonprofit association with all of the autonomy the District Court describes and the General Assembly does not dispute,  Br. at 39, JUA has an existence separate from the state, *see infra* at Section 2.A., and its funds are dedicated to its nonprofit purpose.  JUA's autonomy does not, of course, prevent the legislature from repealing 40 <u>P.S. §§ 1303.731-733</u>, *i.e*., the statutory provisions that task JUA with the obligation to provide medical professional liability insurance coverage to those who cannot

30

conveniently obtain it. But repeal of those provisions would not abolish JUA or enable the Commonwealth to reach its assets that are dedicated to its nonprofit purpose.

The General Assembly also stresses that the MCARE Act does not mention JUA's "rights" but only its "powers" and "duties." Br. at 38 ("Tellingly, …it never mentions 'rights.'"). But in creating JUA as a nonprofit association, approving its plan describing itself as an entity separate and distinct from its members (a fact the General Assembly acknowledges, Br. at 30 n. 13), providing for plenary control of JUA by its independent board, and regulating JUA for forty years in the way it regulates private insurers, the Commonwealth created the conditions under which JUA acquired the right to protection from uncompensated takings. Thus, the answer to the General Assembly's question "can a state legislature inadvertently create an entity endowed with federal constitutional rights that shield it from the control of its creator?," Br. at 12, is threefold. Establishing JUA as a nonprofit association in two successive statutes over forty years  was not "inadvertent,"  and the consequences were foreseeable. One consequence is that JUA has federal constitutional rights. Another is that the Commonwealth can control JUA in the same way it polices and regulates other private insurers.

### b.    Function

Next, the General Assembly faults the District Court's focus on JUA's function, arguing that the court wrongly assumed that insurance is the province of private companies. Br. at 41-44. But the General Assembly takes the court's "inherently non-governmental" description of JUA out of context.

The District Court was well aware government can provide insurance; that is why it observed that the "legislature had the option" "to establish [JUA] as a special fund within the state's treasury," (A.0107-0108), as it did with MCARE.

Moreover, the District Court used the phrase "inherently non-governmental" only to make the point that JUA is not a traditional political subdivision because it lacks traditional governmental powers such as taxing and eminent domain:

> [JUA] is neither a political subdivision nor "sufficiently analogous" to one for Section 1983 purposes. [JUA] is not empowered with governmental authority: it has no power, for example, to tax, to issue bonds, or to exercise eminent domain.

(A.0027-0028).

Consideration of an entity's function, however, including the *way* that it functions, is meaningful for purposes of the "is it part of the state?" analysis, and the District Court rightly took notice of JUA's:

> [JUA], since its inception, has been a private institution. It has operated just like a private insurance company for decades. It is privately funded and organized and has never received public funding. Until Act 41, the Commonwealth explicitly disclaimed any responsibility for [JUA's] debts and liabilities. [JUA] covers

32

its own operating expenses and bears its own aggregate insurance risk. Its plan of operations contemplates borrowing and reimbursable member assessments, not state financial support, in the event of a deficit.

(A.0121 (footnote omitted)).

### c.    Source of JUA's Funds

Finally, the General Assembly criticizes the District Court's consideration of the fact that the Commonwealth has never provided or contributed in any way to the funds the Commonwealth seeks to expropriate from JUA. It argues that JUA acquired the funds in performing a duty imposed by statute, and cannot distribute the funds to members or otherwise use them other than for its nonprofit purpose. Br. at 46.  The General Assembly maintains JUA's funds are thus public, not private, citing *Mississippi Surplus Lines* in support.  But that case is inapposite, as the District Court found.  (A.0035-0036).

*Mississippi Surplus Lines* concerned a Mississippi statute that required the insurance commissioner to determine whether surplus lines insurers (i.e., non-admitted insurers) met the requirements of state law and to collect fees associated with making that determination.  The statute also allowed the commissioner to use an association of surplus lines agents to make the determination and levy and collect an examination fee to cover the association's operating costs "to the extent that such operation relieves the commissioner of duties otherwise required" of the commissioner. 261 Fed. App'x at 784.

33

*Mississippi Surplus Lines* is readily distinguishable on the basis of two key facts that controlled the outcome there but are not present here: (1) the nature of the transaction that gave rise to the funds in controversy – at issue there was a surplus collected from fees the insurance commissioner would otherwise have charged and collected himself for a regulatory function he was required to perform, whereas here it arises from premiums JUA charged as a nonprofit insurer in exchange for risk JUA took; and (2) the conditions imposed by statute on the funds the private association collected – there it was clear the funds were to be used solely to cover the association's operating costs, *id*. at 787,  where here the statute authorizes JUA as a medical professional liability insurer, 40 P.S. §§ 1303.731(b)(3), 732 (A.0874-0875), to collect premiums based on rates approved just like any other insurer, *Id.* § 1303.731(b)(2) (A.0874) with no reference to the ownership of funds collected other than to specify that JUA owns any and all liabilities, *Id.* § 1303.731(c) (A.0875) ("a liability of …the association shall not be deemed to constitute a debt or liability of the Commonwealth or a charge against the General Fund.").

*Mississippi Surplus Lines*' reasoning as to both points supports JUA's position, not the General Assembly's.  As to fees, the court explained:

> The surplus line fees in Mississippi … have a public end use. *The fees are, as commanded by statute, to be used only to "relieve[ ] the commissioner of duties otherwise required of the Commissioner of Insurance" and only to pay for the association's operational costs.* Their sole purpose is to support the Commissioner's work.

261 Fed. App'x at 287 (emphasis in original). Here, nothing in the statute states or even suggests that JUA's surplus from premiums collected is intended either to "support the Commissioner's work" or pay "only for the association's operational costs."

Similarly, as to conditions imposed by the Mississippi statute, the court contrasted Mississippi's conditioning of the association's right to collect surplus lines examination fees with the Illinois statute establishing the foundation in *Illinois Clean Energy Foundation v. Filan*, 392 F. 3d 934 (7th Cir. 2004). It reasoned:

> the legislature conditioned the association's receipt of fee-generated funds upon the association's use of those funds for operating costs alone, for so long as the Commissioner found that the association relieved him of his statutorily-defined duties.

*Mississippi Surplus Lines*, 261 Fed. App'x at 285.

Here, the MCARE Act expresses no such conditioning with respect to JUA's receipt of premiums. The persuasive precedent thus is not *Mississippi Surplus Lines*, but rather *Filan,* where the court held that a statute transferring privately contributed funds from a foundation established by the state and controlled by state-appointed trustees to the state's general fund violated the Takings Clause, because (as here) the statute creating the foundation did not reserve to the state the right to confiscate foundation funds. 392 F.3d at 937.

2. <u>The District Court properly analyzed the authorities on which it relied</u>

The General Assembly caps off its assault on the District Court's multi-factor test with the claim that there is no basis for the test in the three cases the court "purportedly" Br. at 47 used – the Fifth Circuit's *Morales*, the First Circuit's *Asociacion/Arroyo* decisions, and the New York high court's *MMIA*.[9] Br. at 47-55. Rather, the General Assembly maintains, the only relevant determinant is the presence or absence of a private, non-state interest: in *Morales* there was one so Texas's CATPOOL was deemed private, in *MMIA* there was not so New York's JUA was deemed part of the state, and in *Asociacion* the analysis was too abbreviated to make a determination. JUA exhibits no private, non-state interest, the General Assembly continues, so it is the state.  Though tidy, this analysis is untrue. A reading of the cases reveals that each case actually considered multiple factors; none turned on the presence or absence of a private, non-state interest.

In *Morales*, in concluding that a Texas entity similar to JUA could sue the state because it was a private entity, the court based its conclusion that CATPOOL was "not the state" on a number of factors. One was the absence of state involvement with CATPOOL's profits or losses: any profit, the court observed, "does not go to the state," and losses in excess of premiums could result in the

---

[9] The District Court also relied on the Fifth Circuit's *Mississippi Surplus Lines*, (A.0106), but the General Assembly does not discuss that case in this context.

assessment of association members, "not the public treasury." <u>975 F. 2d at 1182</u>.

Another was function and statutory treatment: having reviewed the statute's

creation of CATPOOL, the court invoked *Dartmouth*, observing "[t]he act creating

CATPOOL is not 'a grant of political power,' as in the case of a municipality or

other political subdivision; CATPOOL is not 'employed in the administration of

the government.'" A third was state control: "That the state holds, and exercises,

the coercive power to force private insurers doing business in Texas to cover

certain risks does not mean that the money coming out of the companies' bank

accounts is state money. It is private money directed to pay private claims." *Id*. at

1182-1183. The District Court correctly concluded that *Morales* considered all of

these factors, that the General Assembly's characterization was "narrow,"

(A.0117), and that an assessment of JUA using these factors yields a similar

conclusion that JUA is private not public.

In *MMIA*, New York's Court of Appeals reached the opposite result from

*Morales* and concluded that MMIA, New York's medical professional liability

insurance association, is the state, and so could not assert a Takings claim.  The

court  considered several factors,  including the statute's highly prescriptive

treatment of the association's rights, duties and obligations, and New York state's

comprehensive and tight control that foreclosed MMIA's autonomy.  The *MMIA*

court also noted, as the General Assembly points out, that MMIA was a "legal

entity separate and distinct from its members." 533 N.E.2d at 1037. This "bright line" between association and members, the General Assembly declares, proves "by necessary implication," that the true basis for the court's conclusion that MMIA is the state was not New York's vice-like control over MMIA (a fact the General Assembly pronounces "essentially meaningless"), but rather that the lawsuit "implicated no private non-state interest." Br. at 50-51. Assessing the General Assembly's similar argument below, the District Court reaffirmed its reliance on *MMIA* as instructive for its multi-factor analysis (A.0119), and rejected the General Assembly's result-oriented interpretation that defies the opinion's text:

> [W]e again reject the suggestion that a statutorily-created insurance association may bring suit against the state only if the association's members have some personal stake in the entity—and then only on behalf of those members. We simply do not read the applicable authorities as espousing such a rule.

(A.0120).

Finally, in a pair of First Circuit cases, *Asociacion and Arroyo,* the court concluded that Asociacion, Puerto Rico's JUA, was a private entity, not the state. *Arroyo* was a 2005 case in which the court engaged in a multi-factor analysis of Asociacion's attributes, focusing primarily on the entity's degree of autonomy from the state, 398 F.3d at 62, but also examining its function, statutory footprint, and source of funds/allocation of risk. The court noted, but did not dwell on or emphasize, the fact that Asociacion's members shared in its profits and losses, and

38

certainly did not rely exclusively or even primarily on that aspect.  In following

*Arroyo* as precedent two years later in *Asociacion,* and rejecting the state's claim

that Asociacion was not a proper 1983 plaintiff, the court did not even mention the

criterion the General Assembly claims as controlling – the private, non-state

interest that Asociacion *members* may have possessed. *Asociacion*, <u>484 F.3d at 20</u>.

Although the General Assembly finds it "difficult to see how these [First Circuit]

decisions support the district court's holistic test – or its conclusions," Br. at 55,

the explanation is plain to see in the text of opinions.  The District Court here, in

rejecting the General Assembly's "private, non-state interest" blinders,

summarized fulsomely the manner in which *Asociacion* and *Arroyo* support its

holistic test.  (*See* A.0118).

## II.    The District Court's Conclusion that JUA is a Private Entity is Correct; the Governor's New Arguments to the Contrary Are Meritless

The Governor attacks the District Court's conclusion that JUA is a private

entity based on three legally and factually erroneous arguments, including a newly

manufactured challenge contrary to the Governor's advocacy before the District

Court.

First, the Governor alleges the "central thesis" of the District Court's

decision is that JUA was established as a nonprofit "with its own statutory rights,"

when, the Governor alleges, JUA had no such rights under the 2013 Pennsylvania

Uniform Unincorporated Nonprofit Association Law, 15 Pa. C.S. §§ 9111 *et seq*.

(Unincorporated Association Law) or otherwise. Br. at 21-22. This is factually and

legally inaccurate.  To begin, application of the Unincorporated Association Law

to JUA is not "central" to District's Court's analysis. The conclusion that JUA is a

private entity is true regardless if JUA's operational affairs are subject to the 2013

Unincorporated Association Law. JUA has an independent legal existence first

authorized by the CAT Fund statute, then effectuated by JUA's Plan of Operation,

and then reaffirmed by the MCARE Act. Recognized by common law at the time

of its creation, it was confirmed by statutory law thereafter. Moreover, the

Governor's advocacy of the opposite position before the District Court precludes

appellate review of this claim.

     Second, the Governor argues that the District Court misconstrued the

Insurance Department's "supervision" of JUA as mere regulatory authority instead

of the level of state control exercised over public entities. Br. at 35-38. This is

wrong for two reasons. First, the term "supervision" has no special meaning

indicating a higher level of control than the Insurance Commissioner's regulatory

authority. Second, even assuming that "supervision" as used in the MCARE Act

indicates heightened control, the Insurance Commissioner has such control over

other private entities; it does not make JUA the state.

Third, the Governor claims the District Court erred in finding that JUA members are liable for assessments and in relying on that fact to determine JUA's members have an interest in JUA.  But the plain language of the Plan of Operations provides that JUA members can be assessed. (A.1176).

### A. The District Court Correctly Concluded that JUA is a Distinct Entity with Rights of its Own, notwithstanding the Governor's Unpreserved Argument Concerning the Unincorporated Nonprofit Association Law

The Governor's primary argument on appeal is that the District Court concluded, in error, that the Unincorporated Association Law applies to JUA, resulting in the court's further erroneous conclusion that JUA has statutory rights in addition to those conferred by the CAT Fund and MCARE statutes.  Br. at 21-27. This argument is waived or, at minimum, forfeited; if nonetheless reached, it is wrong on the merits.

#### 1. The Governor's challenge to JUA's existence as an unincorporated association has been waived or forfeited

Waiver is the "'intentional relinquishment or abandonment of a known right.'" *Barna v. Bd. of Sch. Dir. of Panther Valley Sch. Dist.*, 877 F. 3d 136, 147 (3d Cir. 2017), *quoting United States v. Olano*, 507 U.S. 725, 733 (1993). Waiver can occur where a party elects "to pursue an argument before the District Court that, if not strictly incompatible with the argument it presses on appeal, is at least at odds with it," because the party made "a conscious or tactical choice … in favor of

41

the argument that it did make." *Tri-Arc Fin. Servs., Inc. v. Evanston Ins. Co.*, 725 Fed. App'x 97, 100 (3d Cir. 2018). The Governor's new argument on appeal that the Unincorporated Association Law is inapplicable to JUA is waived because he made the tactical choice to present the opposite argument to the District Court, where he stated that the Unincorporated Association Law applies to JUA and supports the conclusion that no taking of private property occurred, because Section 9135 of the Unincorporated Association Law requires that any surplus that remains on dissolution of JUA escheats to the state. Doc. 73 (JUA I Wolf Ans Br.) at 22 n.8. attached hereto as Excerpt of Governor Wolf's Answering Brief in *JUA I*; (A.0042-0043 (rejecting rationale based on escheat pursuant to Section 9135 of the Unincorporated Association Law)). Waived claims "may not be resurrected on appeal" and the court lacks authority to address them. *Barna*, 877 F.3d at 146-147 and n. 7; *Tri-Arc Servs., supra*.

   "'[F]orfeiture is the failure to make the timely assertion of a right," example of which is an inadvertent failure to raise an argument.'" *Barna*, *supra* at 147, *quoting Olano*, 507 U.S. at 733. If the Governor could plausibly make the case that he "inadvertently" failed to present the District Court with his argument that the Unincorporated Association Law is inapplicable to JUA, this court has authority to excuse the forfeiture, but only if the "public interest," the prevention of "manifest injustice," or other "exceptional circumstances" are present. *Id.* This is a

heavy burden the Governor cannot meet. The District Court's application of the

Unincorporated Association Law to JUA is correct, consistent with the positions

taken by all parties below (and that the General Assembly continues to press on

appeal, Br. at 7-8, 30, 45) and unlikely to have broad future application.

Exceptional circumstances only exist where, for example, the district court was

clearly wrong on a purely legal issue that has wide application, *Id.* at 148

(forfeiture excused where district court decision on qualified immunity directly

contradicted Supreme Court precedent), or where the question forfeited is one that

will affect a host of future cases. *General Refractories Co. v. First State Ins. Co.*,

855 F. 3d 152, 162-163 (3d Cir. 2017) (forfeiture excused where district court

clearly misinterpreted asbestos exclusion in insurance contract and "our

interpretation may affect a wide range of insurers and insureds beyond the

immediate parties to the suit."). Here, the District Court's invocation of the

Unincorporated Association Law is neither "central" to its decision (Governor's

Br. at 21), obviously incorrect, nor likely to influence other cases. Accordingly,

assuming waiver does not preclude consideration of the Governor's new issue, the

conditions needed to forgive forfeiture are not present here.

2. <u>The District Court Correctly Concluded that JUA's Rights are Inherent in the Legal and Factual Reality of its Existence as a Private Non-state Entity</u>

If the court entertains it, the Governor's argument is wrong. Application of the Unincorporated Association Law to JUA was not "central" to the District's Court's determination of JUA's private entity status. The District Court did not base its determination that JUA is a private entity on JUA's business entity structure. It based it on a holistic consideration of relevant factors pertaining to JUA's relationship with the state.

a. *JUA's Status as an Unincorporated Association*

The Governor's assertion that the word "association" had a "very specific legal definition" is not supported by the common law or statutory concept of unincorporated associations. Specifically, the Governor argues that voluntary membership is a "hallmark" of an unincorporated association, and that JUA's membership is involuntary. This is wrong on both accounts. First, "voluntary membership" is not a prerequisite for an association under Pennsylvania law. Whereas the Governor quotes treatises, Pennsylvania's Statutory Construction Act of 1972, 1 <u>Pa. C.S. § 1991</u>, defines "association" without any reference to a "voluntary membership" requirement:

(1)  When used in any statute finally enacted before December 7, 1994, any form of unincorporated enterprise owned by two or more persons other than a partnership or limited partnership.

(2)  When used in any statute finally enacted on or after December 7, 1994, an association as defined in 15 Pa.C.S. § 102 (relating to definitions).

The Limited Liability Company Act, Act of December 7, 1994 (P.L. 703, No. 106), 15 Pa. C.S. § 102, likewise omits any mention of voluntary membership, defining an "association" as:

A corporation, a partnership, a limited liability company, a business trust or two or more persons associated in a common enterprise or undertaking. The term does not include a testamentary trust or an inter vivos trust as defined in 20 Pa.C.S. § 711(3) (relating to 26 mandatory exercise of jurisdiction through orphans' court division in general).

Even if the Governor were correct that voluntary membership is a prerequisite for legal existence as an unincorporated association, JUA's membership is not involuntary. Rather, JUA membership is compulsory, and there is a difference. Authority to write insurance in the Commonwealth, a voluntary choice, is conditioned on JUA membership. Compulsory membership does not disqualify an entity from independent existence as a private unincorporated association. *See, e.g.,* 68 Pa. C.S. §§ 5301-5303 (unit owners association may be unincorporated association notwithstanding compulsory membership of unit owners as prescribed by statute).

Continuing on with this newly imagined purity test for unincorporated nonprofit associations, the Governor asserts that the General Assembly's use of the

word "association" in the CAT Fund statute is indicative of its intent to create a

public entity that is part of the state, whereas creation of a corporation or a trust

would have been indicative of intent to create an independent private entity. This

too is wrong. For example, in *Pocono I,* this court instructed the district court on

remand to consider, the charter school's relationship to the state notwithstanding

its existence as "a body corporate." 24 P.S. § 17-1714-A(a). Moreover, the

Governor's argument cuts both ways – if the General Assembly had wanted to

make JUA part of the state, it could have declared JUA to be so in 1975 in the

CAT Fund statute or the 2002 in the MCARE Act. It did not. Instead, the

Commonwealth proposed, accepted, facilitated, and then codified JUA's private

independent existence as a nonprofit association for over 40 years. In this context,

the General Assembly's use of "association" does not indicate an intent to create a

state entity – if anything, it is evidence of the General Assembly's intent to

distance the Commonwealth from the JUA.

#### b.    *Source of JUA's Rights*

The Governor's misinterpretation of the pre-Unincorporated Association

Law existence of unincorporated nonprofit associations and the District Court's

application of Unincorporated Association Law to JUA next leads him to ask,

"from what source did JUA derive its authority to enter into contracts and hold

property prior to 2013?" Br. at 27. However, the Governor is wrong that the

District Court used the Unincorporated Association Law to provide JUA with any new authority or rights not already possessed by virtue of its statutorily authorized existence. Rather, the Unincorporated Association Law serves, as it does for all unincorporated nonprofit associations, to "bring[] to fruition the parties' expectations that previous law frustrated."  15 Pa. C.S. § 9111 cmt. (further providing that "the chapter provides a nonprofit association and its members with a legal structure that conforms to the expectations of many of them."). In sum, the Unincorporated Association Law does not serve to provide an association with "new rights" but rather provides for the structural framework for the operation of such entities existing in the Commonwealth, acting as a gap filler to the extent organic documents and relevant statutes are silent. This is how the District Court viewed and applied it. Nonetheless, even if the Governor was correct that the Unincorporated Association Law does not apply, it is of no consequence to the court's threshold determination when JUA's legal existence, including the property rights derived therefrom, was likewise recognized at common law.

3. Common law statutory authorization does not render the Unincorporated Association Law inapplicable.

At the time of JUA's creation, unincorporated associations were governed by common law. While common law provided that an unincorporated nonprofit association had no independent legal existence apart from its members, it also

recognized that such independent legal existence could nonetheless be authorized by statute.

Moreover and contrary to the Governor's implication, the common law view of unincorporated associations did not serve to invalidate the association's purpose or the dedication of funds to that purpose. Rather, the common law member-aggregate theory of unincorporated associations treated an unincorporated association's members as trustees of the association's property "for the benefit of the present and future membership of the association." *Fuhrman v. Doll*, 451 A.2d 530, 532-533 (Pa. Super. 1982), *citing In re Pittsburg Wagon Works' Estate*, 54 A. 316, 389 (Pa. 1903). Under this theory, creation of JUA amounted to creation of a "trust", which even the Governor agrees, is sufficient to "create a legal entity with its own statutory rights" Br. at 25.

Nonetheless, JUA's status as an association was expressly acknowledged by the CAT Fund statute, which provided for the creation of an "association" outside of the Insurance Department. 40 P.S. § 1301.801 (superseded) (A.733). Section 804 of the CAT Fund statute further provided that the Insurance Commissioner could "authorize the formation and operation of bureaus and other legal entities" in order to "[t]o carry out the objectives of this article[.]" (A.0734) (emphasis added). As Article VIII of the CAT Fund statute does not contemplate the "formation and operation" of any entity other than JUA, this provision can only be read to apply to

48

JUA. *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) ("We assume . . . that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous"). That the Insurance Commissioner authorized JUA's existence as an "other legal entity," *i.e.*, an association separate and apart from the Insurance Department, is evident from the facts surrounding its creation. JUA members organized the association and developed its governance document, *i.e.*, the Plan of Operation.  This Plan expressly identified JUA as a legal entity separate from its members and provided for JUA's right to own property. (A.0775). These provisions were approved by Commissioner Sheppard in 1975, thus effectuating JUA's independent private existence, including the right to hold property in its name and enter into contracts – rights it openly exercised for the next 40 years without interference or challenge.[10]  Such express statutory authority does not equate to the level of state control the Commonwealth exercises over its state entities. Rather, this statutory treatment provides the status necessary to exist as an independent non-governmental entity. *See, e.g.*, 68 Pa. C.S. §§ 5301-5302

---

[10] In fact, by the time of the 2002 passage of the MCARE Act, the 1988 General Associations Act, Act of Oct. 1, 1988, P.L. 1444, No. 177, had expanded on the common law concept of associations, by permitting an unincorporated association to have an independent legal existence pursuant to its organic documents (e.g., JUA's Plan of Operation, A.0773-0782).

49

(authorizing private unincorporated unit owners' associations to adopt bylaws, collect assessments, enter into contracts, indemnify its members, and "exercise any other powers necessary and proper for the governance and operation of the association"). Similarly, the Commonwealth's statutory grant of this authority to JUA is not evidence of intent to create a government entity. The reverse is true. By providing JUA with the statutory authority necessary for its independent existence, the Commonwealth was able to further distance itself from JUA's operations and liabilities. Legally and factually, the District Court correctly determined that JUA exists as a private, independent entity.

The Governor's misapplication of the Unincorporated Association Law's exclusion of entities "formed under any other statute that governs the organization and operation of nonprofit associations" to JUA, Br. at 26, disregards the plain language of this provision. Notwithstanding the Governor's emphasis that this exclusion applies to entities "formed under any other statute," the clause that follows the language the Governor relies on, *i.e.*, "that governs the organization and operation of nonprofit associations," serves to modify all of the language preceding it and is thus essential to its meaning. 1 Pa. C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *Equitable Gas Co. v. City of Pittsburgh*, 488 A.2d 270 (Pa. 1985) (modifying clause operates only upon phrase

preceding it.) Neither the CAT Fund nor MCARE Acts are fairly characterized as the type of general statutes governing organization and operation of nonprofit associations contemplated by this provision of the Unincorporated Association Law. Br. at 6 ("The MCARE Act continued the objectives of the Malpractice Act – ensuring that medical care is available to the Commonwealth through a comprehensive and high quality health care system.").

In sum, the Governor's argument fails to appreciate the common thread connecting the common law and statutory treatment of unincorporated associations: Property of an association held by the association, either in its own name or by trust, is held for the benefit of its nonprofit purpose. Under common law, JUA's property was dedicated to its nonprofit purpose and could not be divested from it. The same was true under the 1988 General Associations Act and remains true today under the Unincorporated Association Law.

### B. The District Court Correctly Distinguished the Insurance Commissioner's Regulatory Authority over JUA from State Control of a Public Entity

The Governor next accuses the District Court of conflating the terms "regulate" and "supervise." It did not. Rather, the court found that the Insurance Department's power of "supervision" over JUA could not be evidence of state control when the Department is likewise empowered to "supervise" private insurance entities, such as the financially distressed private insurance companies

51

referenced in the court's opinion. (A.0038). This conclusion, the Governor argues,

ignores the special meaning of the term "supervise" used in the insurance statutes

that indicates JUA is subject to state control far beyond the Insurance Department's

regulatory authority over private insurance companies. However, the treatment of

other statutorily "supervised" private entities proves otherwise.

    The Governor declares that "supervise" appears only once across

Pennsylvania's insurance statutes outside of financially-distressed entities,

evidencing its special significance.  This is literally true but very misleading.

Variations of the word "supervise" (*i.e.*, "supervisory" or "supervision") appear

multiple times across the Insurance Company Law of 1921 and Insurance

Department Act of 1921 and in various contexts beyond the supervision of

financially distressed private insurance companies referenced by the District Court.

(A.0037-0041). This usage confirms that statutorily required "supervision," is a fact

of life for many private entities that do business in the heavily regulated insurance

industry, including private title insurance companies,[11] Lloyds Associations,[12] and

---

[11] 40 P.S. § 59 (providing that Insurance Department has the "power and duty" to "supervise" private title insurance companies).

[12] 40 P.S. § 911 (titled "Supervision by and Reports to Insurance Commissioner" and providing that Lloyds Associations "shall, respectively, be subject to the same supervision by, and required to make the same reports to, the Insurance Commissioner, as is required of foreign insurance companies and their representatives transacting the same or similar kinds of insurance in this Commonwealth…").

professional health service corporations.[13]

The Commissioner's supervision and approval power as used throughout the insurance statutes does not amount to limitless state control, but rather denotes her authority to monitor the entities she regulates. Importantly, her decisions are not without recourse. Action that she takes against a private entity is subject to due process. *See Nationwide Mut. Ins. Co. v. Com.*, 324 A.2d 878 (Pa. Cmwlth. 1974) (insurance commissioner's refusal to approve rate filing must be grounded on statute-based reasons and fully supported so as not to be arbitrary and capricious). For example, if Commissioner Sheppard in 1975 had refused to approve a reasonable plan of operations that JUA had submitted, JUA, just like any other regulated insurer, had due process rights to challenge the determination through an administrative appeal that would have culminated in judicial review and an eventual orderly resolution of the dispute. Given this reality of JUA's existence in the highly regulated insurance industry, the District Court properly concluded that the Commissioner's supervision and approval power with respect to JUA is something considerably less imposing than "harsh medicine," Br. at 29, and certainly not sufficient to transform JUA into a state instrumentality.

---

[13] *Pennsylvania Blue Shield v. Dept. of Health*, 500 A.2d 1244, 1249 (Pa. Cmwlth. 1993) ("The department's statutory authority to *supervise* and regulate professional health service corporations is found in 40 Pa. C.S. §§ 6301-6335") (emphasis added).

### C. The District Court Correctly Determined that JUA's Members have an Interest in JUA's Property and Purpose

The Governor next argues that the District Court's finding that JUA's members are liable for its losses via assessments was in error. In support of its argument, the Governor relies on an excerpt from the deposition of JUA's corporate designee, Ms. Susan Sersha. Br. at 31-32. The Governor's assertion is wrong for two reasons. First, the deposition excerpt quoted does not accurately represent Ms. Sersha's testimony as it related to member assessments. Second, even if the Governor's representation regarding Ms. Sersha's testimony were accurate, the fact that JUA's members are subject to assessments in the event of the association's loss is not a disputed fact. The plain language of JUA's Plan of Operations explicitly provides for member assessments.[14]

Contrary to the Governor's assertion, Ms. Sersha confirmed the existence of the assessment provision in JUA's Plan of Operations and the possibility that such assessments could occur:

> Q:     You were talking about assessments and how assessments were in - in the plan of operation but then they weren't in the plan of operation. I want to make sure I follow this. I think the possibility of assessments is in your current plan of operation?
>
> A:     Yes.

---

[14] While JUA's Plan of Operations was amended in fall of 2018, this amendment is beyond the record of this case. Nonetheless, even if the amended Plan was open to consideration, it likewise provides for assessment of JUA's members.

(A.1469-1470). Ms. Sersha further affirmed:

> Q:    So theoretically as things stand sitting here today, you
>       could assess your carriers?
> A:    Yes.

(A.1471).

Even if the Governor's cherrypicked deposition excerpt was a fair

representation of Ms. Sersha's view on assessments, a corporate designee's

deposition testimony does not negate the plain language of JUA's Plan of

Operations, which explicitly provides for assessments. *AstenJohnson, Inc. v.*

*Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009) (testimony of corporate

designee, which amounted to a legal conclusion as to interpretation of a contract,

was not binding on corporation and corporation was entitled to provide evidence to

the contrary); *Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit*

*Sys.*, 327 F.Supp.3d 767, 777 n.6 (M.D. Pa. 2018) (testimony of a Rule 30(b)(6)

representative "although admissible against the party that designates the

representative, is not a judicial admission absolutely binding on that party.").

Furthermore, as an unincorporated association, JUA's members have an

interest in JUA's purpose. As described in JUA's 1976 IRS filing the grant of

which conferred its ongoing non-profit 501(c)(6) status, all JUA members have a

pecuniary interest in the success of JUA's non-profit purpose of assuring that

health care providers are able to obtain professional liability insurance:

55

> The Association's activities of writing such insurance will promote the common business interests of its members by providing malpractice insurance to health care providers who would normally be unable to obtain such insurance, thereby minimizing public criticism of the industry. As such, the Association's activities fit squarely within Rev. Rul. 71-155; 1971-1 CB 152, and it is clearly entitled to exemption under Section 501(c)(6).

(A.0746-0747). Comparatively, the state has no such interest.

Moreover, JUA's assets are the product of purely private activity; it has never received a penny of state funding; the state has never (until Act 41) shouldered responsibility for JUA liabilities – indeed, the MCARE Act expressly disclaimed state liability (A.0875); and all of its members are private insurers. (A.0032 ("That the Association's private operations work an incidental public benefit does not render its function a public one.")). Thus, the District Court correctly determined that any taking of JUA's property necessarily affects JUA's members. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831-32 (1987) ("where governmental action results in '[a] permanent physical occupation' of the property, by the government itself or by others, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner[.]") (emphasis added) (internal citations omitted).

The Governor's hypothetical question, "suppose one sought to purchase JUA. To whom would they write the check?", does not evidence a "practical

problem with the District Court's ruling." Br. at 33. To the contrary, this question illustrates the Governor's misunderstanding of the factual and legal reality of JUA's existence. Specifically, an unincorporated nonprofit association exists for the benefit of its purpose – it cannot be bought or sold in any traditional sense. *See* 15 Pa. C.S. §§ 9134-9135 (setting forth process for winding up and dissolution of an unincorporated association). Rather, a nonprofit association continues in perpetual duration until it is dissolved, the result of which is dedication of the property to the association's nonprofit purpose regardless if the dissolution occurs pursuant to Pennsylvania common law or statutory law. *Leatherman v. Wolf*, 88 A. 17 (Pa. 1913) (once the property and funds of a nonprofit association are dedicated to its nonprofit purpose, the association's members are prohibited from authorizing the diversion of funds to another purpose); *accord* 15 Pa. C.S. § 9114(d) ("profits from any activities must be used or set aside for the nonprofit purposes of the nonprofit association"). In fact, the Insurance Commissioner has developed an approach to this issue in the context of another nonprofit she regulates, the Blues, and has already used the Blues approach as a template for JUA. (*See* A.0938; A.0941-0981).

Ultimately, the answer to the Governor's hypothetical is irrelevant to the question at hand. Regardless of whether common law or the Unincorporated Association Law applies, the District Court's conclusion that JUA is a private

entity withstands the result. To the extent the application of the law may be relevant to questions of JUA's dissolution, such dissolution is speculative, and need not be addressed to resolve the question of whether the state may expropriate JUA's funds.

### D. The District Court Correctly Applied Its Multi-Factor Test

In contrast to the General Assembly, the Governor accepts the District Court's holistic analytical approach to distinguishing public and private entities, but argues that differences between JUA and the private entities to which the District Court analogized JUA compel the conclusion that JUA is the state, not a private entity. Br. at 33-39. In particular, the Governor homes in on alleged differences between JUA and similar entities found to be private based on his three challenges to the District Court's conclusions concerning (1) JUA's status as a legal entity because Pennsylvania's Unincorporated Nonprofit Association Law did not become effective until 2013, (2) the state's "supervision" over JUA, and (3) JUA's alleged inability to assess its members. Br. at 33 ("Placed into this proper context [i.e., accounting for the three alleged errors] we see that JUA resembles the public entities in [*Mississippi Surplus Lines* and *MMIA*]".)  But these three alleged errors by the District Court, even if accepted as true, would not undermine the

District Court's conclusion that JUA is a private entity, not the state.[15]

As to JUA's entity status under the Unincorporated Nonprofit Association Law, Br. at 21-27, the Governor appears to argue that the Puerto Rico JUA in *Asociacion,* CATPOOL in *Morales,* and the foundation in the Seventh Circuit's opinion in *Filan,*[16] are different from JUA in that those entities have a separate legal identity but JUA does not. Br. at 34-35. As explained *supra* at Section II.A., however, JUA's independent legal existence, which was authorized by the CAT Fund statute, affirmed by the MCARE Act, and effectuated by JUA's Plan of Operation, was recognized by common law at the time of its creation and by statutory law thereafter.

As to "supervision" of JUA under the MCARE Act, Br. at 27-30, the Governor points out that the court in *Mississippi Surplus Lines* found that the association there "exists wholly to serve the State and operates under conditions imposed by state law" Br. at 36, similar to JUA, which "operates under conditions imposed by MCARE and is supervised, not just regulated, by the Commissioner." The Governor argues this indicates that JUA is public, not private.  But even if the

---

[15] The Governor discusses most of the same cases already addressed in response to the General Assembly's brief, including *Mississippi Surplus Lines*, *MMIA*, *Asociacion*, *Filan*, and *Morales*.  Except to the extent the Governor raises different points, JUA will not re-address the same cases.

[16] The District Court did not rely on *Filan* as a basis for its holistic test or as a private entity comparable to JUA.

Governor were correct that the word choice "supervise" in the MCARE Act

indicated a heightened level of scrutiny over JUA versus other insurers, the reality

is that JUA's Plan under which it has operated since its inception in 1975 provides

it with almost complete autonomy, and the record reveals that JUA has always

operated that way, as the District Court found. (A.0121).

As to JUA's alleged inability to assess its members, Br. at 30-33, the

Governor argues that the members of CATPOOL in *Morales* and the JUA entity

in *Asociacion* shared in the those associations' profits and losses Br. at 34; based

on this he appears to argue that JUA's alleged inability to assess its members

removes any possibility that JUA could claim infringement of a private non-

governmental interest as a result of the government Taking the Commonwealth is

attempting.  This argument fails as well.  As explained above in response to the

General Assembly, Section I.B.2. *supra*, even if were correct that JUA cannot

assess its members, the courts in *Morales* and *Asociacion* considered multiple

factors, and neither case turned on the presence or absence of a private, non-state

interest. Moreover, JUA's members have always had an interest in the success of

the JUA that is reputational, and thus pecuniary in nature. *See* Section II.C. *supra.*

Finally, the Governor's presentation is larded with asides to the effect that

JUA has amassed a "fortune" in its surplus that "serves no purpose and can have

no purpose other than to earn interest and expand." *E.g.,* Br. at 38-39.  As

60

explained *supra* at Section II.C., however, JUA as a nonprofit has a duty to dedicate its surplus to its nonprofit purpose, a concept the Insurance Commissioner is intimately familiar with because she regulates the Blues entities, where similar issues have arisen in the past. To the extent JUA has surplus above the level it needs to assure the ability to responsibly meet its obligations, its duty and intention is to dispose of the excess consistent with its nonprofit purpose. (A.0988-0989).

### III.     The District Court's Decision is Consistent with Principles of Federalism

The General Assembly, Br. at 16-18, and the Governor, Br. at 39-42, accuse the District Court of undermining federalism by interfering with the General Assembly's policy choices.

The Governor goes further, suggesting that the District Court's decisions have enjoined "the Commonwealth's power to repeal or amend its own laws," Br. at 3, specifically, "from ever repealing the MCARE Act." Br. at 40.  JUA has never disputed that the General Assembly has the power prospectively to alter the laws relating to the provision of medical professional liability insurance to providers who face difficulties procuring it, however, and nothing in the District Court's decisions prevents that from happening.  The General Assembly could repeal that part of the MCARE Act that requires JUA to provide medical professional liability insurance.  It could amend that law to provide that insurance of last resort will henceforth be available only from the Insurance Department or

61

from some other entity.  But repealing is one thing, and the General Assembly is free to do it; the uncompensated taking of private property is quite another – it is akin to stealing.

The District Court was acutely aware of its obligations to accommodate state policy decisions and the exercise of state police powers.  But the federal courts also have an obligation to uphold constitutional rights against the overreach of state governments.  The District Court aptly summarized these competing considerations, and the result it reached is the one required under our federalist system where a state government overreaches:

> We lastly address the legislative defendants' suggestion that this court's decision in *JUA I* conflicts with principles of federalism and deference to state legislative action. Defendants charge that "federal courts should not wield the federal constitution like a ruler, rapping knuckles whenever they disagree with state governance." (Doc. 37 at 16). We agree, as we have at each stage of these lawsuits, that the legislature has wide discretion to experiment with its police powers. The Supreme Court observed as much in *Dartmouth*, stating that federal courts charged with constitutional review of state legislative acts must approach their task with "cautious circumspection." *Dartmouth*, 17 U.S. (4 Wheat.) at 625. That deference is not without limitation, however, and federal courts also have an obligation to hear the constitutional cases properly brought before them. *See id.* As the Supreme Court aptly noted, "however irksome the task may be, this is a duty from which we dare not shrink." *Id.* Our holdings in *JUA I* and here today flow not from our disagreement with exercise of legislative prerogative but from what the Fifth Amendment deems to be an unconstitutional abuse thereof.

(A.0122).

## CONCLUSION

For these reasons, the Court should affirm the judgments of the District

Court.

Respectfully submitted,

*/s/ Kevin J. McKeon*
Kevin J. McKeon, I.D. # 30428
Dennis A. Whitaker, I.D. #53975
Melissa A. Chapaska, I.D. # 319449
Hawke McKeon & Sniscak, LLP
100 North Tenth Street
Harrisburg, PA  17101
(717) 236-1300
(717) 236-4841
kjmckeon@hmslegal.com
dawhitaker@hmslegal.com
machapaska@hmslegal.com

*Counsel for Plaintiff, Pennsylvania
Professional Liability Joint Underwriting
Association*

## COMBINED CERTIFICATIONS OF COUNSEL

1. <u>Bar Membership:</u> The undersigned certifies that Kevin J. McKeon, Dennis A. Whitaker, and Melissa A. Chapaska are members of the bar of this Court.

2. <u>Word Count:</u> The undersigned certifies that the foregoing brief uses a proportionally spaced, 14-point Times New Roman typeface, and that the text of the brief contains 12,956 words according to the word count provided by Microsoft Word.

3. <u>Service:</u> The undersigned certifies that the foregoing brief was served by the Court's electronic filing system on the date below on all counsel of record in this case.

4. <u>Identical Text:</u> The undersigned certifies that the text of the electronically-filed brief is identical to the text of the 7 hard copies that will be delivered within 5 days of this electronic filing to the Clerk of the Court.

5. <u>Virus Check:</u> The undersigned certifies that he caused virus detection to be performed on the electronically-filed copy of this brief using ESET NOD32 Antivirus and that no virus was detected.

*/s/ Kevin J. McKeon*

Dated: April 25, 2019

**ADDENDUM OF STATUTES PURSUANT TO FRAP 28(f)**

1. Excerpts of Pennsylvania Health Care Services Malpractice Act of 1975

2. Excerpts of Pennsylvania Medical Care Availability and Reduction of Error Act

3. Pennsylvania Uniform Unincorporated Nonprofit Association Law,
   15 Pa. C.S. §§ 9111 *et seq.*

390    Act No. 111                    LAWS OF PENNSYLVANIA

## No. 111

## AN ACT

HB 1367

Relating to medical and health related malpractice insurance, prescribing the powers and duties of the Insurance Department; providing for a joint underwriting plan; the Arbitration Panels for Health Care, compulsory screening of claims; collateral sources requirement; limitation on contingent fee compensation; establishing a Catastrophe Loss Fund; and prescribing penalties.

## TABLE OF CONTENTS

Article I.   Preliminary Provisions

    Section 101.   Short Title.
    Section 102.   Purpose.
    Section 103.   Definitions.

Article II.   Services Rendered by Non-health Care Providers

    Section 201.   Liability of Non-qualifying Health Care Providers.

Article III.   Administrator for Arbitration Panels for Health Care

    Section 301.   Appointment and Compensation of Administrator.
    Section 302.   Removal of Administrator for Cause.
    Section 303.   Appointment of Employees.
    Section 304.   Fees Paid by Health Care Providers.
    Section 305.   Preparation and Furnishing of Documents.
    Section 306.   Submission of Annual Report.
    Section 307.   Rules and Regulations.
    Section 308.   Arbitration Panels for Health Care.
    Section 309.   Jurisdiction of Arbitration Panel.

Article IV.   Procedure for Filing a Claim

    Section 401.   Filing of Complaint.
    Section 402.   Hearing and Determination of Claim.

Article V.   Procedure Before the Arbitration Panel for Health Care

    Section 501.   Location of Hearings.
    Section 502.   Joinder of Additional Parties.
    Section 503.   Service of Complaints and Hearing Notices.
    Section 504.   Service of Briefs and Pleadings.
    Section 505.   Vote Required for Deciding Matters.
    Section 506.   Applicability of Laws, Rules and Evidence.
    Section 507.   Appointment of Expert Witnesses.
    Section 508.   Powers and Duties of Arbitration Panel.
    Section 509.   Judicial Review.
    Section 510.   Admissibility of Record on Appeal.

A0722

SESSION OF 1975            Act No. 111      391

Section 511.   Transfer and Enforcement of Judgment.
Section 512.   Liability not Admitted by Advance Payment.
Section 513.   Reduction of Award by Advance Payment.
Section 514.   Submission of Findings to Licensing Boards.

Article VI.   Awards

Section 601.   Right of Recovery of Damages.
Section 602.   Reduction of Award by Other Benefits.
Section 603.   Award of Punitive Damages.
Section 604.   Attorney's Fees.
Section 605.   Statute of Limitations.
Section 606.   Provider not a Warrantor or Guarantor.

Article VII.   Medical Professional Liability Catastrophe Loss Fund

Section 701.   Professional Liability Insurance and Fund.
Section 702.   Director and Administration of Fund.
Section 703.   Discontinuance of Fund.
Section 704.   Amount and Liability for Continued Surcharge.

Article VIII.   Availability of Insurance

Section 801.   Plan to Assure Availability of Insurance.
Section 802.   Participation in Plan.
Section 803.   Plan Operation, Rates and Deficits.
Section 804.   Authority of Insurance Commissioner.
Section 805.   Financing and Payment of Premiums.
Section 806.   Selection of Insurer to Administer Plan.
Section 807.   Approval of Policies on "Claims Made" Basis.
Section 808.   When Plan Exclusive Source of Insurance.
Section 809.   Annual Reports to Insurance Commissioner.
Section 810.   Studies and Recommendations for Changes.

Article IX.   Disciplinary Proceedings

Section 901.   Investigations.
Section 902.   Hearings.
Section 903.   Hearing Examiners' Decisions.
Section 904.   Evidence.
Section 905.   Review by State Licensing Boards.
Section 906.   Judicial Review.
Section 907.   Disposition of Certain Moneys.

Article X.   General Provisions

Section 1001.   Immunity from Liability for Official Actions.
Section 1002.   Cancellation of Insurance Policy.
Section 1003.   Inapplicability to Prior Services.
Section 1004.   Existing Contract Provisions Unaffected.
Section 1005.   Fines and Penalties.

A0723

392      Act No. 111      LAWS OF PENNSYLVANIA

Section 1006.   Joint Committee.
Section 1007.   Repealer.
Section 1008.   Effective Date.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

## ARTICLE I
### Preliminary Provisions

Section 101. Short Title.—This act shall be known and may be cited as the "Health Care Services Malpractice Act."

Section 102. Purpose.—It is the purpose of this act to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation.

Section 103. Definitions.—As used in this act:

"Administrator" means the office of Administrator for Arbitration Panels for Health Care.

"Arbitration panel" means Arbitration Panels for Health Care.

"Claims made" means a policy of professional liability insurance that would limit or restrict the liability of the insurer under the policy to only those claims made or reported during the currency of the policy period and would exclude coverage for claims reported subsequent to the termination even when such claims resulted from occurrences during the currency of the policy period.

"Commissioner" means the Insurance Commissioner of this Commonwealth.

"Health care provider" means a person, corporation, facility institution or other entity licensed or approved by the Commonwealth to provide health care or professional services as a physician, including a medical doctor and a doctor of osteopathy and a doctor of podiatry; hospital; nursing home; health maintenance organization; or an officer, employee or agent of any of them acting in the course and scope of his employment.

"Informed consent" means for the purposes of this act and of any proceedings arising under the provisions of this act, the consent of a patient to the performance of health care services by a physician or podiatrist: Provided, That prior to the consent having been given, the physician or podiatrist has informed the patient of the nature of the proposed procedure or treatment and of those risks and alternatives to treatment or diagnosis that a reasonable patient would consider material to the decision whether or not to undergo treatment or diagnosis. No physician or podiatrist shall be liable for a failure to

A0724

SESSION OF 1975          Act No. 111          393

obtain an informed consent in the event of an emergency which prevents consulting the patient. No physician or podiatrist shall be liable for failure to obtain an informed consent if it is established by a preponderance of the evidence that furnishing the information in question to the patient would have resulted in a seriously adverse effect on the patient or on the therapeutic process to the material detriment of the patient's health.

"Licensure Board" means the State Board of Medical Education and Licensure, the State Board of Osteopathic Examiners, the State Board of Podiatry Examiners, the Department of Public Welfare and the Department of Health.

"Patient" means a natural person who receives or should have received health care from a licensed health care provider.

"Professional liability insurance" means insurance against liability on the part of a health care provider arising out of any tort or breach of contract causing injury or death occurring in or resulting from the furnishing of medical services which were or should have been provided.

## ARTICLE II
### Services Rendered by Non-health Care Providers

Section 201. Liability of Non-qualifying Health Care Providers.—Any person rendering services normally rendered by a health care provider who fails to qualify as a health care provider under this act is subject to liability under the law without regard to the provisions of this act.

## ARTICLE III
### Administrator for Arbitration Panels for Health Care

Section 301. Appointment and Compensation of Administrator.—There is established within the Department of Justice the office of Administrator for Arbitration Panels for Health Care to be appointed by the Governor. The salary of the administrator shall be set by the Executive Board.

Section 302. Removal of Administrator for Cause.—The administrator may be removed by the Governor for incompetence, neglect of duty, misconduct in office, or other good cause to be stated in writing in the order of removal.

Section 303. Appointment of Employees.—The administrator shall appoint a secretary and such other employees as are required to administer this act.

Section 304. Fees Paid by Health Care Providers.—(a) The administration of this act shall be funded in part from fees charged to each health care provider practicing in the Commonwealth and payable to the administrator.

(b) Physicians and podiatrists practicing in the Commonwealth shall be charged $50 annually.

A0725

77

398      Act No. 111      LAWS OF PENNSYLVANIA

## ARTICLE VI
### Awards

Section 601. Right of Recovery of Damages.—Upon a finding by the arbitration panel that the defendant's conduct was tortious or constituted a breach of contract, the plaintiff shall have the same rights of recovery for damages as are now provided by law.

Section 602. Reduction of Award by Other Benefits.—The loss and damages awarded under this act shall be reduced by any public collateral source of compensation or benefits. A right of subrogation is not enforceable against any benefit or compensation awarded under this act or against any health care provider or its liability insurer.

Section 603. Award of Punitive Damages.—In the event the arbitration panel finds that the injury or damage to the patient was caused in whole or in part by the wilful or wanton misconduct of any of the defendants, the panel may award such punitive damages against the defendant as may be awarded at law.

Section 604. Attorney's Fees.—(a) When a plaintiff is represented by an attorney in the prosecution of his claim the plaintiff's attorney fees from any award made from the first $100,000 may not exceed 30%, from the second $100,000 attorney fees may not exceed 25%, and attorney fees may not exceed 20% on the balance of any award.

(b) A plaintiff has the right to elect to pay for the attorney's services on a mutually satisfactory per diem basis. The election, however, must be exercised in written form at the time of employment.

Section 605. Statute of Limitations.—All claims for recovery pursuant to this act must be commenced within the existing applicable statutes of limitation. In the event that any claim is filed against a health care provider subject to the provisions of Article VII more than four years after the breach of contract or tort occurred, such claim shall be paid by the Medical Professional Liability Catastrophe Loss Fund established pursuant to section 701. If such claim is made after four years because of the wilfull concealment of the health care provider, the fund shall have the right of indemnity from such health care provider. A filing pursuant to section 401 shall toll the running of the limitations contained herein.

Section 606. Provider not a Warrantor or Guarantor.—In the absence of a special contract in writing, a health care provider is neither a warrantor nor a guarantor of a cure.

## ARTICLE VII
### Medical Professional Liability Catastrophe Loss Fund

Section 701. Professional Liability Insurance and Fund.—(a) Every health care provider subject to the provisions of this act shall insure his liability by purchasing professional liability insurance in the amount of $100,000 per occurrence and $300,000 per annual aggregate, hereinafter

A0730

known as "basic coverage insurance." General and special hospitals may maintain professional liability insurance in the amount of $1,000,000. Upon certification by the administrator, of the aforementioned amount of insurance maintained by all general and special hospitals, all such hospitals shall be exempt from the provisions of this article.

(b)  No insurer providing professional liability insurance to a health care provider pursuant to the provisions of section 701(a) shall be liable for payment of any claim against a health care provider for any loss or damages awarded in a professional liability action in excess of $100,000 per occurrence and $300,000 per annual aggregate.

(c)  There is hereby created a contingency fund for the purpose of paying all awards for loss or damages against a health care provider as a consequence of any medical malpractice action which are in excess of $100,000. Such fund shall be known as the "Medical Professional Liability Catastrophe Loss Fund," in this Article VII called the "fund." The limit of liability of the fund shall be $1,000,000 for each occurrence and $3,000,000 per annual aggregate.

(d)  The fund shall be funded by the levying of an annual surcharge on all health care providers. The surcharge shall be determined by the director appointed pursuant to section 702 based upon actuarial principles and subject to the prior approval of the commissioner. The surcharge shall not exceed 10% of the cost to each health care provider for maintenance of professional liability insurance or $100, whichever is greater. The fund and all income from the fund shall be held in trust, deposited in a segregated account, invested and reinvested by the director, and shall not become a part of the General Fund of the Commonwealth. If the total fund exceeds the sum of $15,000,000 at the end of any calendar year after the payment of all claims and expenses, including the expenses of operation of the office of the director, the director shall reduce the surcharge provided in this section in order to maintain the fund at an approximate level of $15,000,000. All claims shall be computed on December 31 of the year in which the claim becomes final. All such claims shall be paid within two weeks thereafter. If the fund would be exhausted by the payment in full of all claims allowed during any calendar year, then the amount paid to each claimant shall be prorated. Any amounts due and unpaid shall be paid in the following calendar year. The annual surcharge on health care providers and any income realized by investment or reinvestment shall constitute the sole and exclusive sources of funding for the fund. No claims or expenses against the fund shall be deemed to constitute a debt of the Commonwealth or a charge against the General Fund of the Commonwealth. The director shall issue rules and regulations consistent with this section regarding the establishment of the fund and the levying, payment and collection of the surcharges.

(e)  The failure of any health care provider to comply with any of the provisions of this section or any of the rules and regulations issued by

A0731

400     Act No. 111          LAWS OF PENNSYLVANIA

the director shall result in the suspension or revocation of the health care provider's license by the licensure board.

Section 702.   Director and Administration of Fund.—(a) The fund shall be administered by a director who shall be appointed by the Governor and whose salary shall be fixed by the Executive Board. The director may employ and fix the compensation of such clerical and other assistants as may be deemed necessary.

(b)   The director shall be provided with adequate offices in which the records shall be kept and official business shall be transacted, and the director shall also be provided with necessary office furniture and other supplies.

(c)   The basic coverage insurance carrier shall promptly notify the director of any case where it reasonably believes that the value of the claim exceeds the basic insurer's coverage or falls under section 605. Failure to so notify the director shall make the basic coverage insurance carrier responsible for the payment of the entire award or verdict, provided that the fund has been prejudiced by the failure of notice.

(d)   The basic coverage insurance carrier shall at all times be responsible to provide a defense for the insured health care provider. In such instances where the director has been notified in accordance with subsection (c), the director may, at his option, join in the defense and be represented by counsel.

(e)   In the event that the basic coverage insurance carrier enters into a settlement with the claimant to the full extent of its liability as provided above, it may obtain a release from the claimant to the extent of its payment, which payment shall have no effect upon any excess claim against the fund.

(f)   The director is authorized to defend, litigate, settle and/or compromise any claim in excess of the basic coverage hereinbefore provided.

(g)   The director is hereby empowered to purchase, on behalf of the fund, as much insurance or re-insurance as is necessary to preserve the fund.

(h)   Nothing in this act shall preclude the director from adjusting or paying for the adjustment of claims.

Section 703.   Discontinuance of Fund.—If after collection of the second annual surcharge, and following the collection of any subsequent annual surcharge, the fund is reduced below $7,500,000, the director shall certify such facts to the Governor and the General Assembly. If upon the expiration of 25 legislative days, following such certification, no remedial action is taken by the General Assembly, and enacted into law, the liability of the fund for claims arising from occurrences after such period shall cease and the Joint Underwriting Association created under Article VIII shall terminate and the provisions of Article VII, section 701(a) and Article VIII shall no longer apply. In such case, the fund will continue to function until all of its

A0732

liability for claims has been satisfied. The director is authorized to continue to collect a surcharge annually without limit, to the extent necessary to satisfy the obligations of the fund. Such surcharge must be filed with and approved by the commissioner prior to use. Any moneys remaining in the fund following the satisfaction of all its liabilities shall be returned to the health care providers under such terms and conditions as determined by a plan prepared by the director and approved by the commissioner.

Section 704. Amount and Liability for Continued Surcharge.—Determination of the adequacy of the surcharge is to be based on the reasonably anticipated payment of claims and other expenses of the fund during the period for which the surcharge is made. The surcharge shall be assessed against each health care provider qualifying as such at the time the surcharge is made.

## ARTICLE VIII
### Availability of Insurance

Section 801. Plan to Assure Availability of Insurance.—The commissioner shall establish and implement or approve and supervise a plan assuring that professional liability insurance will be conveniently and expeditiously available, subject only to payment or provisions for payment of the premium, to those providers who cannot conveniently obtain insurance through ordinary methods at rates not in excess of those applicable to similarly situated health care providers under the plan. The plan may provide reasonable means for the transfer of health care providers insured thereunder into the ordinary insurance market, at the same or lower rates pursuant to regulations established by the Insurance Commissioner. The plan may be implemented by a joint underwriting association that results in all applicants being conveniently afforded access to the insurance coverages on reasonable and not unfairly discriminatory terms.

Section 802. Participation in Plan.—The plan shall consist of all insurers authorized to write insurance pursuant to section 202(c)(4) and (11) of the act of May 17, 1921 (P.L.682, No.284), known as "The Insurance Company Law of 1921." The plan shall provide for equitable apportionment of the financial burdens of insurance provided to applicants under the plan and the costs of operation of the plan among all participating insurers writing such insurance coverage.

Section 803. Plan Operation, Rates and Deficits.—(a) Subject to the supervision and approval of the commissioner, insurers may consult and agree with each other and with other appropriate persons as to the organization, administration and operation of the plan and as to rates and rate modifications for insurance coverages provided under the plan. Rates and rate modifications adopted or changed for insurance coverages provided under the plan shall be approved by the commissioner in accordance with the act of June 11, 1947 (P.L.538,

A0733

No.246), known as "The Casualty and Surety Rate Regulatory Act."

(b) In the event that the Joint Underwriting Association suffers a deficit in any calendar year, the board of directors of the Joint Underwriting Association shall so certify to the director of the Catastrophe Loss Fund and the Insurance Commissioner. Such certification shall be subject to the review and approval of the Insurance Commissioner. Within 60 days following such certification and approval the director of the fund shall make sufficient payment to the Joint Underwriting Association to compensate for said deficit. A deficit shall exist whenever the sum of the earned premiums collected by the Joint Underwriting Association and the investment income therefrom is exhausted by virtue of payment of or allocation for the Joint Underwriting Association's necessary administrative expenses, taxes, losses, loss adjustment expenses and reserves, including reserves for: (1) losses incurred, (2) losses incurred but not reported, (3) loss adjustment expenses, (4) unearned premiums.

Section 804.  Authority of Insurance Commissioner.—To carry out the objectives of this article, the commissioner may adopt rules, make orders, enter into agreements with other governmental or private entities and individuals and form and operate or authorize the formation and operation of bureaus and other legal entities.

Section 805.  Financing and Payment of Premiums.—The plan shall assure that there is available through the private sector or otherwise, to all applicants, adequate premium financing or provision for the installment payment of premiums subject to customary terms and conditions.

Section 806.  Selection of Insurer to Administer Plan.—The commissioner may select an insurer to administer any plan established pursuant to this article. Such insurer shall be admitted to transact the business of insurance in this Commonwealth.

Section 807.  Approval of Policies on "Claims Made" Basis.—The Insurance Commissioner shall not approve a policy written on a "claims made" basis by any insurer doing business in this Commonwealth unless such insurer shall guarantee to the commissioner the continued availability of suitable liability protection for health care providers subsequent to the discontinuance of professional practice by the health care provider or the sooner termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the health care provider may be held liable.

Section 808.  When Plan Exclusive Source of Insurance.—If the private insurance market unfairly discriminates against higher risk physicians by denying professional liability insurance coverage to 50% or more of all physicians in insurance rating classes 3, 4 or 5, or their equivalents the commissioner, after notice in the Pennsylvania Bulletin and public hearings, may declare that the plan established under this

A0734

article shall be the sole and exclusive source of professional liability insurance for health care providers within this Commonwealth. The commissioner may dissolve the plan if he determines that it is no longer necessary and that an adequate market will be maintained for professional liability insurance for health care providers by the private insurance market. The commissioner may reestablish the plan if he shall find that the private industry has failed to provide an adequate market for professional liability insurance by denying professional liability insurance coverage to 50% or more of all rating classes 3, 4 or 5, or their equivalents, and may declare it the sole and exclusive source of such insurance under the procedure set forth in this section.

Section 809.   Annual Reports to Insurance Commissioner.—The plan shall report to the commissioner annually on a date and, on a form prescribed by the commissioner the total amount of premium dollars collected, the total amount of claims paid and expenses incurred therewith, the total amount of reserve set aside for future claims, the nature and substance of each claim, the date and place in which each claim arose, the amounts paid, if any, and the disposition of each claim (judgment of arbitration panel, judgment of court, settlement or otherwise), and such additional information as the commissioner shall require.

Section 810.   Studies and Recommendations for Changes.—The plan shall conduct studies and review member records for the purpose of determining the causes of patient compensation claims and make recommendations for legislative, regulatory and other changes necessary to reduce the frequency and severity of such claims.

## ARTICLE IX
### Disciplinary Proceedings

Section 901.   Investigations.—The State Board of Medical Education and Licensure, the State Board of Osteopathic Examiners and the State Board of Podiatry Examiners shall employ such qualified investigators and attorneys as are necessary to fully implement their authority to revoke, suspend, limit or otherwise regulate the licenses of physicians; issue reprimands, fines, require refresher educational courses, or require licensees to submit to medical treatment.

Section 902.   Hearings.—(a) The State Board of Medical Education and Licensure, the State Board of Osteopathic Examiners and the State Board of Podiatry Examiners shall appoint, with the approval of the Governor, such hearing examiners as shall be necessary to conduct hearings in accordance with the disciplinary authority granted by the act of July 20, 1974 (P.L.551, No.190), known as the "Medical Practice Act of 1974," and the act of March 19, 1909 (P.L.46, No.29), entitled, as amended, "An act to regulate the practice of osteopathy and surgery in the State of Pennsylvania; to provide for the establishment of a State Board of Osteopathic Examiners; to define the powers and duties of said

A0735

83

**MEDICAL CARE AVAILABILITY AND REDUCTION OF ERROR (MCARE) ACT**
**Act of Mar. 20, 2002, P.L. 154, No. 13    40**
AN ACT

Reforming the law on medical professional liability; providing
for patient safety and reporting; establishing the Patient
Safety Authority and the Patient Safety Trust Fund;
abrogating regulations; providing for medical professional
liability informed consent, damages, expert qualifications,
limitations of actions and medical records; establishing the
Interbranch Commission on Venue; providing for medical
professional liability insurance; establishing the Medical
Care Availability and Reduction of Error Fund; providing for
medical professional liability claims; establishing the Joint
Underwriting Association; regulating medical professional
liability insurance; providing for medical licensure
regulation; providing for administration; imposing penalties;
and making repeals.

TABLE OF CONTENTS

Chapter 1.  Preliminary Provisions

Section 101.  Short title.
Section 102.  Declaration of policy.
Section 103.  Definitions.
Section 104.  Liability of nonqualifying health care providers.
Section 105.  Provider not a warrantor or guarantor.

Chapter 3.  Patient Safety

Section 301.  Scope.
Section 302.  Definitions.
Section 303.  Establishment of Patient Safety Authority.
Section 304.  Powers and duties.
Section 305.  Patient Safety Trust Fund.
Section 306.  Department responsibilities.
Section 307.  Patient safety plans.
Section 308.  Reporting and notification.
Section 309.  Patient safety officer.
Section 310.  Patient safety committee.
Section 311.  Confidentiality and compliance.
Section 312.  Patient safety discount.
Section 313.  Medical facility reports and notifications.
Section 314.  Existing regulations.

Chapter 5.  Medical Professional Liability

Section 501.  Scope.
Section 502.  Declaration of policy.
Section 503.  Definitions.
Section 504.  Informed consent.
Section 505.  Punitive damages.
Section 506.  Affidavit of noninvolvement.
Section 507.  Advance payments.
Section 508.  Collateral sources.
Section 509.  Payment of damages.

A0843

Section 510.  Reduction to present value.
Section 511.  Preservation and accuracy of medical records.
Section 512.  Expert qualifications.
Section 513.  Statute of repose.
Section 514.  Interbranch Commission on Venue.
Section 515.  Remittitur.
Section 516.  Ostensible agency.

Chapter 7.  Insurance

    Subchapter A.  Preliminary Provisions

Section 701.  Scope.
Section 702.  Definitions.

    Subchapter B.  Fund

Section 711.  Medical professional liability insurance.
Section 712.  Medical Care Availability and Reduction of Error
              Fund.
Section 713.  Administration of fund.
Section 714.  Medical professional liability claims.
Section 715.  Extended claims.
Section 716.  Podiatrist liability.

    Subchapter C.  Joint Underwriting Association

Section 731.  Joint underwriting association.
Section 732.  Medical professional liability insurance.
Section 733.  Deficit.

    Subchapter D.  Regulation of Medical Professional
                   Liability Insurance

Section 741.  Approval.
Section 742.  Approval of policies on "claims made" basis.
Section 743.  Reports to commissioner and claims information.
Section 744.  Professional corporations, professional
              associations and partnerships.
Section 745.  Actuarial data.
Section 746.  Mandatory reporting.
Section 747.  Cancellation of insurance policy.
Section 748.  Regulations.

Chapter 9.  Administrative Provisions

Section 901.  Scope.
Section 902.  Definitions.
Section 903.  Reporting.
Section 904.  Commencement of investigation and action.
Section 905.  Action on negligence.
Section 906.  Confidentiality agreements.
Section 907.  Confidentiality of records of licensure boards.
Section 908.  Licensure board-imposed civil penalty.
Section 909.  Licensure board report.
Section 910.  Continuing medical education.

A0844

Chapter 51.  Miscellaneous Provisions

Section 5101.  Oversight.
Section 5102.  Prior fund.
Section 5103.  Notice.
Section 5104.  Repeals.
Section 5105.  Applicability.
Section 5106.  Expiration.
Section 5107.  Continuation.
Section 5108.  Effective date.
     The General Assembly of the Commonwealth of Pennsylvania
hereby enacts as follows:

CHAPTER 1
PRELIMINARY PROVISIONS

Section 101.  Short title.
     This act shall be known and may be cited as the Medical Care
Availability and Reduction of Error (Mcare) Act.
Section 102.  Declaration of policy.
     The General Assembly finds and declares as follows:
     (1)  It is the purpose of this act to ensure that medical
care is available in this Commonwealth through a
comprehensive and high-quality health care system.
     (2)  Access to a full spectrum of hospital services and
to highly trained physicians in all specialties must be
available across this Commonwealth.
     (3)  To maintain this system, medical professional
liability insurance has to be obtainable at an affordable and
reasonable cost in every geographic region of this
Commonwealth.
     (4)  A person who has sustained injury or death as a
result of medical negligence by a health care provider must
be afforded a prompt determination and fair compensation.
     (5)  Every effort must be made to reduce and eliminate
medical errors by identifying problems and implementing
solutions that promote patient safety.
     (6)  Recognition and furtherance of all of these elements
is essential to the public health, safety and welfare of all
the citizens of Pennsylvania.
Section 103.  Definitions.
     The following words and phrases when used in this act shall
have the meanings given to them in this section unless the
context clearly indicates otherwise:
     "Birth center."  An entity licensed as a birth center under
the act of July 19, 1979 (P.L.130, No.48), known as the Health
Care Facilities Act.
     "Claimant."  A patient, including a patient's immediate
family, guardian, personal representative or estate.
     "Commissioner."  The Insurance Commissioner of the
Commonwealth.
     "Guardian."  A fiduciary who has the care and management of
the estate or person of a minor or an incapacitated person.
     "Health care provider."  A primary health care center or a
person, including a corporation, university or other educational
institution licensed or approved by the Commonwealth to provide
health care or professional medical services as a physician, a
certified nurse midwife, a podiatrist, hospital, nursing home,
birth center and, except as to section 711(a), an officer,

A0845

employee or agent of any of them acting in the course and scope
of employment.
   "Hospital." An entity licensed as a hospital under the act
of June 13, 1967 (P.L.31, No.21), known as the Public Welfare
Code, or the act of July 19, 1979 (P.L.130, No.48), known as the
Health Care Facilities Act.
   "Immediate family." A parent, a spouse, a child or an adult
sibling residing in the same household.
   "Medical professional liability action." Any proceeding in
which a medical professional liability claim is asserted,
including an action in a court of law or an arbitration
proceeding.
   "Medical professional liability claim." Any claim seeking
the recovery of damages or loss from a health care provider
arising out of any tort or breach of contract causing injury or
death resulting from the furnishing of health care services
which were or should have been provided.
   "Nursing home." An entity licensed as a nursing home under
the act of July 19, 1979 (P.L.130, No.48), known as the Health
Care Facilities Act.
   "Patient." A natural person who receives or should have
received health care from a health care provider.
   "Personal representative." An executor or administrator of a
patient's estate.
   "Primary health center." A community-based nonprofit
corporation meeting standards prescribed by the Department of
Health which provides preventive, diagnostic, therapeutic and
basic emergency health care by licensed practitioners who are
employees of the corporation or under contract to the
corporation.
Section 104. Liability of nonqualifying health care providers.
   Any person rendering services normally rendered by a health
care provider who fails to qualify as a health care provider
under this act is subject to liability under the law without
regard to the provisions of this act.
Section 105. Provider not a warrantor or guarantor.
   In the absence of a special contract in writing, a health
care provider is neither a warrantor nor a guarantor of a cure.


                         CHAPTER 3
                       PATIENT SAFETY
Section 301. Scope.
   This chapter relates to the reduction of medical errors for
the purpose of ensuring patient safety.
Section 302. Definitions.
   The following words and phrases when used in this chapter
shall have the meanings given to them in this section unless the
context clearly indicates otherwise:
   "Ambulatory surgical facility." An entity defined as an
ambulatory surgical facility under the act of July 19, 1979
(P.L.130, No.48), known as the Health Care Facilities Act.
   "Authority." The Patient Safety Authority established in
section 303.
   "Board." The board of directors of the Patient Safety
Authority.
   "Department." The Department of Health of the Commonwealth.
   "Fund." The Patient Safety Trust Fund established in section

A0846

lower court's denial of remittitur may find an abuse of
discretion if evidence of the impact of paying the verdict upon
availability and access to health care in the community has not
been adequately considered by the lower court.
    (d)  Limit of security.--A trial court or appellate court may
limit or reduce the amount of security that a defendant health
care provider must post to prevent execution if the court finds
that requiring a bond in excess of the limits of available
insurance coverage would effectively deny the right to appeal.
Section 516.  Ostensible agency.
    (a)  Vicarious liability.--A hospital may be held vicariously
liable for the acts of another health care provider through
principles of ostensible agency only if the evidence shows that:
        (1)  a reasonably prudent person in the patient's
    position would be justified in the belief that the care in
    question was being rendered by the hospital or its agents; or
        (2)  the care in question was advertised or otherwise
    represented to the patient as care being rendered by the
    hospital or its agents.
    (b)  Staff privileges.--Evidence that a physician holds staff
privileges at a hospital shall be insufficient to establish
vicarious liability through principles of ostensible agency
unless the claimant meets the requirements of subsection (a)(1)
or (2).


                        CHAPTER 7
                        INSURANCE


                        SUBCHAPTER A
                    PRELIMINARY PROVISIONS
Section 701.  Scope.
    This chapter relates to medical professional liability
insurance.
Section 702.  Definitions.
    The following words and phrases when used in this chapter
shall have the meanings given to them in this section unless the
context clearly indicates otherwise:
    "Basic insurance coverage."  The limits of medical
professional liability insurance required under section 711(d).
    "Claims made."  Medical professional liability insurance that
insures those claims made or reported during a period which is
insured and excludes coverage for a claim reported subsequent to
the period even if the claim resulted from an occurrence during
the period which was insured.
    "Claims period."  The period from September 1 to the
following August 31.
    "Deficit."  A joint underwriting association loss which
exceeds the sum of earned premiums collected by the joint
underwriting association and investment income.
    "Department."  The Insurance Department of the Commonwealth.
    "Fund."  The Medical Care Availability and Reduction of Error
(Mcare) Fund established in section 712.
    "Fund coverage limits."  The coverage provided by the Medical
Care Availability and Reduction of Error Fund under section 712.
    "Government."  The Government of the United States, any
state, any political subdivision of a state, any instrumentality
of one or more states or any agency, subdivision or department

A0864

of any such government, including any corporation or other
association organized by a government for the execution of a
government program and subject to control by a government or any
corporation or agency established under an interstate compact or
international treaty.

"Health care business or practice."  The number of patients
to whom health care services are rendered by a health care
provider within an annual period.

"Health care provider."  A participating health care provider
or nonparticipating health care provider.

"Joint underwriting association."  The Pennsylvania
Professional Liability Joint Underwriting Association
established in section 731.

"Joint underwriting association loss."  The sum of the
administrative expenses, taxes, losses, loss adjustment
expenses, unearned premiums and reserves, including reserves for
losses incurred and losses incurred but not reported, of the
joint underwriting association.

"Licensure authority."  The State Board of Medicine, the
State Board of Osteopathic Medicine, the State Board of
Podiatry, the Department of Public Welfare and the Department of
Health.

"Medical professional liability insurance."  Insurance
against liability on the part of a health care provider arising
out of any tort or breach of contract causing injury or death
resulting from the furnishing of medical services which were or
should have been provided.

"Nonparticipating health care provider."  A health care
provider as defined in section 103 that conducts 20% or less of
its health care business or practice within this Commonwealth.

"Participating health care provider."  A health care provider
as defined in section 103 that conducts more than 20% of its
health care business or practice within this Commonwealth or a
nonparticipating health care provider who chooses to participate
in the fund.

"Prevailing primary premium."  The schedule of occurrence
rates approved by the commissioner for the joint underwriting
association.

                    SUBCHAPTER B
                        FUND
Section 711.  Medical professional liability insurance.
    (a)  Requirement.--A health care provider providing health
care services in this Commonwealth shall:
        (1)  purchase medical professional liability insurance
    from an insurer which is licensed or approved by the
    department; or
        (2)  provide self-insurance.
    (b)  Proof of insurance.--A health care provider required by
subsection (a) to purchase medical professional liability
insurance or provide self-insurance shall submit proof of
insurance or self-insurance to the department within 60 days of
the policy being issued.
    (c)  Failure to provide proof of insurance.--If a health care
provider fails to submit the proof of insurance or self-
insurance required by subsection (b), the department shall,
after providing the health care provider with notice, notify the

A0865

health care provider's licensing authority. A health care
provider's license shall be suspended or revoked by its
licensure board or agency if the health care provider fails to
comply with any of the provisions of this chapter.

(d) Basic coverage limits.--A health care provider shall
insure or self-insure medical professional liability in
accordance with the following:

(1) For policies issued or renewed in the calendar year
2002, the basic insurance coverage shall be:

(i) $500,000 per occurrence or claim and $1,500,000
per annual aggregate for a health care provider who
conducts more than 50% of its health care business or
practice within this Commonwealth and that is not a
hospital.

(ii) $500,000 per occurrence or claim and $1,500,000
per annual aggregate for a health care provider who
conducts 50% or less of its health care business or
practice within this Commonwealth.

(iii) $500,000 per occurrence or claim and
$2,500,000 per annual aggregate for a hospital.

(2) For policies issued or renewed in the calendar years
2003, 2004 and 2005, the basic insurance coverage shall be:

(i) $500,000 per occurrence or claim and $1,500,000
per annual aggregate for a participating health care
provider that is not a hospital.

(ii) $1,000,000 per occurrence or claim and
$3,000,000 per annual aggregate for a nonparticipating
health care provider.

(iii) $500,000 per occurrence or claim and
$2,500,000 per annual aggregate for a hospital.

(3) Unless the commissioner finds pursuant to section
745(a) that additional basic insurance coverage capacity is
not available, for policies issued or renewed in calendar
year 2006 and each year thereafter subject to paragraph (4),
the basic insurance coverage shall be:

(i) $750,000 per occurrence or claim and $2,250,000
per annual aggregate for a participating health care
provider that is not a hospital.

(ii) $1,000,000 per occurrence or claim and
$3,000,000 per annual aggregate for a nonparticipating
health care provider.

(iii) $750,000 per occurrence or claim and
$3,750,000 per annual aggregate for a hospital.

If the commissioner finds pursuant to section 745(a) that
additional basic insurance coverage capacity is not
available, the basic insurance coverage requirements shall
remain at the level required by paragraph (2); and the
commissioner shall conduct a study every two years until the
commissioner finds that additional basic insurance coverage
capacity is available, at which time the commissioner shall
increase the required basic insurance coverage in accordance
with this paragraph.

(4) Unless the commissioner finds pursuant to section
745(b) that additional basic insurance coverage capacity is
not available, for policies issued or renewed three years
after the increase in coverage limits required by paragraph
(3) and for each year thereafter, the basic insurance

A0866

90

coverage shall be:
      (i)  $1,000,000 per occurrence or claim and $3,000,000 per annual aggregate for a participating health care provider that is not a hospital.
      (ii)  $1,000,000 per occurrence or claim and $3,000,000 per annual aggregate for a nonparticipating health care provider.
      (iii)  $1,000,000 per occurrence or claim and $4,500,000 per annual aggregate for a hospital.
If the commissioner finds pursuant to section 745(b) that additional basic insurance coverage capacity is not available, the basic insurance coverage requirements shall remain at the level required by paragraph (3); and the commissioner shall conduct a study every two years until the commissioner finds that additional basic insurance coverage capacity is available, at which time the commissioner shall increase the required basic insurance coverage in accordance with this paragraph.
  (e)  Fund participation.--A participating health care provider shall be required to participate in the fund.
  (f)  Self-insurance.--
    (1)  If a health care provider self-insures its medical professional liability, the health care provider shall submit its self-insurance plan, such additional information as the department may require and the examination fee to the department for approval.
    (2)  The department shall approve the plan if it determines that the plan constitutes protection equivalent to the insurance required of a health care provider under subsection (d).
  (g)  Basic insurance liability.--
    (1)  An insurer providing medical professional liability insurance shall not be liable for payment of a claim against a health care provider for any loss or damages awarded in a medical professional liability action in excess of the basic insurance coverage required by subsection (d) unless the health care provider's medical professional liability insurance policy or self-insurance plan provides for a higher limit.
    (2)  If a claim exceeds the limits of a participating health care provider's basic insurance coverage or self-insurance plan, the fund shall be responsible for payment of the claim against the participating health care provider up to the fund liability limits.
  (h)  Excess insurance.--
    (1)  No insurer providing medical professional liability insurance with liability limits in excess of the fund's liability limits to a participating health care provider shall be liable for payment of a claim against the participating health care provider for a loss or damages in a medical professional liability action except the losses and damages in excess of the fund coverage limits.
    (2)  No insurer providing medical professional liability insurance with liability limits in excess of the fund's liability limits to a participating health care provider shall be liable for any loss resulting from the insolvency or dissolution of the fund.

A0867

(i)  Governmental entities.--A governmental entity may
satisfy its obligations under this chapter, as well as the
obligations of its employees to the extent of their employment,
by either purchasing medical professional liability insurance or
assuming an obligation as a self-insurer, and paying the
assessments under this chapter.
    (j)  Exemptions.--The following participating health care
providers shall be exempt from this chapter:
        (1)  A physician who exclusively practices the specialty
    of forensic pathology.
        (2)  A participating health care provider who is a member
    of the Pennsylvania military forces while in the performance
    of the member's assigned duty in the Pennsylvania military
    forces under orders.
        (3)  A retired licensed participating health care
    provider who provides care only to the provider or the
    provider's immediate family members.
Section 712.  Medical Care Availability and Reduction of Error
                Fund.
    (a)  Establishment.--There is hereby established within the
State Treasury a special fund to be known as the Medical Care
Availability and Reduction of Error Fund. Money in the fund
shall be used to pay claims against participating health care
providers for losses or damages awarded in medical professional
liability actions against them in excess of the basic insurance
coverage required by section 711(d), liabilities transferred in
accordance with subsection (b) and for the administration of the
fund.
    (b)  Transfer of assets and liabilities.--
        (1)  (i)  The money in the Medical Professional Liability
        Catastrophe Loss Fund established under section 701(d) of
        the former act of October 15, 1975 (P.L.390, No.111),
        known as the Health Care Services Malpractice Act, is
        transferred to the fund.
            (ii)  The rights of the Medical Professional
        Liability Catastrophe Loss Fund established under section
        701(d) of the former Health Care Services Malpractice Act
        are transferred to and assumed by the fund.
        (2)  The liabilities and obligations of the Medical
    Professional Liability Catastrophe Loss Fund established
    under section 701(d) of the former Health Care Services
    Malpractice Act are transferred to and assumed by the fund.
    (c)  Fund liability limits.--
        (1)  For calendar year 2002, the limit of liability of
    the fund created in section 701(d) of the former Health Care
    Services Malpractice Act for each health care provider that
    conducts more than 50% of its health care business or
    practice within this Commonwealth and for each hospital shall
    be $700,000 for each occurrence and $2,100,000 per annual
    aggregate.
        (2)  The limit of liability of the fund for each
    participating health care provider shall be as follows:
            (i)  For calendar year 2003 and each year thereafter,
        the limit of liability of the fund shall be $500,000 for
        each occurrence and $1,500,000 per annual aggregate.
            (ii)  If the basic insurance coverage requirement is
        increased in accordance with section 711(d)(3) and,

A0868

notwithstanding subparagraph (i), for each calendar year following the increase in the basic insurance coverage requirement, the limit of liability of the fund shall be $250,000 for each occurrence and $750,000 per annual aggregate.

(iii)  If the basic insurance coverage requirement is increased in accordance with section 711(d)(4) and, notwithstanding subparagraphs (i) and (ii), for each calendar year following the increase in the basic insurance coverage requirement, the limit of liability of the fund shall be zero.

(d)  Assessments.--

(1)  For calendar year 2003 and for each year thereafter, the fund shall be funded by an assessment on each participating health care provider. Assessments shall be levied by the department on or after January 1 of each year. The assessment shall be based on the prevailing primary premium for each participating health care provider and shall, in the aggregate, produce an amount sufficient to do all of the following:

(i)  Reimburse the fund for the payment of reported claims which became final during the preceding claims period.

(ii)  Pay expenses of the fund incurred during the preceding claims period.

(iii)  Pay principal and interest on moneys transferred into the fund in accordance with section 713(c).

(iv)  Provide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii).

(2)  The department shall notify all basic insurance coverage insurers and self-insured participating health care providers of the assessment by November 1 for the succeeding calendar year.

(3)  Any appeal of the assessment shall be filed with the department.

(e)  Discount on surcharges and assessments.--

(1)  For calendar year 2002, the department shall discount the aggregate surcharge imposed under section 701(e)(1) of the Health Care Services Malpractice Act by 5% of the aggregate surcharge imposed under that section for calendar year 2001 in accordance with the following:

(i)  Fifty percent of the aggregate discount shall be granted equally to hospitals and to participating health care providers that were surcharged as members of one of the four highest rate classes of the prevailing primary premium.

(ii)  Notwithstanding subparagraph (i), 50% of the aggregate discount shall be granted equally to all participating health care providers.

(iii)  The department shall issue a credit to a participating health care provider who, prior to the effective date of this section, has paid the surcharge imposed under section 701(e)(1) of the former Health Care Services Malpractice Act for calendar year 2002 prior to the effective date of this section.

(2)  For calendar years 2003 and 2004, the department

A0869

shall discount the aggregate assessment imposed under subsection (d) for each calendar year by 10% of the aggregate surcharge imposed under section 701(e)(1) of the former Health Care Services Malpractice Act for calendar year 2001 in accordance with the following:

(i) Fifty percent of the aggregate discount shall be granted equally to hospitals and to participating health care providers that were assessed as members of one of the four highest rate classes of the prevailing primary premium.

(ii) Notwithstanding subparagraph (i), 50% of the aggregate discount shall be granted equally to all participating health care providers.

(3) For calendar years 2005 and thereafter, if the basic insurance coverage requirement is increased in accordance with section 711(d)(3) or (4), the department may discount the aggregate assessment imposed under subsection (d) by an amount not to exceed the aggregate sum to be deposited in the fund in accordance with subsection (m).

(f) Updated rates.--The joint underwriting association shall file updated rates for all health care providers with the commissioner by May 1 of each year. The department shall review and may adjust the prevailing primary premium in line with any applicable changes which have been approved by the commissioner.

(g) Additional adjustments of the prevailing primary premium.--The department shall adjust the applicable prevailing primary premium of each participating health care provider in accordance with the following:

(1) The applicable prevailing primary premium of a participating health care provider which is not a hospital may be adjusted through an increase in the individual participating health care provider's prevailing primary premium not to exceed 20%. Any adjustment shall be based upon the frequency of claims paid by the fund on behalf of the individual participating health care provider during the past five most recent claims periods and shall be in accordance with the following:

(i) If three claims have been paid during the past five most recent claims periods by the fund, a 10% increase shall be charged.

(ii) If four or more claims have been paid during the past five most recent claims periods by the fund, a 20% increase shall be charged.

(2) The applicable prevailing primary premium of a participating health care provider which is not a hospital and which has not had an adjustment under paragraph (1) may be adjusted through an increase in the individual participating health care provider's prevailing primary premium not to exceed 20%. Any adjustment shall be based upon the severity of at least two claims paid by the fund on behalf of the individual participating health care provider during the past five most recent claims periods.

(3) The applicable prevailing primary premium of a participating health care provider not engaged in direct clinical practice on a full-time basis may be adjusted through a decrease in the individual participating health care provider's prevailing primary premium not to exceed 10%.

A0870

Any adjustment shall be based upon the lower risk associated with the less-than-full-time direct clinical practice.

(4)  The applicable prevailing primary premium of a hospital may be adjusted through an increase or decrease in the individual hospital's prevailing primary premium not to exceed 20%. Any adjustment shall be based upon the frequency and severity of claims paid by the fund on behalf of other hospitals of similar class, size, risk and kind within the same defined region during the past five most recent claims periods.

(h)  Self-insured health care providers.--A participating health care provider that has an approved self-insurance plan shall be assessed an amount equal to the assessment imposed on a participating health care provider of like class, size, risk and kind as determined by the department.

(i)  Change in basic insurance coverage.--If a participating health care provider changes the term of its medical professional liability insurance coverage, the assessment shall be calculated on an annual basis and shall reflect the assessment percentages in effect for the period over which the policies are in effect.

(j)  Payment of claims.--Claims which became final during the preceding claims period shall be paid on or before December 31 following the August 31 on which they became final.

(k)  Termination.--Upon satisfaction of all liabilities of the fund, the fund shall terminate. Any balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments in the preceding calendar year.

(l)  Sole and exclusive source of funding.--Except as provided in subsection (m), the surcharges imposed under section 701(e)(1) of the Health Care Services Malpractice Act and assessments on participating health care providers and any income realized by investment or reinvestment shall constitute the sole and exclusive sources of funding for the fund. Nothing in this subsection shall prohibit the fund from accepting contributions from nongovernmental sources. A claim against or a liability of the fund shall not be deemed to constitute a debt or liability of the Commonwealth or a charge against the General Fund.

(m)  Supplemental funding.--Notwithstanding the provisions of 75 Pa.C.S. § 6506(b) (relating to surcharge) to the contrary, beginning January 1, 2004, and for a period of nine calendar years thereafter, all surcharges levied and collected under 75 Pa.C.S. § 6506(a) by any division of the unified judicial system shall be remitted to the Commonwealth for deposit in the Medical Care Availability and Restriction of Error Fund. These funds shall be used to reduce surcharges and assessments in accordance with subsection (e). Beginning January 1, 2014, and each year thereafter, the surcharges levied and collected under 75 Pa.C.S. § 6506(a) shall be deposited into the General Fund.

(n)  Waiver of right to consent to settlement.--A participating health care provider may maintain the right to consent to a settlement in a basic insurance coverage policy for medical professional liability insurance upon the payment of an additional premium amount.

A0871

Section 713. Administration of fund.

(a) General rule.--The fund shall be administered by the department. The department shall contract with an entity or entities for the administration of claims against the fund in accordance with 62 Pa.C.S. (relating to procurement), and, to the fullest extent practicable, the department shall contract with entities that:

(1) Are not writing, underwriting or brokering medical professional liability insurance for participating health care providers; however, the department may contract with a subsidiary or affiliate of any writer, underwriter or broker of medical professional liability insurance.

(2) Are not trade organizations or associations representing the interests of participating health care providers in this Commonwealth.

(3) Have demonstrable knowledge of and experience in the handling and adjusting of professional liability or other catastrophic claims.

(4) Have developed, instituted and utilized best practice standards and systems for the handling and adjusting of professional liability or other catastrophic claims.

(5) Have demonstrable knowledge of and experience with the professional liability marketplace and the judicial systems of this Commonwealth.

(b) Reinsurance.--The department may purchase, on behalf of and in the name of the fund, as much insurance or reinsurance as is necessary to preserve the fund or retire the liabilities of the fund.

(c) Transfers.--The Governor may transfer to the fund from the Catastrophic Loss Benefits Continuation Fund, or such other funds as may be appropriate, such money as is necessary in order to pay the liabilities of the fund until sufficient revenues are realized by the fund. Any transfer made under this subsection shall be repaid with interest pursuant to section 2 of the act of August 22, 1961 (P.L.1049, No.479), entitled "An act authorizing the State Treasurer under certain conditions to transfer sums of money between the General Fund and certain funds and subsequent transfers of equal sums between such funds, and making appropriations necessary to effect such transfers."

(d) Confidentiality.--Information provided to the department or maintained by the department regarding a claim or adjustments to an individual participating health care provider's assessment shall be confidential, notwithstanding the act of June 21, 1957 (P.L.390, No.212), referred to as the Right-to-Know Law, or 65 Pa.C.S. Ch. 7 (relating to open meetings).

Section 714. Medical professional liability claims.

(a) Notification.--A basic coverage insurer or self-insured participating health care provider shall promptly notify the department in writing of any medical professional liability claim.

(b) Failure to notify.--If a basic coverage insurer or self-insured participating health care provider fails to notify the department as required under subsection (a) and the department has been prejudiced by the failure of notice, the insurer or provider shall be solely responsible for the payment of the entire award or verdict that results from the medical professional liability claim.

A0872

(c)  Defense.--A basic coverage insurer or self-insured
participating health care provider shall provide a defense to a
medical professional liability claim, including a defense of any
potential liability of the fund, except as provided for in
section 715. The department may join in the defense and be
represented by counsel.

(d)  Responsibilities.--In accordance with section 713, the
department may defend, litigate, settle or compromise any
medical professional liability claim payable by the fund.

(e)  Releases.--In the event that a basic coverage insurer or
self-insured participating health care provider enters into a
settlement with a claimant to the full extent of its liability
as provided in this chapter, it may obtain a release from the
claimant to the extent of its payment, which payment shall have
no effect upon any claim against the fund or its duty to
continue the defense of the claim.

(f)  Adjustment.--The department may adjust claims.

(g)  Mediation.--Upon the request of a party to a medical
professional liability claim within the fund coverage limits,
the department may provide for a mediator in instances where
multiple carriers disagree on the disposition or settlement of a
case. Upon the consent of all parties, the mediation shall be
binding. Proceedings conducted and information provided in
accordance with this section shall be confidential and shall not
be considered public information subject to disclosure under the
act of June 21, 1957 (P.L.390, No.212), referred to as the
Right-to-Know Law, or 65 Pa.C.S. Ch. 7 (relating to open
meetings).

(h)  Delay damages and postjudgment interest.--Delay damages
and postjudgment interest applicable to the fund's liability on
a medical professional liability claim shall be paid by the fund
and shall not be charged against the participating health care
provider's annual aggregate limits. The basic coverage insurer
or self-insured participating health care provider shall be
responsible for its proportionate share of delay damages and
postjudgment interest.
Section 715.  Extended claims.

(a)  General rule.--If a medical professional liability claim
against a health care provider who was required to participate
in the Medical Professional Liability Catastrophe Loss Fund
under section 701(d) of the act of October 15, 1975 (P.L.390,
No.111), known as the Health Care Services Malpractice Act, is
made more than four years after the breach of contract or tort
occurred and if the claim is filed within the applicable statute
of limitations, the claim shall be defended by the department if
the department received a written request for indemnity and
defense within 180 days of the date on which notice of the claim
is first given to the participating health care provider or its
insurer. Where multiple treatments or consultations took place
less than four years before the date on which the health care
provider or its insurer received notice of the claim, the claim
shall be deemed for purposes of this section to have occurred
less than four years prior to the date of notice and shall be
defended by the insurer in accordance with this chapter.

(b)  Payment.--If a health care provider is found liable for
a claim defended by the department in accordance with subsection
(a), the claim shall be paid by the fund. The limit of liability

A0873

of the fund for a claim defended by the department under
subsection (a) shall be $1,000,000 per occurrence.
    (c)  Concealment.--If a claim is defended by the department
under subsection (a) or paid under subsection (b) and the claim
is made after four years because of the willful concealment by
the health care provider or its insurer, the fund shall have the
right to full indemnity, including the department's defense
costs, from the health care provider or its insurer.
    (d)  Extended coverage required.--Notwithstanding subsections
(a), (b) and (c), all medical professional liability insurance
policies issued on or after January 1, 2006, shall provide
indemnity and defense for claims asserted against a health care
provider for a breach of contract or tort which occurs four or
more years after the breach of contract or tort occurred and
after December 31, 2005.
Section 716.  Podiatrist liability.
    Within two years of the effective date of this chapter, the
department shall calculate the amount necessary to arrange for
the separate retirement of the fund's liabilities associated
with podiatrists. Any arrangement shall be on terms and
conditions proportionate to the individual liability of the
class of health care provider. The arrangement may result in
assessments for podiatrists different from the assessments for
other health care providers. Upon satisfaction of the
arrangement, podiatrists shall not be required to contribute to
or be entitled to participate in the fund. In cases where the
class rejects an arrangement, the department shall present to
the provider class new term arrangements at least once in every
two-year period. All costs and expenses associated with the
completion and implementation of the arrangement shall be paid
by podiatrists and may be charged in the form of an addition to
the assessment.


                          SUBCHAPTER C
                 JOINT UNDERWRITING ASSOCIATION
Section 731.  Joint underwriting association.
    (a)  Establishment.--There is established a nonprofit joint
underwriting association to be known as the Pennsylvania
Professional Liability Joint Underwriting Association. The joint
underwriting association shall consist of all insurers
authorized to write insurance in accordance with section
202(c)(4) and (11) of the act of May 17, 1921 (P.L.682, No.284),
known as The Insurance Company Law of 1921, and shall be
supervised by the department. The powers and duties of the joint
underwriting association shall be vested in and exercised by a
board of directors.
    (b)  Duties.--The joint underwriting association shall do all
of the following:
        (1)  Submit a plan of operation to the commissioner for
    approval.
        (2)  Submit rates and any rate modification to the
    department for approval in accordance with the act of June
    11, 1947 (P.L.538, No.246), known as The Casualty and Surety
    Rate Regulatory Act.
        (3)  Offer medical professional liability insurance to
    health care providers in accordance with section 732.
        (4)  File with the department the information required in

A0874

section 712.
(c)  Liabilities.--A claim against or a liability of the
joint underwriting association shall not be deemed to constitute
a debt or liability of the Commonwealth or a charge against the
General Fund.
Section 732.  Medical professional liability insurance.
(a)  Insurance.--The joint underwriting association shall
offer medical professional liability insurance to health care
providers and professional corporations, professional
associations and partnerships which are entirely owned by health
care providers who cannot conveniently obtain medical
professional liability insurance through ordinary methods at
rates not in excess of those applicable to similarly situated
health care providers, professional corporations, professional
associations or partnerships.
(b)  Requirements.--The joint underwriting association shall
ensure that the medical professional liability insurance it
offers does all of the following:
    (1)  Is conveniently and expeditiously available to all
health care providers required to be insured under section
711.
    (2)  Is subject only to the payment or provisions for
payment of the premium.
    (3)  Provides reasonable means for the health care
providers it insures to transfer to the ordinary insurance
market.
    (4)  Provides sufficient coverage for a health care
provider to satisfy its insurance requirements under section
711 on reasonable and not unfairly discriminatory terms.
    (5)  Permits a health care provider to finance its
premium or allows installment payment of premiums subject to
customary terms and conditions.
Section 733.  Deficit.
(a)  Filing.--In the event the joint underwriting association
experiences a deficit in any calendar year, the board of
directors shall file with the commissioner the deficit.
(b)  Approval.--Within 30 days of receipt of the filing, the
commissioner shall approve or deny the filing. If approved, the
joint underwriting association is authorized to borrow funds
sufficient to satisfy the deficit.
(c)  Rate filing.--Within 30 days of receiving approval of
its filing in accordance with subsection (b), the joint
underwriting association shall file a rate filing with the
department. The commissioner shall approve the filing if the
premiums generate sufficient income for the joint underwriting
association to avoid a deficit during the following 12 months
and to repay principal and interest on the money borrowed in
accordance with subsection (b).

SUBCHAPTER D
REGULATION OF MEDICAL PROFESSIONAL
LIABILITY INSURANCE
Section 741.  Approval.
    In order for an insurer to issue a policy of medical
professional liability insurance to a health care provider or to
a professional corporation, professional association or
partnership which is entirely owned by health care providers,

99

A0875

the insurer must be authorized to write medical professional
liability insurance in accordance with the act of May 17, 1921
(P.L.682, No.284), known as The Insurance Company Law of 1921.
Section 742.  Approval of policies on "claims made" basis.

The commissioner shall not approve a medical professional
liability insurance policy written on a "claims made" basis by
any insurer doing business in this Commonwealth unless the
insurer shall guarantee to the commissioner the continued
availability of suitable liability protection for a health care
provider subsequent to the discontinuance of professional
practice by the health care provider or the termination of the
insurance policy by the insurer or the health care provider for
so long as there is a reasonable probability of a claim for
injury for which the health care provider may be held liable.
Section 743.  Reports to commissioner and claims information.

(a)  Duty to report.--By October 15 of each year, basic
insurance coverage insurers and self-insured participating
health care providers shall report to the department the claims
information specified in subsection (b).

(b)  Department report.--Sixty days after the end of each
calendar year, the department shall prepare a report. The report
shall contain the total amount of claims paid and expenses
incurred during the preceding calendar year, the total amount of
reserve set aside for future claims, the date and place in which
each claim arose, the amounts paid, if any, and the disposition
of each claim, judgment of court, settlement or otherwise. For
final claims at the end of any calendar year, the report shall
include details by basic insurance coverage insurers and self-
insured participating health care providers of the amount of
assessment collected, the number of reimbursements paid and the
amount of reimbursements paid.

(c)  Submission of report.--A copy of the report prepared
pursuant to this section shall be submitted to the chairman and
minority chairman of the Banking and Insurance Committee of the
Senate and the chairman and minority chairman of the Insurance
Committee of the House of Representatives.
Section 744.  Professional corporations, professional
                    associations and partnerships.

A professional corporation, professional association or
partnership which is entirely owned by health care providers and
which elects to purchase basic insurance coverage in accordance
with section 711 from the joint underwriting association or from
an insurer licensed or approved by the department shall be
required to participate in the fund and, upon payment of the
assessment required by section 712, be entitled to coverage from
the fund.
Section 745.  Actuarial data.

(a)  Initial study.--The following shall apply:
    (1)  No later than April 1, 2005, each insurer providing
medical professional liability insurance in this Commonwealth
shall file loss data as required by the commissioner. For
failure to comply, the commissioner shall impose an
administrative penalty of $1,000 for every day that this data
is not provided in accordance with this paragraph.
    (2)  By July 1, 2005, the commissioner shall conduct a
study regarding the availability of additional basic
insurance coverage capacity. The study shall include an

A0876

estimate of the total change in medical professional
liability insurance loss-cost resulting from implementation
of this act prepared by an independent actuary. The fee for
the independent actuary shall be borne by the fund. In
developing the estimate, the independent actuary shall
consider all of the following:
    (i)  The most recent accident year and ratemaking
data available.
    (ii)  Any other relevant factors within or outside
this Commonwealth in accordance with sound actuarial
principles.
(b)  Additional study.--The following shall apply:
  (1)  Three years following the increase of the basic
insurance coverage requirement in accordance with section
711(d)(3), each insurer providing medical professional
liability insurance in this Commonwealth shall file loss data
with the commissioner upon request. For failure to comply,
the commissioner shall impose an administrative penalty of
$1,000 for every day that this data is not provided in
accordance with this paragraph.
  (2)  Three months following the request made under
paragraph (1), the commissioner shall conduct a study
regarding the availability of additional basic insurance
coverage capacity. The study shall include an estimate of the
total change in medical professional liability insurance
loss-cost resulting from implementation of this act prepared
by an independent actuary. The fee for the independent
actuary shall be borne by the fund. In developing the
estimate, the independent actuary shall consider all of the
following:
    (i)  The most recent accident year and ratemaking
data available.
    (ii)  Any other relevant factors within or outside
this Commonwealth in accordance with sound actuarial
principles.
Section 746.  Mandatory reporting.
(a)  General provisions.--Each medical professional liability
insurer and each self-insured health care provider, including
the fund established by this chapter, which makes payment in
settlement or in partial settlement of or in satisfaction of a
judgment in a medical professional liability action or claim
shall provide to the appropriate licensure board a true and
correct copy of the report required to be filed with the Federal
Government by section 421 of the Health Care Quality Improvement
Act of 1986 (Public Law 99-660, 42 U.S.C. § 11131). The copy of
the report required by this section shall be filed
simultaneously with the report required by section 421 of the
Health Care Quality Improvement Act of 1986. The department
shall monitor and enforce compliance with this section. The
Bureau of Professional and Occupational Affairs and the
licensure boards shall have access to information pertaining to
compliance.
(b)  Immunity.--A medical professional liability insurer or
person who reports under subsection (a) in good faith and
without malice shall be immune from civil or criminal liability
arising from the report.
(c)  Public information.--Information received under this

A0877

section shall not be considered public information for the
purposes of the act of June 21, 1957 (P.L.390, No.212), referred
to as the Right-to-Know Law, or 65 Pa.C.S. Ch. 7 (relating to
open meetings) until used in a formal disciplinary proceeding.
Section 747.  Cancellation of insurance policy.
     A termination of a medical professional liability insurance
policy by cancellation, except for suspension or revocation of
the insured's license or for reason of nonpayment of premium, is
not effective against the insured unless notice of cancellation
was given within 60 days after the issuance of the policy to the
insured, and no cancellation shall take effect unless a written
notice stating the reasons for the cancellation and the date and
time upon which the termination becomes effective has been
received by the commissioner. Mailing of the notice to the
commissioner at the commissioner's principal office address
shall constitute notice to the commissioner.
Section 748.  Regulations.
     The commissioner may promulgate regulations to implement and
administer this chapter.


                         CHAPTER 9
                  ADMINISTRATIVE PROVISIONS
Section 901.  Scope.
     (a)  General rule.--
     (1)  Except as set forth in subsection (b), this chapter
is in pari materia with:
          (i)  the act of October 5, 1978 (P.L.1109, No.261),
     known as the Osteopathic Medical Practice Act; and
          (ii)  the act of December 20, 1985 (P.L.457, No.112),
     known as the Medical Practice Act of 1985.
     (2)  No duplication of procedure is required between this
chapter and either:
          (i)  the Osteopathic Medical Practice Act; or
          (ii)  the Medical Practice Act of 1985.
     (b)  Conflict.--This chapter shall prevail if there is a
conflict between this chapter and either:
     (1)  the Osteopathic Medical Practice Act; or
     (2)  the Medical Practice Act of 1985.
Section 902.  Definitions.
     The following words and phrases when used in this chapter
shall have the meanings given to them in this section unless the
context clearly indicates otherwise:
     "Licensure board."  Either or both of the following,
depending on the licensure of the affected individual:
     (1)  The State Board of Medicine.
     (2)  The State Board of Osteopathic Medicine.
     "Physician."  An individual licensed under the laws of this
Commonwealth to engage in the practice of:
     (1)  medicine and surgery in all its branches within the
     scope of the act of December 20, 1985 (P.L.457, No.112),
     known as the Medical Practice Act of 1985; or
     (2)  osteopathic medicine and surgery within the scope of
     the act of October 5, 1978 (P.L.1109, No.261), known as the
     Osteopathic Medical Practice Act.
Section 903.  Reporting.
     A physician shall report to the State Board of Medicine or
the State Board of Osteopathic Medicine, as appropriate, within

A0878

**PART IV**
UNINCORPORATED ASSOCIATIONS

**Chapter**
91.  Unincorporated Nonprofit Associations
93.  Professional Associations

   **Enactment.**  Part IV was added December 21, 1988, P.L.1444,
No.177, effective October 1, 1989.
   **Prior Provisions.**  Former Part IV (Reserved) was added November
15, 1972, P.L.1063, No.271, and repealed December 21, 1988,
P.L.1444, No.177, effective October 1, 1989.

**CHAPTER 91**
UNINCORPORATED NONPROFIT ASSOCIATIONS

**Sec.**
9101.  Customary parliamentary law applicable (Repealed).
9102.  Funeral and similar benefits (Repealed).
9103.  Nontransferable membership interests (Repealed).
9111.  Short title and application of chapter.
9112.  Definitions.
9113.  Governing law.
9114.  Entity status.
9115.  Ownership and transfer of property.
9116.  Statement of authority as to real property.
9117.  Liability.
9118.  Assertion and defense of claims.
9119.  Effect of judgment or order.
9120.  Appointment of agent to receive service of process.
9121.  Action or proceeding not abated by change of members or
       managers.
9122.  Member not agent.
9123.  Approval by members.
9124.  Action by members.
9125.  Duties of member.
9126.  Membership.
9127.  Member's interest not transferable.
9128.  Selection and management rights of managers.
9129.  Duties of managers.
9130.  Action by managers.
9131.  Right of member or manager to information.
9132.  Distributions prohibited; compensation and other permitted
       payments.
9133.  Reimbursement, indemnification and advancement of expenses.
9134.  Dissolution.
9135.  Winding up.
9136.  Subordination of chapter to canon law.

   **Enactment.**  Chapter 91 was added December 21, 1988, P.L.1444,
No.177, effective October 1, 1989.
   **Chapter Heading.**  The heading of Chapter 91 was amended July 9,
2013, P.L.476, No.67, effective in 60 days.
**§ 9101.  Customary parliamentary law applicable (Repealed).**

   **2013 Repeal.**  Section 9101 was repealed July 9, 2013, P.L.476,
No.67, effective in 60 days.
**§ 9102.  Funeral and similar benefits (Repealed).**

103

**2013 Repeal.** Section 9102 was repealed July 9, 2013, P.L.476, No.67, effective in 60 days.

**§ 9103. Nontransferable membership interests (Repealed).**

**2013 Repeal.** Section 9103 was repealed July 9, 2013, P.L.476, No.67, effective in 60 days.

**§ 9111. Short title and application of chapter.**

(a) **Short title.**--This chapter shall be known and may be cited as the Pennsylvania Uniform Unincorporated Nonprofit Association Law.

(b) **Transitional provisions concerning property.**--

(1) If, before September 9, 2013, an interest in property was by the terms of a transfer purportedly transferred to a nonprofit association but under the law of this Commonwealth the interest did not vest in the nonprofit association, or in one or more persons on behalf of the nonprofit association under paragraph (2), on September 9, 2013, the interest vests in the nonprofit association, unless the parties to the transfer have treated the transfer as ineffective.

(2) If, before September 9, 2013, an interest in property was by the terms of a transfer purportedly transferred to a nonprofit association but the interest was vested in one or more persons to hold the interest for the nonprofit association, its members or both, on or after September 9, 2013, the persons or their successors in interest may transfer the interest to the nonprofit association in its name, or the nonprofit association may require that the interest be transferred to it in its name.

(c) **Savings provisions.**--

(1) This chapter supplements the law of this Commonwealth that applies to nonprofit associations operating in this Commonwealth, but, if a conflict exists between this chapter and another statute, the other statute applies.

(2) Nothing in this chapter shall be deemed to repeal or supersede any provision in section 7 of the act of April 26, 1855 (P.L.328, No.347), entitled "An act relating to Corporations and to Estates held for Corporate, Religious and Charitable uses."

(d) **Cross reference.**--See section 5331 (relating to incorporation of unincorporated associations).

(July 9, 2013, P.L.476, No.67, eff. 60 days)

**2013 Amendment.** Act 67 added section 9111.

**§ 9112. Definitions.**

The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Established practices."** The practices used by a nonprofit association without material change during:

(1) the most recent five years of its existence; or

(2) if it has existed for less than five years, its entire existence.

"Governing principles." The agreements, whether oral, in record form or implied from its established practices, that govern the purpose or operation of a nonprofit association and the rights and obligations of its members and managers. The term includes any amendment or restatement of the agreements constituting the governing principles.

"Manager." A person that is responsible, alone or in concert with others, for the management of a nonprofit association.

"Member." A person that, under the governing principles, may participate in the selection of persons authorized to manage the affairs of the nonprofit association or in the development of policies and activities of the nonprofit association.

104

"Nonprofit association."  An unincorporated organization consisting of two or more members joined together under an agreement that is oral, in record form or implied from conduct for one or more common, nonprofit purposes. The term does not include:

    (1)   a trust;

    (2)   a marriage, domestic partnership, common law domestic relationship, civil union or other domestic living arrangement;

    (3)   an organization formed under any other statute that governs the organization and operation of unincorporated associations;

    (4)   a joint tenancy, tenancy in common or tenancy by the entireties, even if the co-owners share use of the property for a nonprofit purpose; or

    (5)   a relationship under an agreement in record form that expressly provides that the relationship between the parties does not create a nonprofit association.

"Property."  Includes:

    (1)   real property;

    (2)   personal property which is tangible or intangible;

    (3)   mixed real and personal property; and

    (4)   a right or interest in property.

"Transfer."  (Deleted by amendment).

(July 9, 2013, P.L.476, No.67, eff. 60 days; Oct. 22, 2014, P.L.2640, No.172, eff. July 1, 2015)

    **2014 Amendment.**  Act 172 deleted the def. of "transfer."

    **2013 Amendment.**  Act 67 added section 9112.

    **Cross References.**  Section 9112 is referred to in section 102 of this title.

**§ 9113.  Governing law.**

    **(a)   Operations.**--Except as provided in subsection (b), the law of this Commonwealth governs the operation in this Commonwealth of a nonprofit association formed or operating in this Commonwealth.

    **(b)   Internal affairs.**--Unless the governing principles specify a different jurisdiction, the law of the jurisdiction in which a nonprofit association has its main place of activities governs the internal affairs of the nonprofit association.

(July 9, 2013, P.L.476, No.67, eff. 60 days)

    **2013 Amendment.**  Act 67 added section 9113.

**§ 9114.  Entity status.**

    **(a)   Legal entity.**--A nonprofit association is a legal entity distinct from its members and managers.

    **(b)   Perpetual duration.**--A nonprofit association has perpetual duration unless the governing principles specify otherwise.

    **(c)   Powers.**--A nonprofit association has the same powers as an individual to do all things necessary or convenient to carry on its purposes.

    **(d)   Profits.**--A nonprofit association may engage in profit-making activities, but profits from any activities must be used or set aside for the nonprofit purposes of the nonprofit association.

(July 9, 2013, P.L.476, No.67, eff. 60 days)

    **2013 Amendment.**  Act 67 added section 9114.

**§ 9115.  Ownership and transfer of property.**

    **(a)   General rule.**--A nonprofit association may acquire, hold or transfer, in its name, an interest in property.

    **(b)   Testamentary and fiduciary dispositions.**--A nonprofit association may be a beneficiary of a trust or contract, a legatee or a devisee.

    **(c)   Authority to take and hold trust property.**--Every nonprofit association organized for a charitable purpose or purposes may take, receive and hold real and personal property as may be given, devised to or otherwise vested in the nonprofit

association, in trust, for the purpose or purposes set forth in
its governing principles. The managers of the nonprofit
association shall, as trustees of the property, be held to the
same degree of responsibility and accountability as other
trustees, unless a lesser degree or a particular degree of
responsibility and accountability is prescribed in the trust
instrument, or unless the managers remain under the control of the
members of the nonprofit association or third persons who retain
the right to direct, and do direct, the actions of the managers as
to the use of the trust property from time to time.

   **(d)   Nondiversion of certain property.**--Property of a nonprofit
association committed to charitable purposes shall not, by any
proceeding under Chapter 3 (relating to entity transactions) or
otherwise, be diverted from the objects to which it was donated,
granted or devised, unless and until the nonprofit association
obtains from the court an order under 20 Pa.C.S. Ch. 77 (relating
to trusts) specifying the disposition of the property.
(July 9, 2013, P.L.476, No.67, eff. 60 days; Nov. 21, 2016,
P.L.1328, No.170, eff. 90 days)

**§ 9116.   Statement of authority as to real property.**

   **(a)   General rule.**--An interest in real property held in the
name of a nonprofit association may be transferred by a person
authorized to do so in a statement of authority recorded by the
nonprofit association in the office of the recorder of deeds for
the county in which a transfer of the property would be recorded.

   **(b)   Contents of statement.**--The statement of authority must
set forth:

      (1)   the name of the nonprofit association;
      (2)   the address in this Commonwealth, including the street
   and number, if any, of the nonprofit association or, if the
   nonprofit association does not have an address in this
   Commonwealth, its address outside of this Commonwealth;
      (3)   that the association is a nonprofit association; and
      (4)   the name, title or position of a person authorized to
   transfer an estate or interest in real property held in the
   name of the nonprofit association.

   **(c)   Execution.**--A statement of authority must be executed in
the same manner as a deed by a person other than the person
authorized in the statement to transfer the interest.

   **(d)   Recording fee.**--The recorder of deeds may collect a fee
for recording a statement of authority in the amount authorized
for recording a transfer of real property, but the mere recording
of a statement of authority does not constitute a transfer of an
interest in the real property for the purpose of the taxation of
real property transfers.

   **(e)   Changes.**--A document amending, revoking or canceling a
statement of authority or stating that the statement is
unauthorized or erroneous must meet the requirements for executing
and recording an original statement.

   **(f)   Cancellation by operation of law.**--Unless canceled
earlier, a recorded statement of authority and its most recent
amendment expire five years after the date of the most recent
recording.

   **(g)   Effect of filing.**--If the record title to real property is
in the name of a nonprofit association and a statement of
authority is recorded in the office of the recorder of deeds for
the county in which a transfer of the property would be recorded,
the authority of the person named in the statement to transfer is
conclusive in favor of a person that gives value without notice
that the person lacks authority.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


   **2013 Amendment.**   Act 67 added section 9116.
**§ 9117.   Liability.**
   **(a)   Scope.**--

(1)  A debt, obligation or other liability of a nonprofit association, whether arising in contract, tort or otherwise, is solely the debt, obligation or other liability of the nonprofit association.

(2)  A member or manager is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation or other liability of the nonprofit association solely by reason of being or acting as a member or manager.

(3)  This subsection applies regardless of the dissolution of the nonprofit association.

**(b)  Liability for conduct.--**A person's status as a member or manager does not prevent or restrict law other than this chapter from imposing liability on the person or the nonprofit association because of the person's conduct.

**(c)  Agents.--**A person that makes a contract or incurs an obligation on behalf of a nonprofit association after September 9, 2013, is not liable for performance or breach of the contract or other obligation if the fact that the person was acting for the nonprofit association was disclosed to, was known by or reasonably should have been known by the other party to the contract or to the party owed performance.

**(d)  Observation of formalities.--**The failure of a nonprofit association to observe formalities relating to the exercise of its powers or the management of its activities and affairs is not a ground for imposing liability on a member or manager of the nonprofit association for a debt, obligation or other liability of the nonprofit association.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9117.
**§ 9118.  Assertion and defense of claims.**
**(a)  General rule.--**A nonprofit association may sue or be sued in its own name.

**(b)  Permissible claims.--**A member or manager may assert a claim the member or manager has against the nonprofit association. A nonprofit association may assert a claim it has against a member or manager.

**(c)  Representational status.--**A nonprofit association may assert a claim in its name on behalf of its members if one or more members of the nonprofit association have standing to assert a claim in their own right, the interests the nonprofit association seeks to protect are germane to its purposes and neither the claim asserted nor the relief requested requires the participation of a member.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9118.
**§ 9119.  Effect of judgment or order.**
A judgment or order against a nonprofit association is not by itself a judgment or order against a member or manager.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9119.
**§ 9120.  Appointment of agent to receive service of process.**
**(a)  Statement.--**A nonprofit association may deliver to the department for filing a statement appointing an agent to receive service of process.

**(b)  Contents.--**A statement appointing an agent to receive service of process must state:

(1)  the name of the nonprofit association;

(2)  the address, if any, in this Commonwealth; and

(3)  the name of the person in this Commonwealth authorized to receive service of process and the person's address, including street and number, in this Commonwealth.

**(c)  Signature and effect.--**
(1)  A statement appointing an agent to receive service of process must be signed by:
(i)  a person authorized to manage the affairs of the nonprofit association; and
(ii)  the person appointed as the agent.
(2)  The signing of the statement is an affirmation:
(i)  by the person authorized to manage the affairs of the nonprofit association that the person has that authority; and
(ii)  by the person appointed as agent that the person consents to act as agent.

**(d)  Amendment or cancellation.--**An amendment to or cancellation of a statement appointing an agent to receive service of process must meet the requirements for signature of an original statement. An agent may resign by delivering a resignation to the department for filing and giving notice to the nonprofit association.

**(e)  Rejection of statement.--**A statement appointing an agent to receive service of process may not be rejected for filing because the name of the nonprofit association signing the statement is not distinguishable on the records of the department from the name of another association appearing in those records. The filing of such a statement does not make the name of the nonprofit association signing the statement unavailable for use by another association.

**(f)  Effectiveness.--**A statement appointing an agent to receive service of process:
(1)  takes effect on filing by the department; and
(2)  is effective for five years after the date of filing unless canceled or terminated earlier.

**(g)  Duty of agent.--**The only duty under this chapter of an agent to receive service of process is to forward to the nonprofit association at the address most recently supplied to the agent by the nonprofit association any process, notice or demand pertaining to the nonprofit association which is served or received by the agent.

**(h)  Cross reference.--**See section 135 (relating to requirements to be met by filed documents).
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9120.
**§ 9121.  Action or proceeding not abated by change of members or managers.**
An action or proceeding against a nonprofit association does not abate merely because of a change in its members or managers.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9121.
**§ 9122.  Member not agent.**
A member is not an agent of the nonprofit association solely by reason of being a member.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


**2013 Amendment.**  Act 67 added section 9122.
**§ 9123.  Approval by members.**
**(a)  General rule.--**Except as provided in the governing principles, a nonprofit association must have the approval of its members to:
(1)  admit, suspend, dismiss or expel a member;
(2)  select or dismiss a manager;
(3)  adopt, amend or repeal the governing principles;
(4)  transfer all, or substantially all, of the property of the nonprofit association, with or without its goodwill,

108

outside the ordinary course of its activities;
      (5)   dissolve under section 9134 (relating to dissolution);
      (6)   undertake any other act outside the ordinary course of the activities of the nonprofit association; or
      (7)   determine the policy and purposes of the nonprofit association.
  **(b)  Other actions.--**A nonprofit association must have the approval of the members to do any other act or exercise a right that the governing principles require to be approved by members.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

  **2013 Amendment.**  Act 67 added section 9123.
  **Cross References.**  Section 9123 is referred to in section 9128 of this title.
**§ 9124.  Action by members.**
  **(a)  General rule.--**Except as provided in the governing principles:
      (1)   approval of a matter by the members requires the affirmative vote of at least a majority of the votes cast at a meeting of members; and
      (2)   each member is entitled to one vote on each matter that is submitted for approval by the members.
  **(b)  Procedural matters.--**The governing principles may provide for the:
      (1)   calling, location and timing of member meetings;
      (2)   notice and quorum requirements for member meetings;
      (3)   conduct of member meetings;
      (4)   taking of action by the members by consent without a meeting or by ballot;
      (5)   participation by members in a meeting of the members by telephone or other means of electronic communication; and
      (6)   taking of action by members by proxy.
  **(c)  Absence of governing principles.--**If the governing principles do not provide for a matter described in subsection (b), customary usages and principles of parliamentary law and procedure apply.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

  **2013 Amendment.**  Act 67 added section 9124.
**§ 9125.  Duties of member.**
  **(a)  No fiduciary duties generally.--**A member does not have a fiduciary duty to a nonprofit association or to another member solely by being a member.
  **(b)  Discharge of duties and exercise of rights.--**A member shall, consistent with the governing principles and the contractual obligation of good faith and fair dealing:
      (1)   discharge duties under the governing principles to the nonprofit association and the other members; and
      (2)   exercise any rights under the governing principles and this chapter.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

  **2013 Amendment.**  Act 67 added section 9125.
**§ 9126.  Membership.**
  **(a)  Admission, suspension, dismissal and expulsion of member.--**

      (1)   A person becomes a member and may be suspended, dismissed or expelled in accordance with the governing principles. If there are no applicable governing principles, a person may become a member or be suspended, dismissed or expelled only with the approval of the members. A person may not be admitted as a member without the person's consent.
      (2)   Except as provided in the governing principles, the suspension, dismissal or expulsion of a member does not relieve

109

the member from any unpaid capital contribution, dues,
assessments, fees or other obligation incurred or commitment
made by the member before the suspension, dismissal or
expulsion.
   **(b)  Resignation of member.--**
     (1)  A member may resign as a member in accordance with the
governing principles. In the absence of applicable governing
principles, a member may resign at any time.
     (2)  Except as provided in the governing principles,
resignation of a member does not relieve the member from any
unpaid capital contribution, dues, assessments, fees or other
obligation incurred or commitment made by the member before
resignation.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


   **2013 Amendment.**  Act 67 added section 9126.
**§ 9127.  Member's interest not transferable.**
   **(a)  General rule.--**Except as set forth in subsection (b) or
the governing principles, a member's interest or any right under
the governing principles is not transferable.
   **(b)  Certain nonprofit associations formed prior to effective
date.--**
     (1)  This subsection applies to a nonprofit association:
       (i)  which was formed before September 9, 2013;
       (ii)  which was formed for the purpose of encouraging
lawful associational activity among agricultural and
industrial workers through the organization of a nonprofit
association for mutual benefit insurance, saving or other
lawful objects; and
       (iii)  in which the persons that organized the
nonprofit association derive benefits from the preservation
and continuance of the membership and interest among
persons engaged in a common calling, labor or enterprise.
     (2)  For a nonprofit association subject to paragraph (1),
the following apply:
       (i)  Except as set forth in subparagraph (ii), a
member's interest or any right under the governing
principles is transferable.
       (ii)  A member's interest or any right under the
governing principles is nontransferable if the governing
principles so provide.
   **(c)  Assignments and pledges.--**No legal or equitable right or
interest shall pass as a result of an attempted transfer in
violation of:
     (1)  subsection (a); or
     (2)  a transfer restriction under subsection (b)(2)(ii).
   **(d)  Knowledge of nontransferability.--**Whenever the interest of
a member in a nonprofit association is evidenced by a certificate,
an endorsement on the certificate that the certificate
is nontransferable shall be conclusive evidence that the person to
whom any attempted transfer of the certificate is made has
knowledge of the nontransferable character of the interest of the
member.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


   **2013 Amendment.**  Act 67 added section 9127.
**§ 9128.  Selection and management rights of managers.**
   Except as provided in this chapter or the governing principles:
     (1)  if there is no manager selected and serving, all
members are managers;
     (2)  only the members may select a manager;
     (3)  a manager may be a member or a nonmember;
     (4)  each manager has equal rights in the management and
conduct of the activities of the nonprofit association;

(5)  all matters relating to the activities of the
nonprofit association are decided by its managers except for
matters reserved for approval by the members in section 9123
(relating to approval by members); and
(6)  a difference among the managers is decided by a
majority of the managers.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

**2013 Amendment.**  Act 67 added section 9128.
**§ 9129.  Duties of managers.**
**(a)  Duty of care.--**
(1)  A manager shall manage the nonprofit association:
(i)  in good faith;
(ii)  in a manner the manager reasonably believes to be
in the best interests of the nonprofit association; and
(iii)  with such care, including reasonable inquiry, as
a prudent person would reasonably exercise in a similar
position and under similar circumstances.
(2)  A manager may rely in good faith on any opinion,
report, statement or other information provided by another
person that the manager reasonably believes is a competent and
reliable source for the information.
**(b)  Conflicts of interest.--**
(1)  A manager owes a fiduciary duty of loyalty to the
nonprofit association with respect to the responsibilities of
the manager.
(2)  After full disclosure of all material facts, a
specific act or transaction that would otherwise violate the
duty of loyalty by a manager may be authorized or ratified by a
majority of the members that are not interested directly or
indirectly in the act or transaction.
**(c)  Presumption.--**A manager that makes a judgment in good
faith satisfies the duties specified in subsection (a) if the
manager:
(1)  is not interested, directly or indirectly, in the
subject of the judgment and is otherwise able to exercise
independent judgment;
(2)  is informed with respect to the subject of the
judgment to the extent the manager reasonably believes to be
appropriate under the circumstances; and
(3)  believes that the judgment is in or not opposed to the
best interests of the nonprofit association.
**(d)  Limitation of liability.--**
(1)  Except as set forth in paragraph (2), the governing
principles in record form may provide that a manager shall not
be personally liable, as a manager, for monetary damages for
any action taken unless:
(i)  the manager has breached or failed to perform the
manager's duties under this chapter; and
(ii)  the breach or failure to perform constitutes
self-dealing, willful misconduct or recklessness.
(2)  Paragraph (1) shall not apply to:
(i)  the responsibility or liability of a manager under
a criminal statute; or
(ii)  the liability of the manager for the payment of
taxes under Federal, State or local law.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

**2013 Amendment.**  Act 67 added section 9129.
**§ 9130.  Action by managers.**
**(a)  General rule.--**Except as provided in the governing
principles:
(1)  approval of a matter by the managers requires the
affirmative vote of at least a majority of the votes cast at a

meeting of managers; and
    (2)  each manager is entitled to one vote on each matter
that is submitted for approval by the managers.
   **(b)**  **Procedural matters.--**The governing principles may provide
for the:
    (1)  delegation to a manager of authority to act without a
meeting of the managers;
    (2)  creation and authority of committees of the managers;
    (3)  calling, location and timing of meetings of the
managers or a committee of the managers;
    (4)  notice and quorum requirements for meetings of the
managers or a committee of the managers;
    (5)  conduct of meetings of the managers or a committee of
the managers;
    (6)  taking of action by the managers or a committee of the
managers by consent without a meeting or by ballot;
    (7)  participation by managers in a meeting of the managers
or a committee of the managers by telephone or other means of
electronic communication; and
    (8)  taking of action by a manager by proxy.
   **(c)**  **Absence of governing principles.--**If the governing
principles do not provide for a matter described in subsection
(b), customary usages and principles of parliamentary law and
procedure apply.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


   **2013 Amendment.**  Act 67 added section 9130.
**§ 9131.  Right of member or manager to information.**
   **(a)**  **Inspection.--**On reasonable notice, a member or manager of
a nonprofit association may inspect and copy, at a reasonable time
and location specified by the nonprofit association, any record
maintained by the nonprofit association regarding its activities,
financial condition and other circumstances, to the extent the
information is material to the rights and duties of the member or
manager under the governing principles.
   **(b)**  **Restrictions.--**A nonprofit association may impose
reasonable restrictions on access to and use of information to be
furnished under this section, including designating the
information confidential and imposing on the recipient obligations
of nondisclosure and safeguarding.
   **(c)**  **Costs.--**A nonprofit association may charge a person that
makes a demand under this section reasonable copying costs.
   **(d)**  **Former member or manager.--**A former member or manager is
entitled to information to which the member or manager was
entitled while a member or manager if:
    (1)  the information pertains to the period during which
the person was a member or manager;
    (2)  the former member or manager seeks the information in
good faith; and
    (3)  the former member or manager satisfies subsections
(a), (b) and (c).
(July 9, 2013, P.L.476, No.67, eff. 60 days)


   **2013 Amendment.**  Act 67 added section 9131.
**§ 9132.  Distributions prohibited; compensation and other
         permitted payments.**
   **(a)**  **General rule.--**Except as provided in subsection (b), a
nonprofit association may not pay dividends or make distributions
to a member or manager.
   **(b)**  **Permitted payments.--**A nonprofit association may:
    (1)  pay reasonable compensation or reimburse reasonable
expenses to a member or manager for services rendered;
    (2)  confer benefits on or make contributions to a member
or manager in conformity with its nonprofit purposes;

    (3)  repurchase a membership and repay a capital
contribution made by a member to the extent authorized by its
governing principles;
    (4)  repay indebtedness to a member or manager; and
    (5)  make distributions of property to members upon winding
up and termination to the extent permitted by section 9135
(relating to winding up).
(July 9, 2013, P.L.476, No.67, eff. 60 days)


    **2013 Amendment.**  Act 67 added section 9132.
**§ 9133.   Reimbursement, indemnification and advancement of
           expenses.**
    **(a)   Reimbursement.**--Except as provided in the governing
principles, a nonprofit association shall reimburse a member or
manager for authorized expenses reasonably incurred in the course
of the activities of the member or manager on behalf of the
nonprofit association.
    **(b)   Indemnification and advancement of expenses.--**
    (1)  A nonprofit association is subject to Ch. 57 Subch. D
(relating to indemnification).
    (2)  For purposes of applying Ch. 57 Subch. D, references
to the "articles" or "bylaws," "directors" and "members" shall
mean the "governing principles," "managers" and "members,"
respectively.
(July 9, 2013, P.L.476, No.67, eff. 60 days)


    **2013 Amendment.**  Act 67 added section 9133.
**§ 9134.   Dissolution.**
    **(a)   General rule.**--A nonprofit association may be dissolved as
follows:
    (1)  if the governing principles provide a time or method
for dissolution, at that time or by that method;
    (2)  if the governing principles do not provide a time or
method for dissolution, upon approval by the members;
    (3)  if no member can be located and the operations of the
nonprofit association have been discontinued for at least three
years, by:
        (i)  the managers; or
        (ii)  if the nonprofit association has no current
    manager, its last manager;
    (4)  by court order; or
    (5)  under law other than this chapter.
    **(b)   Continuation during winding up.**--After dissolution, a
nonprofit association continues in existence until its activities
have been wound up under section 9135 (relating to winding up).
(July 9, 2013, P.L.476, No.67, eff. 60 days)


    **2013 Amendment.**  Act 67 added section 9134.
    **Cross References.**  Section 9134 is referred to in section 9123
of this title.
**§ 9135.   Winding up.**
    Winding up of a nonprofit association must proceed in
accordance with the following rules:
    (1)  All known debts and liabilities shall be paid or
adequately provided for.
    (2)  Any property subject to a condition requiring return
to the person designated by the donor shall be transferred to
that person.
    (3)  Any property subject to a trust shall be distributed
in accordance with the trust agreement.
    (4)  Any property committed to a charitable purpose shall
be distributed in accordance with that purpose unless the
nonprofit association obtains a court order under 20 Pa.C.S.

113

Ch. 77 (relating to trusts) specifying the disposition of the property.
    (5)  Any remaining property shall be distributed as follows:
        (i)  Distribution shall be made:
           (A)  in accordance with the governing principles of the nonprofit association; or
           (B)  in the absence of applicable governing principles, to the members of the nonprofit association:
               (I)  per capita; or
               (II)  as the members direct.
        (ii)  If subparagraph (i) does not apply, distribution shall be made under Article XIII.1 of the act of April 9, 1929 (P.L.343, No.176), known as The Fiscal Code.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

    **2013 Amendment.**  Act 67 added section 9135.
    **Cross References.**  Section 9135 is referred to in sections 9132, 9134 of this title.
**§ 9136.  Subordination of chapter to canon law.**
    If and to the extent canon law or similar principles applicable to a nonprofit association organized for religious purposes sets forth provisions relating to the government and regulation of the affairs of the nonprofit association that are inconsistent with the provisions of this chapter on the same subject, the provisions of canon law or similar principles shall control except to the extent prohibited by the Constitution of the United States or the Constitution of Pennsylvania.
(July 9, 2013, P.L.476, No.67, eff. 60 days)

    **2013 Amendment.**  Act 67 added section 9136.