IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

**Nos. 18-2297 & 18-2323**

———————

**Pennsylvania Professional Liability
Joint Underwriting Association**

**v.**

**Governor of the Commonwealth of
Pennsylvania and The General
Assembly of the Commonwealth of
Pennsylvania,**

*Appellants.*

———————

**Nos. 19-1057 & 19-1058**

———————

**Pennsylvania Professional Liability
Joint Underwriting Association**

**v.**

**Governor of Pennsylvania,
Insurance Commissioner of
Pennsylvania, President Pro
Tempore of Pennsylvania Senate,
Minority Leader of Pennsylvania
Senate, Speaker of Pennsylvania
House of Representatives, Minority
Leader of Pennsylvania House of
Representatives,**

*Appellants.*

———————

**REPLY BRIEF FOR APPELLANTS THE GOVERNOR AND
INSURANCE COMMISSIONER OF PENNSYLVANIA**

———————

APPEAL FROM THE JUDGMENTS OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
ENTERED MAY 17, 2018 AND DECEMBER 18, 2018

JOSH SHAPIRO
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 705-2331
FAX:   (717) 772-4526

DATE: May 30, 2019

BY:   SEAN A. KIRKPATRICK
*Senior Deputy Attorney General*

J. BART DELONE
*Chief Deputy Attorney General
Chief, Appellate Litigation Section*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT ...............................................................................................3

A. The JUA Cannot Rehabilitate the District Court's Legal Errors. ...................4

    1. The JUA cannot rely upon statutes enacted in 1994 to argue
       about its legal status in 1975. .............................................................6

    2. The JUA's invented "member-aggregate theory" finds no
       support in the law. ...........................................................................7

    3. The JUA's novel theory that it is now a trust also finds no
       support in the law. ...........................................................................8

    4. The JUA's alternative theory that its private status can be found
       in the language to the Malpractice Act, making it akin to a unit
       owner's association, is just as meritless. ...........................................9

    5. The JUA is a governmental instrumentality created long before
       the Unincorporated Association Law was enacted. ............................11

    6. The JUA's waiver argument, relying on the out-of-context
       reading of a footnote in a single brief below, is baseless. ..................14

B. The JUA Did Not "Acquire" Constitutional Rights. .....................................15

    1. The Commonwealth created the JUA to serve a specific public
       purpose. The JUA is not akin to a private insurance company in
       either its creation or form. ...............................................................16

    2. Acts 44 and 41 do not infringe upon any non-state interests, as
       its members have no rights to its assets. The JUA's argument
       that its members have a "reputational" interest in the surplus
       fund is at war with reality. ..............................................................20

C. The District Court's Rulings Violate the Principles of Federalism by
    Inhibiting the General Assembly's Ability to Repeal its Own Law. ............23

CONCLUSION ...................................................................................26

CERTIFICATE OF COUNSEL ...........................................................27

CERTIFICATE OF SERVICE ..............................................................28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arneson v. Wolf*,
   124 A.3d 1225 (Pa. 2015) ...................................................................20

*Arroyo-Nekecui v, Puerto Rican American Ins. Co.*,
   398 F.3d 56 (1st Cir. 2005) .................................................................23

*Brubaker v. Lauver*,
   185 A. 848 (Pa. 1936) .........................................................................9

*Campbell v. Floyd*,
   25 A. 1033 (Pa. 1893) .........................................................................4

*Commonwealth v. McCombs*,
   56 Pa. 436 (1867) ...............................................................................15

*Commonwealth v. Scolieri*,
   813 A.2d 672 (2002) ...........................................................................13

*Crawford v. Bd. of Educ. of City of Los Angeles*,
   458 U.S. 527 (1982) ............................................................................25

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987) ..............................................................................10

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
   539 F.3d 199 (3d Cir. 2008) ................................................................19

*Fuhrman v. Doll*,
   451 A.2d 530 (Pa. Super. 1982) .......................................................7, 8

*Hess v. Port Authority Trans-Hudson Corp.*,
   513 U.S. 30 (1994) ..............................................................................11

*In re Pittsburg Wagon Works' Estate*,
   54 A. 316 (Pa. 1903) ...........................................................................8

*In re Pruner's Estate*,
   136 A.2d 107 (Pa. 1957) .....................................................................9

*Krumbine v. Lebanon County Tax Claim Bureau*,
 663 A.2d 158 (Pa. 1995) ...............................................................................4, 11

*McKee Estate*,
 108 A.2d 214 (Pa. 1954) ...................................................................................9

*Medical Malpractice Ins. Ass'n v. Superintendent of Ins.*,
 72 N.Y.2d 753 (1988) ......................................................................................23

*Oregon v. Ice*,
 555 U.S. 160 (2009) .........................................................................................25

*Trustees of Dartmouth College v. Woodward*,
 17 U.S. 518 (1819) .................................................................................. passim

**Statutes**

1 Pa.C.S.A. § 1991 .................................................................................................6

15 Pa.C.S.A. § 102 ....................................................................................... 6, 7, 12

15 Pa.C.S.A. § 9101 .............................................................................................11

15 Pa.C.S.A. § 9111 .............................................................................................13

15 Pa.C.S.A. § 9112 .............................................................................................12

15 Pa.C.S.A. § 9115 ...............................................................................................9

40 P.S. § 59 .........................................................................................................19

40 P.S. § 323.1-A .................................................................................................24

40 P.S. § 323.11-A ...............................................................................................22

40 P.S. § 323.12-A ...............................................................................................22

40 P.S. § 1301.802 .................................................................................................6

40 P.S. § 1303.101 *et seq.* ....................................................................................3

40 P.S. § 1303.711 ...............................................................................................22

40 P.S. § 1303.733 ....................................................................................... 18, 24

iv

68 Pa.C.S.A. § 5301 *et seq*.........................................................................10

72 P.S. § 1301.2 ..........................................................................................14

Health Care Services Malpractice Act, Act of Oct. 15, 1975, P.L. 390, No. 111
    (Malpractice Act) .......................................................................... passim

Medical Care Availability and Reduction of Error Act (MCARE Act), Act of
    March 20, 2002, P.L. 154, No. 13 ............................................... passim

**Treatises**

*Black's Law Dictionary* (4th Ed. Rev. 1968).............................................5

*Black's Law Dictionary* (9th Ed. 2009) .............................................5, 12

## SUMMARY OF ARGUMENT

The parties agree that the General Assembly created the Pennsylvania Professional Liability Joint Underwriting Association (JUA) as an integral part of a medical malpractice statutory framework. This makes the JUA a creature of the Commonwealth. Based upon its own invented "holistic" test and an ahistorical misunderstanding of Pennsylvania law, however, the district court concluded that the JUA was conceived as a private entity. The JUA backs away from this conclusion, arguing that it "acquired" private status sometime over the past 40 years. Neither conclusion is correct.

In an attempt to rehabilitate the district court's legal errors, the JUA proffers a diverse scattering of unavailing arguments. The JUA attempts to broaden the definition of what constituted an "association" in 1975 by citing to statutes enacted in 1994. The JUA invents a "member-aggregate theory" to explain its legal status prior to the enactment of the Unincorporated Associations Law; that theory, however, is not supported by the cases it cites. The JUA then attempts to argue that it is a trust. This argument, not raised below or discussed by the district court, fails for want of any statutory support or even the minimal requirements for creation of a trust. The JUA then twists the language of both the Malpractice Act and the Unincorporated Association Law to craft alternative sources for private status. In desperation, it also argues waiver.

1

None of these arguments, either individually or collectively, support the JUA's position. It is a creature of the State; the JUA's existence and authority flows from its status as an integral part of a statutory and regulatory framework.

The JUA's argument that it somehow acquired constitutional rights during its existence fares no better. We agree with the General Assembly that, under the longstanding analysis arising from *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819), a court must ask two foundational questions: Did the state create the entity in question to serve a public purpose; and does the state's action infringe on any non-state interests?

As to the first question, the Commonwealth created the JUA to serve a specific public purpose in its medical malpractice statutory regime. The JUA is not akin to a private insurance company in either its creation or form, and lives under an unusually high level of supervision by the Commissioner.

As to the second question, the statutes at issue do not infringe upon any non-state interests. Members of JUA have no right to any of its assets. Nor do they have any novel "reputational" interest in the surplus fund.

Through its rulings, the district court prevented the General Assembly from repealing and amending its own laws to modernize and restructure its own medical malpractice statutory and regulatory regime. These rulings are not only legally untenable, they also infringe upon basic principles of Federalism.

# ARGUMENT

The Pennsylvania Professional Liability Joint Underwriting Association (JUA) does not—because it cannot—dispute that it was created by the Commonwealth. Whereas private corporations, nonprofits, charities, and trusts are begot by the private will and pleasure of individuals under the general permission of the State, *see Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 661 (1819) (Washington, J., concurring), the JUA was wholly created and designed by the General Assembly, for its own specific public purpose, through passage of the Health Care Services Malpractice Act (Malpractice Act)[1], and thereafter, the Medical Care Availability and Reduction of Error Act (MCARE Act).[2] The question, then, is whether JUA is an instrument of the Commonwealth, and if not, how and when did it become private? The district court and the JUA offer different answers to this question.

The district court concluded that the "[JUA], *since its inception*, has been a private institution." A121 (JUA I at 30) (emphasis added). Despite no support for this in the language of either enabling statute and based upon an ahistorical understanding of unincorporated associations, the district court opined that the

---

[1] Act of Oct. 15, 1975, P.L. 390, No. 111 (40 P.S. § 1301.101 *et seq*. (repealed).

[2] Act of March 20, 2002, P.L. 154, No. 13 (40 P.S. § 1303.101 *et seq*.).

General Assembly intentionally chose to create JUA as a private entity. A.43 (JUA I at 33). JUA is not quite so sure about this conclusion, arguing instead that over a span of 40 years "the Commonwealth created the conditions under which JUA *acquired* the right to protection from uncompensated takings." JUA Br. at 31 (emphasis added). Implicit in this theory is that the General Assembly created JUA as a creature of the state, but that it somehow, over time, evolved into a private entity. Neither is correct.

**A.   The JUA Cannot Rehabilitate the District Court's Legal Errors.**

As we explained in our opening brief, the district court relies upon an ahistorical reimagining of the law at the time of JUA's creation in 1975. Executive Br. at 21-27. The JUA was not, as the district court incorrectly concludes, established "with its own statutory rights" beyond those specifically prescribed by the Malpractice Act. A115 (JUA II at 24).

At the time of the JUA's creation, the Common Law did not recognize unincorporated associations as legal entities separate from their members or capable of holding property. *Krumbine v. Lebanon County Tax Claim Bureau*, 663 A.2d 158, 160 (Pa. 1995); *Campbell v. Floyd*, 25 A. 1033, 1036 (Pa. 1893) ("[A]n unincorporated association has no capacity to be sued as an entity distinct from its members. The name which it adopts merely stands for the names of its members, as a matter of convenience"). The Black's Law Dictionary in print at the time

defined associations as: "a word of vague meaning used to indicate a collection of persons who have joined together for a certain object. . . . It is not a legal entity separate from the persons who compose it." *Black's Law Dictionary* 156 (4th Ed. Rev. 1968).

Yet from its inception, JUA has always been an entity separate from its members; the JUA's original plan of operations explicitly established it as a "legal entity separate and distinct from its members." A775 (1975 Plan of Operations). The district court view of the JUA being created as a private institution separate from the Commonwealth, therefore, requires the creation of an entirely new form of legal entity not recognized by the law. This morass demonstrates that the district court took a wrong turn in its analysis.

When viewed in the proper context as a governmental instrumentality, the JUA's status make sense. *See Black's Law Dictionary* 870 (9th ed. 2009) (Defining "instrumentality" as "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body"). As an instrumentality of the Commonwealth, the JUA possessed the authority to enter into contracts and hold property separate from its members, its legal status and authority to issue policies and coerce membership flowed from this status as an integral component of the "plan" the Commissioner was directed to establish and implement by the Malpractice Act. 40 P.S. § 1301.801 (repealed) ("The

commissioner shall establish and implement or approve and supervise a plan . . . .
The plan may be implemented by a joint underwriting association . . .”). The
General Assembly created the JUA as a State creature to help implement this plan.
The law at the time permitted nothing else.

### 1. The JUA cannot rely upon statutes enacted in 1994 to argue about its legal status in 1975.

In an attempt to rehabilitate the district court’s flawed analysis, the JUA first
argues that “association” had a broader definition in 1975 than the definitions used
in the treaties cited by the Executive Appellants.[3] In making this argument, JUA
cites to two statutory definitions from 1994: 1 Pa.C.S.A. § 1991 (current)[4] and 15
Pa.C.S.A. § 102 (amended). JUA Br. at 44-45. Like the Unincorporated
Associations Law, these definitions were not in place when JUA was created in
1975, and provide little guidance as to what the General Assembly meant when it
authorized the Commission to create a “joint underwriting association.” 40 P.S. §
1301.801, 802 (repealed).

---

[3]   Appellants are Governor Tom Wolf and Insurance Commissioner Jessica K.
Altman (collectively Executive Appellants). Also appellants, but separately
represented, are the General Assembly and its leadership.

[4]   JUA’s statement that the definition it cites comes from the Pennsylvania’s
Statutory Construction Act of 1972 is disingenuous. The definition cited by JUA
from 1 Pa.C.S.A. § 1991 comes from the Limited Liability Company Act, Act
1994-106, P.L. 703, No. 106, § 4, enacted in December of 1994.

Further, even if we apply current definitions anachronistically to the past, the current version of 15 Pa.C.S.A. § 102—which JUA cleverly does not cite— explicitly excludes from its definition of association "a government or a governmental subdivision, agency or instrumentality." 15 Pa.C.S.A. § 102 (current). JUA, as a government instrumentality, is not an "association" under this definition.

## 2. The JUA's invented "member-aggregate theory" finds no support in the law.

JUA does not dispute that, under the common law, unincorporated associations were unrecognized as separate legal entities and possessed no legal authority to own property. Instead, JUA argues that it could function as a private legal entity under a "member-aggregate theory of unincorporated associations[,]" citing to *Fuhrman v. Doll*, 451 A.2d 530 (Pa. Super. 1982). JUA Br. at 48. JUA, however, misapprehends the holding of that case.

In *Fuhrman*, individuals formed an association to purchase land for a hunting camp. Three of the individuals, the "named grantees," took title of the land "as Trustees" of the association. *Id.* at 531. When one of the grantees was later ejected from the association, he demanded that the land be partitioned. *Id.* Contrary to JUA's argument, the court in *Fuhrman* explicitly refused to analyze the controversy as a trust created by the named grantees. *Id.* ("Nor do we think that the proper analysis in this case is whether or not the property . . . was held in trust by

the named grantees"). Rather, that court analyzed the controversy under contract law, concluding that an agreement limiting the right to partition had been created. *Id.* at 532-533.

More to the point, the *Fuhrman* court recognized that the association possessed no right to own property; rather "the property was held by the named grantees" limited by an implied agreement to hold that property for the benefit of future members. *Id.* at 531. This is directly contrary to JUA, which holds property under its own name and members possess no rights to any assets.[5]

### 3. The JUA's novel theory that it is now a trust also finds no support in the law.

The JUA next argues—for the first time—that "creation of JUA amounted to creation of a 'trust'[.]" JUA Br. at 48. The JUA did not argue that it was created as a trust in its briefs below[6] and the district court did not hold it to be a trust. And for good reason: This novel claim is without any basis in the record. As has long been recognized, the creation of a trust requires a "definite, clear and explicit"

---

[5]     JUA's citation to *In re Pittsburg Wagon Works' Estate*, 54 A. 316 (Pa. 1903) is equally misplaced. In that case, the association held property "in the name of the trustee," because as an unincorporated association, it was incapable of owning property under its own name.

[6]     *See* brief in support of SJ, 17-cv-2041 doc. no. 68; brief in opposition to SJ, 17-cv-2041 doc. no. 75; reply brief, 17-cv-2041 doc. no 81; brief in support of SJ, 18-cv-1308 doc. no. 40; brief in opposition to SJ, 18-cv-1308 doc. no. 54.

declaration of intention to, at minimum, impose enforceable duties upon a trustee on behalf of a beneficiary. *Brubaker v. Lauver*, 185 A. 848, 849 (Pa. 1936). Nowhere in the Malpractice Act, MCARE, or the JUA's plans of operations is any language establishing the JUA as a trust.[7]

### 4. The JUA's alternative theory that its private status can be found in the language to the Malpractice Act, making it akin to a unit owner's association, is just as meritless.

The JUA then argues that the Malpractice Act's authorization of the Commissioner to form and operate "bureaus and other legal entities" to carry out the objectives of the act indicates that the General Assembly sought to create a legal entity "separate and apart from the Insurance Department . . . ." JUA Br. at 48-49. However, use of the adjective "other" does not denote creation of a private

---

[7] To the extent the JUA now argues that it is a trust because it pursues a charitable purpose, this argument is unhelpful to its position. Although 15 Pa.C.S.A. § 9115—which was not in existence at the time of the JUA's creation—permits "[e]very nonprofit association organized for a charitable purpose" to hold property "in trust, for the purpose or purposes set forth in its governing principles." under Pennsylvania law, "[p]roperty given to a charity is in a measure public property . . . and the beneficiary of charitable trusts is the general public to whom the social and economic benefits of the trusts accrue." *In re Milton Hershey Sch. Tr.*, 807 A.2d 324, 330 (Pa. Cmwlth. 2002) (citing *McKee Estate*, 108 A.2d 214 (Pa. 1954); *In re Pruner's Estate*, 136 A.2d 107, 110 (Pa. 1957)). Accordingly, when a charitable trust's purpose becomes "unlawful, impracticable, or wasteful," courts apply the Doctrine of *Cy Pres* to redirect the charitable assets to an entity best fulfilling the original purpose. 20 Pa.C.S.A. § 7740.3(a)

The General Assembly, through the passage of Act 41 of 2018, seeks to make the Commonwealth the sole malpractice insurer of last resorts. The JUA's nonprofit purpose has therefore become impracticable. Under *Cy Pres*, its assets would be transferred to the Commonwealth.

entity. The use of the conjunctive phrase "and other" connects the first noun ("bureaus") with the second ("legal entities"), indicating that both are of the same class. The creation of the JUA as an instrumentality of the plan to provide affordable malpractice insurance to Pennsylvania doctors makes JUA no more of a private entity than would have creation of a bureau to the same effect.

The JUA next equates itself to a unit owners' association, JUA Br. at 49-50, an entity authorized to exist in 1996 by the Uniform Planned Community Act, Act 1996-180, Dec. 19, P.L. 1336, No. 180, § 1. *See* 68 Pa.C.S.A. §§ 5301-5302. JUA misses the point. Unlike a unit owner's association founded after 1996, the JUA possessed no independent statutory or common law authorization to exist when it was created. As even it recognizes, its existence was wholly authorized by the Malpractice Act, and thereafter, MCARE. But nothing in these statutes grants the JUA private rights or status. And unlike a naturally born person, the JUA was not born with inherent rights; "[b]eing the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) (quoting *Dartmouth*, 17 U.S. 518).

As the district court acknowledges, it is an "unremarkable maxim" that "'ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates.'" A30 n.7 (JUA at 20) (quoting *Hess v.*

10

*Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994)). The Commonwealth created the JUA as an entity that could not exist outside the authority of the "plan" the Commissioner was directed to establish and implement by the Malpractice Act. It is a creature of the state.

### 5. The JUA is a governmental instrumentality created long before the Unincorporated Association Law was enacted.

The JUA next argues that it falls under the Unincorporated Association Law. JUA Br. at 50-51. This law, however, was not in place in 1975 when the JUA was created or reestablished by MCARE, and therefore cannot speak to whether the JUA was established as a governmental instrumentality or private organization.[8] Further, nothing in this law transforms a governmental instrumentality into a private entity after the fact. Quite the reverse.

---

[8] The JUA states that the General Associations Act of 1988, Act of Oct. 1, 1988, P.L. 1444, No. 177, permitted an unincorporated association to have an independent legal existence based upon its organic documents. JUA Br. at 49, fn. 10. This is not correct. The General Association Act provided no legal status for unincorporated associations, only that, "[e]xcept as otherwise provided by statute or by the organic documents under which an unincorporated association is constituted," unincorporated associations should be "*governed* by customary usages and principles of parliamentary law and procedure." 15 Pa.C.S.A. § 9101 (repealed) (emphasis added).

In other words, this statute provided how association should be governed, not enable associations to grant themselves legal status by drafting organic documents. *See e.g. Krumbine*, 663 A.2d at 161 ("no Pennsylvania statute authorize[d] an unincorporated association to take title to property in its own name . . ."). This is why passage of the Unincorporated Associations Act was necessary.

Title 15—within which the Unincorporated Associations Law resides—specifically excludes from its definition of "Association" any "governmental subdivision, agency or instrumentality." 15 Pa.C.S.A. § 102. The JUA is a governmental instrumentality; therefore, it is not considered an association by the Unincorporated Association Law.

Moreover, the Unincorporated Association Law's definition of "Nonprofit association," found in 15 Pa.C.S.A. § 9112, defines nonprofit association as "[a]n unincorporated organization consisting of two or more members *joined together under an agreement* . . . for one or more common, nonprofit purposes." *Id.* (emphasis added). It is axiomatic that an agreement requires "mutual assent" by its participants. *Black's Law Dictionary* 78 (9th Ed. 2009). The MCARE Act, which requires certain insurance companies to be members of the JUA in order to sell insurance, is not an agreement—it is a statutory mandate.

The JUA also argues that it fits within the Unincorporated Association Law's definition of "nonprofit association." JUA Br. at 51. That definition, however, specifically excludes any "organization formed under any other statute that governs the organization and operation of unincorporated associations." 15 Pa.C.S.A. § 9112. Because the JUA was formed under prior enabling statutes, which undeniably govern its organization and operation (as a governmental instrumentality), the JUA is not covered by the Unincorporated Association Law.

12

The JUA argues that this provision does not apply to its enabling statutes because those statutes do not exclusively or primarily govern the organization of associations. JUA Br. at 51. Such a reading of the Unincorporated Association Law, however, improperly requires the addition of the words "exclusively" or "primarily" to the definition. *See Commonwealth v. Scolieri,* 813 A.2d 672, 673 (2002) (under Pennsylvania rules of statutory construction, courts "cannot change those words to reflect our own public policy concerns, nor can we edit them based on the supposition that we know what the General Assembly meant to say when it said something different"). The unambiguous language of this statute provides for no such limitation.

The JUA's proposed definition is also at odds with the Committee comments concerning this statute. As explained in the Committee Comment, the Unincorporated Association Law was to provide a legal basis for nonprofits associations with no other express statutory authority. 15 Pa.C.S.A. § 9111 cmt 1. Therefore, the law excludes from coverage entities already recognized elsewhere by law, such as charitable trusts, nonprofit corporations, and "any other type of association organized under statutory law that is authorized to engage in nonprofit activities." *Id.* JUA was organized under statutory law—the MCARE Act—as an instrumentality of the Commonwealth to further its malpractice insurance plan. As an instrumentality, it does not fall under the Unincorporated Association Law.

**6.    The JUA's waiver argument, relying on the out-of-context reading of a footnote in a single brief below, is baseless.**

Finally, JUA argues waiver. This argument warrants only brief discussion. The Executive Appellants argued below, as it does on appeal, that the Malpractice Act created the JUA as a governmental instrumentality, SA 10, 12-13, and that use of the phrase "joint underwriting association" did not create a private entity distinct from the Commissioner's plan under a different source of law, SA 13 n.3. *See also*, Executive's Brief in Support of SJ, 17-cv-2041 doc. no. 73 at 7-9. This argument has not changed on appeal.

The JUA points to only a single footnote in one of our briefs below to argue that we presented a contrary argument to the district court. JUA Br. at 42. A cursory reading of that footnote in context with the body of the brief, however, reveals that the footnote expounds upon the statement that, even assuming arguendo "Pa. JUA is held to be private," its surplus would still escheat to the Commonwealth. SA 27. This footnote recognizes that, if the JUA were to be held a private entity whose rights arise independently from MCARE, as the district court found, the ultimate fate of its assets would be the same—they would escheat to the Commonwealth either by virtue of the Unincorporated Association Law or 72 P.S. § 1301.2 (Disposition of Abandoned and Unclaimed Property).[9] SA 27 fn. 8.

_____

[9]    Art. XIII.1 § 1301.2 of the Act of April 9, 1929, P.L. 343, No. 176.

Because the JUA is a governmental instrumentality created as an integral component to the Commissioner's malpractice insurance plan, however, it derived its authority to operate from the Malpractice Act, and thereafter the MCARE Act, not the Unincorporated Association Law—with postdated the JUA's creation by decades.

We have been consistent on this point throughout this extended litigation. It is, after all, an accurate description of the law.

## B.     The JUA Did Not "Acquire" Constitutional Rights.

Wisely abandoning the district court's ahistorical reading of the law, the JUA instead contends that, somewhere along the way, it "acquired the right to protection from uncompensated takings." JUA Br. at 31. The JUA is not entirely clear on when this acquisition occurred. As the General Assembly correctly points out in their reply brief, "the notion that the Commonwealth can 'lose' its control" over a state entity "contradicts everything we know about state dominion over statutory creations . . . ." GA Reply Br. at 5 (citing *Commonwealth v. McCombs*, 56 Pa. 436, 439 (1867)).

Additionally, implicit in the JUA's argument is the concession that the Commonwealth never conferred any private rights to the JUA through the enabling statutes. This concession is dispositive.

For at least two centuries, our law distinguished between creatures of the state and private entities. In *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819), the Supreme Court announced that creatures of the state are "instruments of government, created for its purposes," *id.* at 638, whereas private entities are the "offspring of [private] will and pleasure," *id.* at 661 (Washington, J., concurring). We agree with the General Assembly that the proper analysis is, therefore, two-fold:

> Under *Dartmouth*, a court must ask two foundational questions. First, did the state <u>create</u> the entity in question to serve a public purpose? Second, does the state's action infringe on any private (*i.e.*, non-state) interest? Where the answer to the first question is "yes" and the second "no," no federal constitutional claim can stand.

GA Opening Br. at 23-24 (emphasis in original).

**1.    The Commonwealth created the JUA to serve a specific public purpose. The JUA is not akin to a private insurance company in either its creation or form.**

As to the first point, it is undisputed that the JUA was created by the General Assembly "in response to a medical malpractice insurance crisis in the Commonwealth." A115 (JUA II at 24). The JUA is the offspring of the Commonwealth's will and pleasure, created to further a public purpose not being met by the private insurance market. But the district court went further, concluding that the General Assembly "relinquished near-total control" of the JUA, rendering it akin to "a private insurance company." A115, A121 (JUA II at 24, 30). This,

16

both the district court and the JUA argue, granted it private rights under the Federal Constitution.

But if one ignores who created an entity and for what purpose, one can cherry-pick aspects to suggest any status. But that requires us to ignore reality. This demonstrates the problem with the district court's invented "holistic" approach to Fifth Amendment jurisprudence. The correct analysis, rather, is whether the State created the entity in question (as opposed to merely establishing the legal framework for private individuals to create the entity) to serve a public purpose. *Dartmouth*, 17 U.S. at 638 (a state's right to change a public corporation "is not founded on their being incorporated, but on their being the instrument of government, created for its purposes"). Under this correct analysis, the JUA is undeniably a governmental entity, as it was specifically designed and created by the General Assembly to serve its own very specific public purpose. In this most fundamental way, it is unlike any private corporation or organization. Accordingly, the Commonwealth's day-to-day control of the JUA is irrelevant to the *Dartmouth* analysis. Even if the JUA possessed all of the outwardly appearances of a private insurance company, its core identity (i.e. who created it and for what purpose) is that of a state instrumentality.

Further, JUA is very different from a private insurance company. Unlike a private insurer, JUA is authorized to write only a single type of insurance—

medical professional liability insurance—only in Pennsylvania, and only for providers that cannot get insurance in the private market. 40 P.S. § 1303.732. Unlike a private insurer, the MCARE Act requires the JUA to provide professional liability insurance under extremely generous terms. The JUA must provide coverage that: (1) is conveniently and expeditiously available to all health care providers; (2) is subject only to the payment of premiums; (3) provides reasonable means for the health care providers it insures to transfer to the ordinary insurance market (thus losing them business); (4) provide sufficient coverage for a health care provider to satisfy its insurance requirements on reasonable terms; and (5) permits a health care provider to finance its premium or allows installment payment of premiums subject to customary terms and conditions. 40 P.S. § 1303.732(b). The JUA engages in no marketing of its services, its members are compelled by law to join, it must have a plan of operations, the Commissioner must approve that plan, and it cannot borrow any funds to cover deficits without the Commissioner's authorization. 40 P.S. §§ 1303.731, 733(a); A1560 (Sersha Depo. at 321).

As we discussed in our opening brief, the JUA is also "supervised" by the Commissioner, 40 P.S. § 1303.731, whereas private insurance companies are merely regulated by her. Br. at 28-29. The JUA takes umbrage with this distinction, arguing that the Commissioner also supervises financially distressed

private insurance companies. JUA Br. at 51. This, of course, is the point. The Commissioner's level of supervisory control over the JUA is abnormally high for a non-failing insurance provider. It is a level otherwise reserved for ailing insurers that the Commonwealth may ultimately have to take over.

Supervision is not coterminous with regulation. And the JUA's citation to the title insurance industry proves this point. The JUA cites to 40 P.S. § 59, JUA Br. at 52, fn. 11, which provides that "[t]he Insurance Department shall have the power and duty to supervise, examine, and regulate" all title insurance companies. Basic principles of statutory construction dictate "that every word in a statute has meaning and [courts should] avoid interpreting one part of a statute in a manner that renders another part superfluous." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008). If supervision and regulation were coterminous terms, as JUA argues, the use of both in this statute would be redundant.[10]

To be clear, we are not arguing that when the Commission supervises an ailing insurer, that insurer loses its status as a private company. An insurer created by private individuals, who own property interest in its shares, for the private purpose of wealth generation, does not transform into a creature of the state by

---

[10]     JUA also cites to 40 P.S. § 911. JUA Br. at 52, fn. 12. That statute, however, is entitled "Licensing of foreign companies" and does not mention supervision.

19

virtue of the Commissioner's supervisory authority. Likewise, the JUA, a coerced assembly of companies possessing no interest in its assets, created by the General Assembly for a wholly public purpose, does not transform into a private entity by virtue of a lack of total governmental control over daily operations.

The JUA argues that supervisory and approval power "do[ ] not amount to limitless state control . . . ." JUA Br. at 53. Nor should it have to. The Commonwealth does not possess unlimited control over many creatures of the state, such its counties, towns, and independent agencies. For example, the Governor lacks authority to remove the Executive Director of the Office of Open Records at-will. *Arneson v. Wolf*, 124 A.3d 1225 (Pa. 2015). That does not transform that public office into a private entity.

### 2. Acts 44 and 41 do not infringe upon any non-state interests, as its members have no rights to its assets. The JUA's argument that its members have a "reputational" interest in the surplus fund is at war with reality.

As to the second prong, no private rights are implicated by the Commonwealth's decision to amend its medical malpractice insurance regulatory structure, and by doing away with the JUA to make the Commonwealth the insurer of last resorts for this particular type of insurance. Members do not pay any money into the JUA, and it does not pay its members dividends, profits, or any revenue. A1307 (Sersha Depo. 68:8-19); A2359 (Joint Statement of Facts §§ 47-48). Members' only participation with the JUA is voting for board members, voting on

changes to the plan, and offering advice. A1307-09 (Sersha Depo. 68:25-70:23); A1310-1311 (Sersha Depo. 71:10-72:11).

The JUA argues that its members' interests are implicated because any decrease in its reserve fund increases the likelihood that they may be assessed should the JUA run a deficit. This argument fails for two reasons.

*First*, as we discuss in our opening brief, the JUA has no authority to assess its members. Br. at 31-32. Nothing in the MCARE Act provides the JUA with authority to assess its members, regardless of what its plans of operations currently provides. This was conceded by its president. A.1318 (Sersha Depo. 79:6-18) ("We don't believe that we have statutory power to assess the members").[11]

*Second*, even if assessment was authorized, it no longer matters. Act 41 of 2018 requires the Commonwealth to absorb all claims and liabilities arising out of

---

[11] Later in her deposition, the president testified that, based upon language in its plans of operations, the JUA might "theoretically" be able to assess its members. A.1471. The JUA selectively quotes this testimony out of all meaningful context. The full discussion demonstrates that, when first asked if the JUA could assess its members, its president stated that "We never intend to do it." A.1470. When asked under what circumstances the JUA might assess, she again answered "We most likely would not." *Id.* When shown that the plan of operations provides for assessment, JUA's president answered: "And you are aware that the insurance department has told us to remove that." *Id.* Finally when pressed yet again, she speculated that it "theoretically" might be able to assess its members, stressing the word "theoretically." A1471. As JUA's president clearly recognized through her testimony, the JUA lacks both the statutory authority and willingness to assess its members. At best, this creates a dispute of fact, which must be resolved in favor of the nonmoving parties—the Appellants. Fed. R. Civ. P. 56(a).

JUA policies. 40 P.S. § 323.11-A(c)(2). The Commonwealth has become the JUA's surplus fund. Accordingly, JUA's members will never again have to worry about the possibility of assessments due to a diminished surplus fund.

The JUA alternatively argues that its members possess a unique "reputational" interest in "providing malpractice insurance to health care providers who would normally be unable to obtain such insurance, thereby minimizing public criticism of the industry." JUA Br. at 55-56; 60. This argument is too cute by half.

*First,* with minor exceptions, Pennsylvania health care providers are required to purchase medical malpractice insurance. 40 P.S. § 1303.711. And even if the law did not require coverage, any physician would be a fool to practice medicine without insurance. Collectively, the JUA's members sell an indispensable product. For both legal and practical reasons, health care providers must purchase coverage, regardless of the insurance industry's reputation.

*Second*, if the JUA's members were worried about their reputation, they would not make malpractice insurance policies unaffordable to certain health care providers. The Commonwealth created the JUA in 1975 precisely because the private insurers were not providing the coverage necessary to support Pennsylvania's health care industry. Further, if this speculative reputational concern was sufficient to grant members a pecuniary interest in the entity, it would

consume the rule, rendering any association a private entity. This is not the law. *See e.g. Arroyo-Nekecui v, Puerto Rican American Ins. Co.*, 398 F.3d 56, 62 (1st Cir. 2005); *Medical Malpractice Ins. Ass'n v. Superintendent of Ins.*, 72 N.Y.2d 753 (1988).

The JUA also argues that the Commonwealth has no interest in public criticism of the insurance industry. *Id.* This is incorrect. The Commonwealth is very concerned with health care providers not being able to obtain insurance, which is why it created the malpractice insurance regulatory regime—of which the JUA is an integral part—in the first instance. *See* 40 P.S. §§ 1301.102 (repealed) (Malpractice Act). Moreover, even if providing doctors with malpractice coverage is an interest possessed only by JUA's members (who are not part of this suit) and not an interest shared by the public generally (which it certainly is), Act 41 furthers this goal through modernizing the medical malpractice regulatory regime, and by making the Commonwealth responsible for JUA's policy liabilities. The Commonwealth's backing of JUA's policies will increase public confidence and the reputation of the industry as a whole.

## C. The District Court's Rulings Violate the Principles of Federalism by Inhibiting the General Assembly's Ability to Repeal its Own Law.

In arguing that the district court's decisions do not offend federalism, the JUA states that "the General Assembly could repel that part of the MCARE Act that requires it to provide medical professional liability insurance to providers who

face difficulties procuring it[.]" JUA Br. at 61. This apparent recognition of the General Assembly's broad powers to enact, amend, and repeal its own legislation is half-hearted. Notably absent from this concession is the equally true statement that the General Assembly can repeal 40 P.S. § 1303.731, removing the JUA's statutory authority to exist. When the General Assembly attempted to do precisely this, the JUA sought—and was granted—an injunction of those portions of the laws that would have repealed Subchapter C of MCARE. *See* A10 (JUA I Order enjoining not only the transfer of funds, but also the sunset provision).

The JUA accuses the Commonwealth of attempting to "steal[ ]" its assets. JUA Br. at 62. But those assets have never been its own. As we discuss above, they are public monies held by a governmental instrumentality. As JUA concedes, the General Assembly has broad authority to make the Department or some other entity the insurer of last resorts. JUA Br. at 61-62. And the Commissioner has the broad authority to reject any attempt by JUA to amend its plan of operations and smuggle its assets to a different purpose. 40 P.S. § 1303.731(b)(1).

The General Assembly found that the need for the type of insurance offered by JUA has decreased. 40 P.S. § 323.1-A(1). Because of this, there exists "a need to modernize the [JUA] in order to produce needed economical and administrative efficiencies[,]" requiring that the JUA be placed within the Department of Insurance. 40 P.S. § 323.1-A(1), (3). For the principles of federalism to have any

substance, States must be permitted to act "as laboratories for devising solutions to difficult legal problems." *See Oregon v. Ice*, 555 U.S. 160, 170 (2009) (internal citations omitted). And for state sovereignty to have any meaning, States must have the authority to repeal and amend their own statutes. *See Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 539 (1982) (if federal courts "[w]ere we to hold that the mere repeal [of a statute] is unconstitutional, we would limit seriously the authority of States to deal with [ ] problems . . .").

The district court's rulings inhibit the Commonwealth's ability to repeal or amend its own laws. These rulings have serious federalism implications and should be reversed.

# CONCLUSION

For these reasons, the Court should reverse the judgments of the district court.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By: */s/ Sean A. Kirkpatrick*

SEAN A. KIRKPATRICK
Senior Deputy Attorney General
Bar No. 92960 (Pa.)

J. BART DeLONE
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 705-2331
FAX:   (717) 772-4526

DATE: May 30, 2019

# CERTIFICATE OF COUNSEL

I, Sean A. Kirkpatrick, Senior Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 6,163 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

*/s/ Sean A. Kirkpatrick*

SEAN A. KIRKPATRICK
Senior Deputy Attorney General

# CERTIFICATE OF SERVICE

I, Sean A. Kirkpatrick, Senior Deputy Attorney General, do hereby certify

that I have this day served the foregoing Reply Brief For Executive Appellants, via

electronic service, on the following:

Dennis A. Whitaker, Esquire
Kevin J. McKeon, Esquire
Melissa A. Chapaska, Esquire
HAWKE MCKEON SNISCAK & KENNARD, LLP
100 N. Tenth Street
Harrisburg, PA 17101
dawhitaker@hmslegal.com
kjmckeon@hmslegal.com
machapaska@hmslegal.com
(*Counsel for Joint Underwriting Assoc.*)

Karl Myers, Esquire
Jonathan F. Bloom, Esquire
STRADLEY RONON STEVENS & YOUNG
2600 One Commerce Square
Philadelphia, PA 19103
jbloom@stradley.com
(*Counsel for General Assembly Parties*)

Seven copies were also sent by first class mail to the Clerk of the United States

Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

*/s/ Sean A. Kirkpatrick*

SEAN A. KIRKPATRICK
Senior Deputy Attorney General

DATE: May 30, 2019